MICHAEL N. FEUER, SBN 111529
City Attorney
JAMES P. CLARK, SBN 64780
Chief Deputy City Attorney
LEELA A. KAPUR, SBN 125548
Executive Assistant City Attorney
VALERIE L. FLORES, SBN 138572
Managing Senior Assistant City Attorney
MICHAEL DUNDAS, SBN 226930
DANIA MINASSIAN, SBN 198928
Deputy City Attorney
200 North Main Street, City Hall East
Suite 800
Los Angeles, California 90012
james.p.clark@lacity.org
Telephone: (213) 978-8347
Facsimile: (213) 978-8312

MITCHELL A. KAMIN, SBN 202788
NEEMA T. SAHNI, SBN 274240
Covington & Burling LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, California 90067-4643
mkamin@cov.com
Telephone: (424) 332-4800
Facsimile: (424) 332-4749

DAVID M. ZIONTS, *pro hac vice*
application forthcoming
IVANO M. VENTRESCA, *pro hac vice*
application forthcoming
BENJAMIN L. CAVATARO, *pro hac vice* application forthcoming
Covington & Burling LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
dzionts@cov.com
Telephone:  (202) 662-6000
Facsimile:  (202) 662-5987

*Attorneys for Plaintiff City of Los Angeles*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF LOS ANGELES,<br><br>    Plaintiff,<br><br>    v.<br><br>JEFFERSON B. SESSIONS, III, in his official capacity as Attorney General of the United States; LAURA ROGERS, in her official capacity as Acting Principal Deputy Assistant Attorney General of the Office of Justice Programs; UNITED STATES DEPARTMENT OF JUSTICE.<br><br>    Defendants. | Case No.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.     The City of Los Angeles ("Los Angeles" or "City") files this Complaint seeking declaratory and injunctive relief to prevent the United States Department of Justice ("DOJ" or "Department") from unconstitutionally seeking to wield authority it does not have to advance policy objectives it cannot lawfully effectuate in such a manner—all at the expense of public safety and community trust in Los Angeles and other communities.

2.     Numerous courts nationwide already have enjoined DOJ from using federal funding to punish jurisdictions like Los Angeles for refusing to abandon their successful community policing practices—built on engendering community trust—to instead assist in the civil immigration enforcement policy of the Trump Administration.

3.     The federal funds at issue in this Complaint are Fiscal Year ("FY") 2018 Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG") funds.  34 U.S.C. § 10152(a)(1).  Congress established the Byrne JAG Program specifically to make grants "for use by the State or unit of local government" in order to provide "additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice."  *Id.* § 10152(a)(1).  Byrne JAG grants are awarded through a statutory formula based on population and rate of violent crime.  They are administered by a component of DOJ, the Bureau of Justice Assistance ("BJA") within DOJ's Office of Justice Programs.

4.     Nothing in the Byrne JAG legislation that Congress enacted permits BJA to condition grant funding on a local jurisdiction's willingness to engage in federal civil immigration enforcement.  To the contrary, such conditions are antithetical to the purpose for which Congress created the funding program—that is, to support local criminal justice programs.

5.      The FY 2018 Byrne JAG grant application released by DOJ flouts the rationale of an earlier ruling by this Court in a case involving a different federal grant program related to community-oriented policing,[1] as well as rulings involving the FY 2017 Byrne JAG grant issued by the United States Court of Appeals for the Seventh Circuit and federal district courts in Chicago and Philadelphia.

6.      Four conditions on the FY 2018 Byrne JAG grant are materially identical to the conditions on the FY 2017 Byrne JAG grants that have been enjoined by the courts. Those conditions require States and localities to: (1) comply with 8 U.S.C. § 1373, which provides that States and localities "may not prohibit, or in any way restrict" government entities and officials from "sending to, or receiving from" the United States Department of Homeland Security ("DHS") information "regarding the citizenship or immigration status, lawful or unlawful, of any individual"; (2) comply with 8 U.S.C. § 1644, which provides that no States and localities "may be prohibited, or in any way restricted" from "sending to or receiving from" DHS "the immigration status, lawful or unlawful, of an alien in the United States"; (3) provide 48 hours' advance notice to DHS, "where feasible" and when requested, before releasing an alien from state or local custody; and (4) provide DHS agents with "access to any correctional facility in order to meet with an alien (or an individual believed to be an alien) and inquire as to his right to be or remain in the United States."  Although it did not make this argument in defending the materially identical conditions on the FY 2017 Byrne JAG grants, DOJ suggests that compliance

[1] Plaintiff here, the City of Los Angeles, previously filed a lawsuit in this District Court challenging FY 2017 Byrne JAG grant conditions, along with conditions on the FY 2017 Community Oriented Policing Services ("COPS") Hiring Program grant, in *City of Los Angeles v. Sessions,* Case No. 2:17-cv-07215-R-JCx.  The Court granted the City's Motion for Summary Judgment against the immigration-related conditions on the COPS grant causes of action and permanently enjoined DOJ from imposing those conditions in future COPS grant cycles. *City of Los Angeles v. Sessions*, 293 F. Supp. 3d 1087 (C.D. Cal. 2018), *appeal pending*.  The motion by Los Angeles for a preliminary injunction against similar conditions in the FY 2017 Byrne JAG grant is currently pending.

with the third and fourth conditions relating to "Notice" and "Access" is required under various statutory provisions of the INA.

7.    In addition to re-imposing those conditions for the FY 2018 Byrne JAG application that have previously been enjoined for FY 2017 Byrne JAG grants, the Department of Justice adds new and equally unlawful conditions, mandatory certifications, and a questionnaire, all of which seek to deny funds to jurisdictions like Los Angeles that use their funds and resources for local criminal justice programs rather than to participate in federal civil immigration enforcement.

8.    The immigration-related conditions, questions, and certifications permeate DOJ's FY 2018 Byrne JAG grant solicitation and are facially unconstitutional and otherwise unlawful for a number of reasons.

9.    *First*, the immigration-related conditions, questions, and certifications violate the constitutional doctrine of separation of powers.  The constitutional authority to spend federal government money, and to attach reasonable and lawful terms and conditions to the receipt of federal funds, belongs to Congress, not the Executive Branch. DOJ, as an agency of the Executive Branch, may not unilaterally impose terms on federal grants to States and local governments in the absence of a specific and unambiguous authorization from Congress, which has not occurred with respect to the immigration-related conditions DOJ seeks to attach to FY 2018 Byrne JAG grants.  On this basis alone, the new Byrne JAG funding conditions violate the Constitution.

10.    DOJ's actions also offend the basic separation of powers principle that an Executive Branch agency has no power to act unless Congress has delegated authority to it.  *See City & Cty. of San Francisco v. Trump*, Nos. 17-17478, 17-17480, 2018 WL 3637911, at *4-5 (9th Cir. Aug. 1, 2018) (holding that the Executive Order conditioning all federal funding on compliance with 8 U.S.C. § 1373 is an unlawful attempt by the Trump Administration to "coopt" for itself Congress's exclusive spending power).

11.    DOJ's FY 2018 immigration-related conditions are not authorized by, and indeed are incompatible with, the statute Congress enacted establishing the Byrne JAG

Program because the conditions cannot be reconciled with Congress's directive that funds be allocated through an explicit funding formula involving only two factors: population and rates of violent crime. DOJ's conditions also undermine Congress's express directive that Byrne JAG funds be used only to provide seven types of support for criminal justice, through eight types of specified criminal justice programs. DOJ's conditions would redirect those funds to State and local law enforcement agencies that participate in federal civil immigration enforcement. Multiple courts have found specifically that DOJ's efforts to impose immigration-related conditions on Byrne JAG grants "violate the separation of powers doctrine and are *ultra vires*." *City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 943 (N.D. Ill. 2017); *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 659 (E.D. Pa. 2017); *City of Chicago v. Sessions*, 888 F.3d 272, 293 (7th Cir. 2018); *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 321, 331 (E.D. Pa. 2018); *City of Chicago v. Sessions*, No. 17 C 5720, 2018 WL 3608564, at *13 (N.D. Ill. July 27, 2018).

12.    DOJ cannot mount an end-run around these court rulings by now claiming that the same unconstitutional conditions are related to inapplicable statutes. As part of the Byrne JAG application, an applicant must certify that it "will comply with all provisions of this part and all other *applicable* Federal laws." 34 U.S.C. § 10153(a)(5)(D) (emphasis added). The federal laws in which DOJ purports to ground its immigration-related conditions are not "applicable" laws under that provision. They have no relevance to the local criminal justice subject matter of the Byrne JAG program. Moreover, they are not valid federal laws, as they are either facially unconstitutional or unconstitutional as DOJ seeks to interpret and apply them here.

13.    The FY 2018 Byrne JAG application also contravenes Congress's statutory mandate in 34 U.S.C. § 10228 prohibiting DOJ's use of the Byrne JAG statute to "exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof."

14.     *Second*, even if the FY 2018 solicitation's immigration-related conditions had been imposed by Congress rather than DOJ, they would be unconstitutional under the Spending Clause and Tenth Amendment to the United States Constitution, which limit the power of the federal government to restrict federal funding for the States (and their municipalities) based on matters of law and policy that are properly reserved to the States.

15.     When Congress attaches new terms to federal funds, it must meet several requirements to ensure that it is not abusing its spending power to improperly regulate State and local officials.  Under the Spending Clause, terms that Congress imposes on use of federal funds by a State or local government must be unambiguous and sufficiently related to the purpose of those federal funds.  Congress created the Byrne JAG Program for the express purpose of funding local criminal justice efforts through statutorily-specified types of support and programs.  DOJ's immigration-related conditions do not relate to that purpose or to the types of support and programs listed in the statute.  Rather, DOJ is attempting to use the Byrne JAG grant to reward localities that participate in federal civil immigration enforcement, and punish those that do not.  In addition, certain of the conditions included in the FY 2018 Byrne JAG solicitation are so ambiguous as to make it difficult for Los Angeles to ascertain what is expected of it.

16.     *Third*, the conditions and certifications in the FY 2018 Byrne JAG grant application are a clear indication that DOJ unconstitutionally seeks to commandeer local police agencies to enforce federal civil immigration laws, in violation of the Tenth Amendment, confirmed by the recent U.S. Supreme Court decision in *Murphy v. NCAA,* 138 S. Ct. 1461, 1477 (2018) ("The Federal Government may not command [either in the affirmative or through prohibitive language] the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." (citation omitted)).  Specifically, the FY 2018 Byrne JAG application requires as a condition to receiving funds that the Los Angeles Mayor and City Attorney certify compliance with 8 U.S.C. §§ 1373 and 1644.  Both statutes violate the Tenth Amendment by giving direct orders to

State and local governments.  *See id.* at 1476;  *see also Philadelphia*, 309 F. Supp. 3d at 331 (holding Section 1373 unconstitutional under the anticommandeering doctrine); *Chicago*, 2018 WL 3608564, at *13 (same); *United States v. California*, No. 2:18-cv-490-JAM-KJN, 2018 WL 3301414, at *14 (E.D. Cal. July 5, 2018) (stating that the constitutionality of Section 1373 is "highly suspect").

17.    In addition, DOJ requires, as a condition for receiving FY 2018 Byrne JAG funds, that top Los Angeles elected officials certify that they will not "violate, or aid or abet" any violation of 8 U.S.C. § 1324(a) (forbidding knowing "conceal[ing]", harbor[ing], or shield[ing] from detection" of an alien), or "impede" the exercise of authority of federal agents under a number of federal statutes including 8 U.S.C §§ 1226(a),(c), 1231(a)(4), 1357(a)(1), and 1366(1),(3).  But those statutes do not concern States or localities and thus have no bearing here.  DOJ's apparent interpretations of those provisions as imposing mandates on State and local governments is an unconstitutional effort to commandeer those States and localities to participate in federal civil immigration enforcement.  *See Chicago*, 888 F.3d at 282; *California*, 2018 WL 3301414, at *19-20.

18.    These requirements are especially disturbing because they do not exist in a vacuum.  High-ranking members of the Trump Administration have publicly proposed arresting local elected officials in jurisdictions that decline to participate in federal civil immigration enforcement.  In imposing its "Harboring Condition," the Justice Department now appears to share the extraordinary view that a State or local government's unwillingness to be commandeered into participating in federal civil immigration enforcement may be a federal crime.

19.    In short, the required certifications put elected officials in Los Angeles in the unsustainable position of either: (1) certifying compliance with statutes that are not applicable and could not constitutionally be applicable to the City, and undermining the Los Angeles Police Department's ("LAPD") relationship with the immigrant community

and threatening public safety; or (2) forfeiting FY 2018 Byrne JAG funding used to support local criminal justice efforts through combating gangs and violent crime.

20.     **Fourth**, the FY 2018 conditions on grant recipients violate the Administrative Procedure Act ("APA") because, in promulgating the new conditions, DOJ did not rely on any analysis or findings to support the implicit premise that individuals whom DHS believes may be unlawfully present in the United States commit more crime than do individuals legally resident in the country, and in fact failed to consider the substantial evidence to the contrary. For this reason, DOJ's attempt to attach the immigration-related conditions to the Byrne JAG grant is arbitrary and capricious in violation of the APA.

21.     In short, DOJ's unilateral and unauthorized attempt to hold hostage federal funding that Congress authorized to support State and local criminal justice programs, and to instead cause State and local agencies to assist with federal civil immigration enforcement, is unconstitutional and unlawful, and cannot be allowed to stand. Los Angeles seeks injunctive relief to ensure that DOJ does not evade constitutional restraints, Congressional intent, and judicial rulings protecting federal funding for State and local law enforcement criminal justice efforts.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346. The Court also has authority to award the relief requested pursuant to 5 U.S.C. §§ 702, 705, 706, and 28 U.S.C. §§ 2201–2202.

23.     Venue is proper in this District under 28 U.S.C. § 1391(e) because Plaintiff resides in this District and a substantial part of the events or omissions giving rise to this action occurred in this District.

## PARTIES

24.     Plaintiff Los Angeles is a municipal corporation organized and existing under the laws of the State of California, and is a charter city pursuant to Article XI of the California Constitution.

25.     Defendant Jefferson B. Sessions, III is the Attorney General of the United States.  The Attorney General is charged with the administration and enforcement of federal criminal law and policy, and oversees the U.S. Department of Justice, which administers the Byrne JAG Program.  Defendant Sessions has supervisory responsibility and is sued in his official capacity.

26.     Defendant U.S. Department of Justice is an agency of the United States. The Bureau of Justice Assistance ("BJA") is a component of the Office of Justice Programs of DOJ ("OJP").  BJA's stated mission is "to provide leadership and services in grant administration and criminal justice policy development to support local, state, and tribal justice strategies to achieve safer communities."  BJA administers the Byrne JAG Program.

27.     Defendant Laura Rogers is Acting Principal Deputy Assistant Attorney General of OJP at DOJ and oversees BJA.  Defendant Rogers has supervisory responsibility and is sued in her official capacity.

## FACTUAL ALLEGATIONS

### A.     Policies and Practices of the City of Los Angeles' Police Department

28.     For nearly four decades, LAPD has implemented policies and practices designed to promote the public safety of the residents of Los Angeles by engendering cooperation and trust between its law enforcement agencies and officers on the one hand, and members of the City's many immigrant communities on the other.  The fundamental goal of these local policies and practices has been to encourage crime victims and witnesses of criminal conduct to cooperate with LAPD, irrespective of their immigration status.  The policy is critical to public safety, especially in Los Angeles, given the size of the immigrant population here.  Central to these policies has been the determination by local law enforcement and its civilian overseers to devote local resources to local criminal justice efforts and leave to the federal government the investigation and enforcement of federal civil immigration laws.

29.     For example, in 1979, LAPD began a policy known as "Special Order 40"—adopted by the Los Angeles Board of Police Commissioners and signed by then-Chief of Police Daryl Gates—that restricts an LAPD officer from initiating a police action with the objective of discovering a person's immigration status, and also prohibits arrests based solely on that status.

30.     The policy behind Special Order 40, as expressed by the LAPD Board of Police Commissioners nearly forty years ago, is "the principle that effective law enforcement depends on a high degree of cooperation between the Department and the public it serves."  This policy was adopted to ensure that individuals, regardless of their civil immigration status, would report crimes to the LAPD and assist the LAPD in apprehending and prosecuting those individuals responsible for criminal acts.

31.     The provisions of Special Order 40, which are reflected in various forms in LAPD's existing policies and procedures, are also consistent with current federal and State law, because the policy restricts LAPD's initiating a detention based on an individual's civil immigration status, and arresting an individual for a misdemeanor violation that did not occur in the officer's presence.

32.     The LAPD policies promulgated after Special Order 40 are compliant with existing federal law.  In the 2009 case, *Sturgeon v. Bratton*, the California Court of Appeal rejected a legal challenge to Special Order 40—as set forth in Section 4/264.50 of the LAPD Manual—ruling that the language of the policy does not conflict with 8 U.S.C. § 1373 ("Section 1373"), and is not invalid.  As the Court of Appeal recognized, Section 1373 addresses certain communications between federal and State or local authorities; Special Order 40 does not address that issue, but rather prohibits police officers from initiating police action to determine immigration status and making arrests for illegal entry.  174 Cal. App. 4th 1407 (Cal. Ct. App. 2009).  It has nothing to do with communications between LAPD and federal authorities.

33.     In 2014, LAPD adopted a practice of refusing to detain individuals, otherwise eligible for release from custody under State law, on the basis of requests from

U.S. Immigration and Customs Enforcement ("ICE") unless the requests are supported by a judicial determination of probable cause, or a valid warrant from a judicial officer. This practice was developed in response to judicial decisions declaring compliance with such warrantless ICE requests to be unconstitutional, and thereby subjecting LAPD to potentially significant liability for violations of the Fourth Amendment. *See, e.g.*, *Miranda-Olivares v. Clackamas County*, No. 3:12-cv-02317-ST, 2014 WL 1414305, at *11 (D. Or. Apr. 11, 2014). In addition, this practice supports LAPD's robust community policing strategy focused on preventing crime through community partnerships, collaborative problem solving, and building public trust consistent with the law— essential components to reducing crime and protecting the public from harm.

34.     When a member of LAPD arrests an individual in connection with a criminal offense, the arrestee may be cited and released in the field where circumstances warrant, or taken to one of LAPD's ten jail detention facilities for booking. Those LAPD jail facilities are all categorized by the State of California as Type I facilities, which are local detention facilities used for the temporary, short-term detention of persons who may be held for no more than 96 hours. In practice, persons arrested by members of LAPD generally are kept in LAPD custody for no more than 48 hours after arrest because of the limitations imposed by State law and the Constitution with respect to the period of time within which law enforcement agencies must: 1) obtain a probable cause determination that an arrested individual committed a criminal offense to support the detention of the individual without a warrant; and 2) transfer a detainee to court for arraignment. *See* Cal. Pen. Code § 825; *Cty. of Riverside v. McLaughlin*, 500 U.S. 44 (1991).

35.     In many situations, arrestees are eligible for release from custody within a few hours of arrest and booking, including by posting bail or bond, on their own recognizance, or by a certificate of release.

36.     While arrestees are in LAPD custody, LAPD permits DHS and ICE personnel access to LAPD detention facilities to interview individual arrestees regarding civil immigration status. LAPD does so consistent with the State statutory requirement

that such persons be provided with advance written notice explaining the purpose of the interview, that the interview is voluntary, and that the person may decline to speak or opt to be interviewed only in the presence of his or her attorney. *See* California TRUTH Act, Cal. Gov. Code § 7283 *et seq*. ("California TRUTH Act"). LAPD implements this State law by obtaining a written expression of the arrestee's willingness prior to the interview. If the arrestee declines the interview, LAPD does not provide DHS and ICE personnel access to that individual in its facilities.

**B.     The Edward Byrne Memorial Justice Assistance Grant Program**

37.     Congress established the Byrne JAG Program to make grants "for use by the State or unit of local government" in order to provide seven types of support for criminal justice efforts, *i.e.*, "additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice." 34 U.S.C. § 10152(a)(1). Congress specified that these funds be used "for any one or more of the following programs":

- •     "Law enforcement programs."
- •     "Prosecution and court programs."
- •     "Prevention and education programs."
- •     "Corrections and community corrections programs."
- •     "Drug treatment and enforcement programs."
- •     "Planning, evaluation, and technology improvement programs."
- •     "Crime victim and witness programs (other than compensation)."
- •     "Mental health programs and related law enforcement and corrections programs, including behavioral programs and crisis intervention teams."

*Id.* § 10152(a)(1)(A)-(H).

38.     Byrne JAG funding is administered by BJA within OJP. *See id.* §§ 10151-58. Each fiscal year, BJA provides State and local government awardees with funds that, in general, may be used over a period of four years.

39.     In awarding funds, BJA must follow the congressionally-mandated formula to allocate funds to eligible States and local governments.  By statute, funding is allocated based on two factors: population and rate of violent crime.  The Attorney General must allocate 50 percent of the available funds to each State recipient in amounts proportionate to its population and its crime statistics.  *Id.* § 10156(a).  The remaining 50 percent of the funds is allocated to each State recipient in amounts proportionate to its rate of violent crime.  *Id.*  Of the total amount allocated to a State, 60 percent is provided as a direct grant to the State, and 40 percent as grants for local governments in that State.  *Id.* § 10156(b)(2), (d).

40.     Local governments wishing to receive a grant must submit an award application to BJA.  In order to be eligible for an award, Congress specified that an applicant must furnish certain reasonable and grant-specific certifications and assurances related to the application or administration of the grant.  Specifically, Congress enumerated two certifications and three assurances that an applicant must make:

- "A certification that Federal funds made available under this part will not be used to supplant State or local funds, but will be used to increase the amounts of such funds that would, in the absence of Federal funds, be made available for law enforcement activities." *Id.* § 10153(a)(1).

- "An assurance that, not fewer than 30 days before the application (or any amendment to the application) was submitted to the Attorney General, the application (or amendment) was submitted for review to the governing body of the State or unit of local government (or to an organization designated by that governing body)." *Id.* § 10153(a)(2).

- "An assurance that, before the application (or any amendment to the application) was submitted to the Attorney General (A) the application (or amendment) was made public; and (B) an opportunity to comment on the application (or amendment) was provided to citizens and to neighborhood or

community-based organizations, to the extent applicable law or established procedure makes such an opportunity available." *Id.* § 10153(a)(3).

- "An assurance that, for each fiscal year covered by an application, the applicant shall maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require." *Id.* § 10153(a)(4).

- "A certification . . . that (A) the programs to be funded by the grant meet all the requirements of this part; (B) all the information contained in the application is correct; (C) there has been appropriate coordination with affected agencies; and (D) the applicant will comply with all provisions of this part and all other applicable Federal laws." *Id.* § 10153(a)(5).

41.    Byrne JAG applications are accepted through an online program.  In order to complete the application, a representative of the applicant is required to electronically sign a page stating that the applicant will comply with standard "assurances" promulgated by the Office of Management and Budget.  These assurances include that, "throughout the period of performance for the award," "the Applicant will comply with all award requirements."

42.    When BJA approves an application for a Byrne JAG award, BJA requires the recipient to agree to an additional set of "Special Conditions."  These conditions generally relate to the administration of the grant or the use of grant funds.  The "Special Conditions" imposed in Los Angeles' fiscal year FY 2016 grant award (the last year in which Byrne JAG funds were released to Los Angeles) governed various aspects of how the City would be required to administer its Byrne JAG award, such as a "[r]equirement for data on performance and effectiveness under the award," "[r]equirements related to System for Award Management and Unique Entity Identifiers," compliance with civil rights and nondiscrimination regulations in the administration of the award, and reporting of any fraud, waste, and abuse in the award implementation.

**C.    The City of Los Angeles Uses Byrne JAG Funds For Critical Local Criminal Justice Needs**

43.    Each year since 1997 (with the exception of FY 2017, which is currently the subject of a related case pending in this District), the City of Los Angeles has been approved for and received more than $1 million in funding under the Byrne JAG Program (and its predecessor).

44.    In the FY 2016 application cycle, Los Angeles applied for and received approximately $1.8 million in Byrne JAG funding for FY 2016 through FY 2019. Approximately $800,000 of the funding went to the County of Los Angeles as a subgrantee, and $1 million remained with the City.  For FY 2016, Los Angeles received its funding directly from the federal government as part of a formula grant, *see* 34 U.S.C. § 10156(d), not as a distribution from the Byrne JAG funds awarded separately to the State of California.

45.    Byrne JAG funds support important criminal justice programs in Los Angeles.  Specifically, the City's FY 2016 Byrne JAG funds assist in funding its Community Law Enforcement and Recovery ("CLEAR") program, which aims to reduce gang violence in Los Angeles and rehabilitate communities that have experienced significant criminal activity.  Through effective collaboration among several city, county, and state criminal justice agencies, the program targets high-crime areas and promotes community recovery by working closely with special criminal investigative units, an aggressive vertical prosecutorial program, probation and parole officers, youth intervention organizations, and schools.

46.    The CLEAR program has been successful.  In 2014, the CLEAR program areas had 22 percent less gang crime over a three-year period than similar non-CLEAR areas.  For FY 2016, the Byrne JAG funds supported 20 to 30 percent of the salaries for nine Deputy City Attorneys, nine Deputy District Attorneys, and nine Deputy Probation officers related to the CLEAR program.

47.     The City's use of Byrne JAG funds to support the CLEAR program and reduce violent crime advances the core criminal justice mission of the Byrne JAG Program.  The CLEAR program's key to success in reducing violent crime in targeted neighborhoods has been the dedication of various agency assets to the goal of reducing crime in CLEAR sites.  Each CLEAR site includes an operational team made up of representatives from LAPD, the County District Attorney's Office, the City Attorney's Office, and the County Probation Department.  In addition to their focus on reducing crime, the CLEAR team members collaborate with residents within each CLEAR site through the creation of a Community Impact Team.  Community members on the team identify effective community organizations in their CLEAR area, and facilitate a relationship between those organizations and CLEAR team members to secure support from individuals and businesses within the community.

48.     The year-over-year federal funding for the CLEAR program has been a catalyst for turning Los Angeles into a leader on coordinated approaches to seemingly intractable issues related to violent crime in general, and gang-related violence in particular.  The CLEAR model was innovative, and went beyond the traditional methods of criminal suppression.  It combined, in one program, elements which have been copied by numerous other jurisdictions, and are now a common approach to addressing not only gang violence, but violent crimes generally.  These elements, such as vertical prosecution of all cases, regular sharing of best practices from public safety teams in various parts of the City, and community outreach, have significantly informed the creation of other innovative approaches to criminal justice in the City, such as the City Attorney's neighborhood prosecutor program.

49.     The City of Los Angeles has yet to receive its statutorily authorized FY 2017 Byrne JAG funding.  The City has already submitted its application for FY 2018 Byrne JAG funding, in advance of the deadline of August 22, 2018.  If the City of Los Angeles were to be deprived of its statutorily authorized FY 2018 Byrne JAG funding as well, Los Angeles would lose valuable resources needed to enhance its local criminal justice efforts

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

and advance public safety.  Consistent Byrne JAG funding ensures that the CLEAR staff can continue to dedicate their time to their roles within the CLEAR team.  The funding also ensures that the City's continued dedication to cross-agency collaboration will pave the way for future successes and innovations still to come.

### D.   Multiple Courts Have Rejected DOJ's Imposition of Federal Civil Immigration-Related Conditions for FY 2017 Byrne JAG Awards

50.    In the FY 2017 funding cycle, BJA included immigration-related conditions in its solicitation for the FY 2017 Byrne JAG applications.  On August 3, 2017, BJA issued that solicitation for applications from local governments for FY 2017 Byrne JAG grants.  One immigration-related condition in the agency's solicitation stated that applicants were required to certify compliance with Section 1373 in order to qualify for Byrne JAG funding (the "1373 Condition").[2]  The FY 2017 Byrne JAG application would not be considered complete without that certification, which meant jurisdictions that were awarded Byrne JAG funds but that did not complete the 1373 Certification would be prohibited from drawing down grant funds.

51.    Separately, the FY 2017 solicitation stated that the agency's award would include two other, immigration-related conditions.  Those two conditions, referred to below as the "Access Condition" and the "Notice Condition"—as presented in FY 2017 Byrne JAG awards that DOJ has already disbursed—required that "as of the date the recipient accepts [its] award," the recipient must have in place "[a] local ordinance, -rule, -regulation, -policy, or -practice (or an applicable State statute, -rule, -regulation, -policy, or -practice)" that is "designed to ensure" that:

---

[2]  Bureau of Justice Assistance, Office of Justice Programs, U.S. Department of Justice, "Edward Byrne Memorial Justice Assistance Grant Program:  FY 2017 Local Solicitation," *available at* https://www.bja.gov/Funding/JAGLocal17.pdf ("Solicitation").

a. "agents of the United States acting under color of federal law in fact are given access [to] a local-government (or local-government-contracted) correctional facility for the purpose of permitting such agents to meet with individuals who are (or are believed by such agents to be) aliens and to inquire as to such individuals' right to be or remain in the United States" (the "Access Condition"); and

b. "when a local-government (or local-government contracted) correctional facility receives from DHS a formal written request authorized by the Immigration and Nationality Act that seeks advance notice of the scheduled release date and time for a particular alien in such facility, then such facility will honor such request and--as early as practicable (see 'Rules of Construction' incorporated by para. 4.B. of this condition--provide the requested notice to DHS." (the "Notice Condition").

Greenville Award, ¶ 56(1) (emphasis added), attached hereto as Exhibit A.

52.     In addition, the "Rules of Construction" referenced in the Notice Condition stated: "Nothing in this condition shall be understood to authorize or require any recipient, any subrecipient at any tier, any State or local government, or any other entity or individual to maintain (or detain) any individual in custody beyond the date and time the individual would have been released in the absence of this condition." *Id.* ¶¶ 55-56, at Para. 4.B.

53.     The Rules of Construction also stated: "Current DHS practice is ordinarily to request advance notice of scheduled release 'as early as practicable (at least 48 hours, if possible).' (See DHS Form I-247A (3/17)).  In the event that (e.g., in light of the date DHS made such request) the scheduled release date and time for an alien are such as not to permit the advance notice that DHS has requested, it shall not be a violation of this condition to provide only as much advance notice as practicable." *Id.*

54.     The United States Court of Appeals for the Seventh Circuit, as well as federal district courts in Chicago and Philadelphia, held that the Access Condition and the Notice Condition for the FY 2017 Byrne JAG grant were *ultra vires* and violated the separation of powers.  The Chicago and Philadelphia district courts also held that the 1373 Condition was unlawful because 8 U.S.C. § 1373 is unconstitutional.

**E.     DOJ Imposes Conditions, Certifications, and Questions Relating to Federal Civil Immigration Enforcement on the Agency Solicitation for the FY 2018 Byrne JAG Grant Despite Contrary Court Rulings in FY 2017 Byrne JAG Grant Litigation.**

55.     In the FY 2018 Byrne JAG funding solicitation, released on July 20, 2018, BJA doubles-down by: 1) employing new versions of the previously enjoined conditions, newly disguised as requirements purportedly imposed by various preexisting statutes; 2) adding new, unconstitutional conditions; 3) requiring unlawful certifications by the City's Mayor and Chief Legal Officer after implied threats of criminal arrest of local officials in jurisdictions that do not cooperate with federal immigration enforcement; and 4) mandating an informational disclosure relating to civil immigration practices in Los Angeles (collectively referred to as the "Challenged Conditions").

**(1)     The "1373" Condition**

56.     The FY 2018 Byrne JAG grant solicitation imposes conditions on the receipt of an award that would require compliance with an interpretation of various federal statutes which would violate the Tenth Amendment if construed to impose such a requirement.  Not only does DOJ carry over the unconstitutional requirement for agencies

to certify compliance with 8 U.S.C. § 1373,[3] but now also requires agencies to certify compliance with 8 U.S.C. § 1644.[4]

57.    8 U.S.C. § 1373 and 8 U.S.C. § 1644 are not applicable laws because they have no relevance to the local criminal justice subject matter of the Byrne JAG program. Moreover, Section 1373 is not a valid federal law at all, as it violates the Tenth Amendment, as recognized by the *Chicago* and *Philadelphia* district courts.  Section 1644, as applied by DOJ here to impose a mandate on States and local governments, is likewise unconstitutional.  Accordingly, DOJ lacks authority to require Byrne JAG applicants to certify compliance with either statute.  This Court's intervention is required to invalidate these unconstitutional conditions.

### (2)    The Revised "Notice and Access" Conditions.

58.    The FY 2018 Byrne JAG application contains "Notice and Access" conditions that, in substance, are nearly indistinguishable from those that were enjoined by federal courts in Chicago, Philadelphia and Los Angeles.[5]  Specifically, DOJ seeks to condition FY 2018 Byrne JAG funding on a jurisdiction agreeing:

- "[n]ot to impede the exercise of the authority of the federal government under 8 U.S.C. § 12[2]6(a) & (c)" (authorizing federal arrest and detention of certain aliens based on a federal warrant, and providing mandatory federal detention of certain criminal aliens) and 8 U.S.C § 1231(a)(4) (relating to completion of criminal terms of imprisonment prior to removal from the

---

[3] *See Philadelphia*, 309 F. Supp. 3d at 331 (holding Section 1373 unconstitutional under the anticommandeering doctrine); *Chicago*, 2018 WL 3608564, at *13 (same); *see also California*, 2018 WL 3301414, at *14.

[4]  Section 1644 is similar to Section 1373 in that it states no State or local government may be prohibited or restricted "from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States."  8 U.S.C. § 1644.

[5]  *City of Los Angeles v. Sessions*, 293 F. Supp. 3d 1087 (C.D. Cal. 2018)

United States, and exceptions allowing for removal of federal, state, and local nonviolent offenders in some circumstances before completion of prison term).  The Byrne JAG solicitation specifies that recipients are required to do so by providing "(where feasible) at least 48 hours' advance notice to DHS regarding the scheduled release date and time of an alien in the recipient's custody when DHS requests such notice in order to take custody of the alien pursuant to the Immigration and Nationality Act."

- "[n]ot to impede the exercise by DHS agents, 'anywhere in or outside the United States' (8 C.F.R. § 287.5(a)(1)), of their authority under 8 U.S.C. § 1357(a)(1) to 'interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States.'"  The Byrne JAG solicitation specifies that recipients are required to do so by permitting "DHS agents to have access to any correctional facility in order to meet with an alien (or an individual believed to be an alien) and inquire as to his right to be or remain in the United States."[6]

59.     In the face of court orders enjoining as unconstitutional the FY 2017 Notice and Access Conditions, DOJ has shifted its tactics, apparently attempting to justify imposition of these conditions under the Byrne JAG statute's "applicable Federal laws" provision.  *See* 34 U.S.C. § 10153(a)(5)(D) (applicants must comply with "all provisions of this part and all other applicable Federal laws").  But the conditions remain unconstitutional.  The statutes on which DOJ now attempts to rely plainly do not impose any requirement on State and local governments, and construing them to create a mandate on State and local governments to participate in federal civil immigration enforcement

---

[6] *See* FY 2018 Byrne JAG Solicitation ("2018 Solicitation") at 36-37, available at https://www.bja.gov/funding/JAGLocal18.pdf.

would violate the Tenth Amendment. The statutes also have nothing to do with federal grant funding or local criminal justice, the subject of the Byrne JAG program.

60.     The solicitation also provides that "[t]he reasonable costs . . . of complying with these conditions, including honoring any duly authorized requests from DHS that is encompassed by these conditions, will be allowable costs under the award." 2018 Solicitation at 37. This provision would use Byrne JAG grant funds, which Congress expressly designated for support of local criminal justice—to unlawfully *fund* State and local participation in federal civil immigration enforcement.

61.     This Court's intervention is required to invalidate these unlawful conditions.

**(3)   The "Harboring" Condition**

62.     Trump Administration officials have threatened to arrest local officials in so-called "sanctuary" jurisdictions—*i.e.*, jurisdictions the Trump Administration deems to be uncooperative in federal civil immigration enforcement because the jurisdictions prioritize their resources for use to protect the health and safety of their residents and leave to the federal government the enforcement of federal civil immigration laws. In a Homeland Security Oversight meeting, Secretary of Homeland Security Kirstjen Nielsen confirmed that, at her department's request, DOJ is exploring such prosecution of local elected officials under 8 U.S.C. § 1324. Then-Acting Director of U.S. Immigration and Customs Enforcement likewise stated that the Justice Department should "file charges against the sanctuary cities [referring to criminal prosecution of local officials and law enforcement under 8 U.S.C. § 1324]" and "hold back their funding."[7] He stated that "we gotta start charging some of these [sanctuary city] politicians with crimes."[8]

---

[7]  Brandon Conradis, *Trump ICE Pick: Politicians Who Run Sanctuary Cities Should Be Charged With Crimes*, THE HILL, Jan. 2, 2018, http://thehill.com/homenews/administration/367167-trump-ice-pick-politicians-who-run-sanctuary-cities-should-be-charged (quoting interview of then-acting ICE acting Director Thomas Homan with Fox News).

[8]  *Id.*

63.     The Justice Department now appears to share the extraordinary view that a State or local government's unwillingness to be commandeered into participating in federal civil immigration enforcement may be a federal crime.  Specifically, DOJ now conditions a jurisdiction's statutorily-authorized FY 2018 Byrne JAG award on the State or local government's chief official and chief legal advisor certifying, under penalty of perjury, that the jurisdiction agrees:  "Not to violate, or aid or abet any violation of, 8 U.S.C. § 1324(a) (forbidding any 'person,' in 'knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law,' to 'conceal, harbor, or shield from detection, or attempt to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation' or to 'engage in any conspiracy to commit any of the preceding acts'…'or aid or abet the commission of any of the preceding acts')."  As with the revised Notice and Access Conditions, the solicitation provides that "[t]he reasonable costs . . . of complying with" the Harboring Condition is an "allowable cost[] under the award."

64.     The Harboring Condition is unlawful because 8 U.S.C. § 1324 does not require States and local governments to participate in federal civil immigration enforcement, and could not be construed to do so without violating the Tenth Amendment.  The statute also has nothing to do with federal grant funding or local criminal justice.  This Court's intervention is required to invalidate this unlawful condition.

### (4)     The "Questionnaire" Condition

65.     BJA attempts to tether FY 2018 Byrne JAG grant awards to federal civil immigration enforcement by requiring each applicant to provide mandatory responses to civil immigration-related questions.  Those questions are:

- (1)     "Does your jurisdiction have any laws, policies, or practices related to whether, when, or how employees may communicate with DHS or ICE?"

- (2)   "Is your jurisdiction subject to any laws from a superior political entity (e.g., a state law that binds a city) that meet the description in question 1?"  2018 Solicitation at 52.

66.   If the answer to either question is yes, the applicant must provide a copy of each law or policy; describe each practice; and explain how the law, policy, or practice complies with Section 1373.  Because the City of Los Angeles passes through a portion of its Byrne grant monies to other localities, the condition also requires the City to collect this information from its subgrantees.

67.   DOJ notes that responses to the questions "must be provided by the applicant as part of the JAG application" and that an agency "will not be able to access award funds (and its award will include a condition that withholds funds) until it submits these responses."  *Id.* at 28.

68.   The information sought by DOJ is not relevant to the Byrne JAG grant and, in any event, has already been provided by the City to DOJ on multiple occasions in different contexts (although not as a prerequisite to receiving grant funding).  The apparent purpose of the questionnaire is to help DOJ enforce its other unlawful immigration-related conditions.

69.   This Court's intervention is required to invalidate this unlawful condition.

## COUNT ONE
### (Violation of Separation of Powers / Ultra Vires Agency Action)

70.   Los Angeles incorporates and re-alleges each and every allegation contained above as if fully set forth herein.

71.   Defendants' imposition of immigration-related conditions, questionnaires, and certifications on Byrne JAG grant applicants violates constitutional principles of separation of powers and exceeds DOJ's lawful authority.

72.   The Constitution confers the power of the Spending Clause on Congress, not the Executive Branch.  *See* U.S. Const. art. I, § 8, cl. 1.  It is Congress, not an Executive Branch agency, that has the constitutional authority to impose conditions on the receipt of

federal funds, and even that power is subject to limitations such as relatedness and clarity. Defendants here are attempting to wield authority that is vested in Congress, not in DOJ.

73.    Congress specifically directed that Byrne JAG funds be issued as grants "for use by the State or unit of local government" in order to provide seven types of support for local criminal justice efforts—"additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice." 34 U.S.C. § 10152(a)(1).  Congress further enumerated eight types of criminal justice programs appropriate for  funding, such as "[l]aw enforcement programs," "[p]rosecution and court programs," and "[p]revention and education programs." *Id.* § 10152(a)(1)(A)-(H).  Enforcing federal civil immigration laws is not among the enumerated programs.

74.    The programs to which Congress directed Byrne JAG funding do not require inducing State and local support for federal investigations of civil immigration status. Yet, the FY 2018 Byrne JAG application authorizes funding for civil immigration-related programs, and requires all jurisdictions to promise to assist in civil immigration enforcement as a condition of receiving funding.  Accordingly, DOJ has expressly and unlawfully shifted money that Congress appropriated to advance local criminal justice programs away from that clear statutory purpose to fund, instead, federal civil immigration enforcement, in violation of the statute.

75.    Congress specifically recognized when it created the Byrne JAG program that State and local governments maintain the sovereign police power to protect the public health and safety of their residents by providing police departments with the "flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution."  H.R. Rep. No. 109-233, at 89 (2005).  The record shows Congress intended to "lessen the administrative burden of applying for the grants."  *Id.*  DOJ's blatant attempt to syphon monies from locally-driven Byrne JAG funded criminal justice programs, like the City's CLEAR program, into a complex, "one size fits all" effort to

support federal civil immigration enforcement, clearly runs afoul of this congressional enactment and purpose.

76.     The Challenged Conditions are also grossly inconsistent with the funding formula for Byrne JAG grants established in 34 U.S.C. § 10156.  BJA is required, by congressional mandate, to allocate Byrne JAG funds based on a prescribed formula that takes into account a State's population, and the violent crime rates in a given State or locality.  34 U.S.C. § 10156(a), (d).  Congress enumerated specific certifications and assurances the applicant must make to access these funds.  Again, Congress did not include a condition mandating local law enforcement involvement in federal civil immigration enforcement.

77.     The Challenged Conditions also violate an express rule of construction imposed by Congress.  Congress directed that the statute creating the Byrne JAG Program not be construed to authorize DOJ to exercise "any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof."  34 U.S.C. § 10228(a).  The Challenged Conditions do just that, asserting federal control over Los Angeles and its police department in the operation of its detention facilities.

78.     Imposition of the Challenged Conditions also exceeds DOJ's authority under the statutory requirement that the applicant certify it "will comply with all provisions of this part and all other applicable Federal laws."  34 U.S.C. § 10153(a)(5)(D).

79.     **The 1373 Condition**: 8 U.S.C. § 1373 is not an applicable law because it has no relevance to the local criminal justice subject matter of the Byrne JAG program. It is also not a valid federal law, as it violates the Tenth Amendment.  Accordingly, DOJ lacks authority to require Byrne JAG applicants to certify compliance with 8 U.S.C. § 1373.

80.     **The 1644 Condition**: 8 U.S.C. § 1644 is not applicable because it has no relevance to the local criminal justice subject matter of the Byrne JAG program. Moreover, any application of § 1644 to impose a mandate on States and local

governments would violate the Tenth Amendment.  Accordingly, DOJ lacks authority to require Byrne JAG applicants to certify compliance with 8 U.S.C. § 1644.

81.     **The Revised Notice and Access Conditions**: DOJ cannot justify the Notice and Access conditions as it has revised them for the 2018 grant process to require applicants to certify that they do not "impede" federal officials' performance of their duties under 8 U.S.C. §§ 1226(a), (c), 1231(a)(4), and 1357(a)(1).  These provisions do not purport to impose any obligations on States and local governments, and so cannot be applicable Federal laws for which an applicant could be required to certify that it complies.  If these statutes were construed to impose requirements on States and local governments, any such application would violate the Tenth Amendment.  And even if these laws could constitutionally impose obligations on States and local governments, and did in fact do so, they would not be applicable to the local criminal justice subject matter of the Byrne JAG Program.  For all of these reasons, DOJ lacks authority to require Byrne JAG applicants to certify compliance with 8 U.S.C. §§ 1226(a), (c), 1231(a)(4), and 1357(a)(1).

82.     **The Harboring Condition**: 8 U.S.C. § 1324(a)(1)(A)(iii), (v) does not require States and local governments to participate in or assist with federal civil immigration enforcement.  If this statute were construed to impose requirements on States and local governments, any such application would violate the Tenth Amendment. And even if this law could constitutionally impose obligations on States and local governments, and did in fact do so, it would not be applicable to the local criminal justice subject matter of the Byrne JAG Program.  For all of these reasons, DOJ lacks authority to require Byrne JAG applicants to certify compliance with 8 U.S.C. § 1324.

83.     **The Questionnaire Condition**: DOJ has not identified any federal law requiring States and local governments to complete its questionnaire concerning participation in federal civil immigration enforcement.  Accordingly, the requirement of certifying compliance with applicable Federal laws cannot justify imposition of the Questionnaire Condition.

84.     In sum, DOJ is attempting to exercise a power it does not have.  Defendants'
attempt to condition federal funding of local criminal justice programs in cities like Los
Angeles on the willingness of the award grantee to engage in federal civil immigration
enforcement violates the separation of powers enshrined in our Constitution and is *ultra
vires* in violation of the Byrne JAG statute.

## COUNT TWO
### (Violation of the Spending Clause)

85.     Los Angeles incorporates and re-alleges each and every allegation contained
above as if fully set forth herein.

86.     Even if Congress could delegate the constitutional spending power to DOJ to
impose the Challenged Conditions (which it cannot), and even if it had done so (which it
has not), such power would be subject to constitutional restrictions that are not met here.
It is well established that the Spending Clause requires that conditions on providing
federal funds to States and local governments must, *inter alia*, be unambiguous, and be
sufficiently germane to the purpose of the federal funds.  Otherwise, the "condition"
amounts to impermissible regulation and commandeering of States and local
governments, in violation of the Tenth Amendment.  The Challenged Conditions fail both
of these requirements.

87.     Conditions placed on the use by States and localities of federal funds must
be stated unambiguously. "The legitimacy of Congress' power to legislate under the
spending power thus rests on whether the State voluntarily and knowingly accepts" the
conditions, and there can be "no knowing acceptance if a State [or city] . . . is unable to
ascertain what is expected of it." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S.
1, 17 (1981).  It is Congress, not an agency, that must speak clearly in defining the type
of conditions at issue.  But even if DOJ could satisfy this requirement by speaking with
the requisite clarity, it has not done so here.  For instance, the DOJ has not
unambiguously explained what conduct would "impede" the exercise of federal
government authority under 8 U.S.C. § 1266(a) & (c) or § 1231(a)(4), or what it means to

"aid or abet" the "harbor[ing]" of a known alien under 8 U.S.C. § 1324.  Nor has DOJ clearly and unambiguously stated whether the version of the Notice Condition included in its FY 2018 solicitation would require States or localities to detain individuals beyond their scheduled release date.  These ambiguities make it difficult for Los Angeles to ascertain exactly what is expected of it.

88.  Conditions imposed on recipients of federal funding must "bear some relationship to the purpose of the federal spending."  *New York v. United States*, 505 U.S. 144, 167 (1992).  The Challenged Conditions concern federal civil immigration enforcement, which is not sufficiently related—or related at all—to the purpose of the Byrne JAG Program created by Congress specifically to support State and local criminal justice efforts through certain types of support and programs.

**COUNT THREE**
**(Violation of Tenth Amendment and Anticommandeering)**

89.  Los Angeles incorporates and re-alleges each and every allegation contained above as if fully set forth herein.

90.  The Tenth Amendment prohibits the federal government from requiring States and municipalities "to govern according to Congress' instructions."  *New York*, 505 U.S. at 162, or "commanding the States' officers . . . to administer or enforce a federal regulatory program."  *Printz v. United States*, 521 U.S. 898, 935 (1997).  The various federal statutes that DOJ attempts to use to justify the Challenged Conditions are either unconstitutional in violation of the Tenth Amendment on their face, as applied to State and local governments, or as DOJ interprets them to apply to State and local governments.

91.  **The 1373 Condition**: DOJ's interpretation of 8 U.S.C. § 1373 of Title 8 of the United States Code to require State and local governments to participate in federal civil immigration enforcement violates the Tenth Amendment making it unconstitutional on its face.  Section 1373 purports to "unequivocally dictate[ ] what a state legislature may and may not do" by prohibiting States and localities from restricting their employees

from communicating with the federal government about a person's citizenship and immigration status. *See Murphy*, 138 S. Ct. at 1478; *Philadelphia*, 309 F. Supp. 3d at 331; *Chicago*, 2018 WL 3608564, at *10.

92.    **The 1644 Condition**: 8 U.S.C. § 1644 does not impose mandates solely on State and local governments, but to the extent it imposes on States and local governments mandates similar to those imposed by 8 U.S.C. § 1373, it is unconstitutional as applied for the same reasons.

93.    **The Revised Notice and Access Conditions**: 8 U.S.C. §§ 1226(a), (c), 1231(a)(4), and 1357(a)(1) do not purport to impose any obligations on States and local governments.  However, if DOJ were permitted to interpret those statutes to impose an obligation on States and local governments to participate in federal civil immigration enforcement, so as not to impede federal officials' performance of their duties pursuant to these statutes, those statutes would be unconstitutional as applied.

94.    **The Harboring Condition**: 8 U.S.C. § 1324 does not purport to impose any obligations on States and local governments.  However, if DOJ were permitted to interpret that statute to make State and local officials criminally responsible for "harboring" based on their unwillingness to participate in federal civil immigration enforcement, that statute would be unconstitutional as applied.

95.    Because these federal statutes are unconstitutional violations of the Tenth Amendment, or would be unconstitutional to the extent they were construed and applied as DOJ suggests, *i.e.*, to impose obligations on State and local governments to participate in federal civil immigration enforcement, DOJ cannot require jurisdictions to comply with its interpretation of these laws as a condition of receiving any Byrne JAG funds or any other federal funding.

## COUNT  FOUR

### (Violation of the Administrative Procedure Act - Arbitrary and Capricious Agency Action)

96.     Los Angeles incorporates and re-alleges each and every allegation contained above as if fully set forth herein.

97.     Agency actions are unlawful and must be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

98.     The decision to impose civil immigration-related conditions and certifications in the FY 2018 Byrne JAG grant solicitation is arbitrary and capricious because DOJ imposed those conditions and certifications without any reasoned basis, provided no support for its linkage between participation by State and local law enforcement officials in federal civil immigration enforcement and the local criminal justice efforts that are the authorized purpose of the grants at issue, and appears to have relied on clearly erroneous and debunked interpretations of existing studies.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff City of Los Angeles respectfully requests that this Court enter judgment in its favor, and grant the following relief:

1.     Declare that the Challenged Conditions in the FY 2018 Byrne JAG solicitation are unconstitutional or otherwise unlawful;

2.     Set aside the Challenged Conditions on FY 2018 Byrne JAG funds, and permanently enjoin Defendants from using the Challenged Conditions or substantively similar conditions in awarding Byrne JAG funding;

3.     Declare that 8 U.S.C. § 1373 is unconstitutional on its face;

4.     Declare that 8 U.S.C. § 1644 is unconstitutional as applied to State and local governments;

5.      Declare that 8 U.S.C. §§ 1226(a), (c), 1231(a)(4), 1324, and 1357(a)(1) do not require State and local governments to participate in federal civil immigration enforcement, and would be unconstitutional as applied to the extent that they did;

6.      Issue a writ of mandamus compelling Defendants to immediately disburse Los Angeles's FY 2018 JAG award, without further delay;

7.      Award Plaintiff City of Los Angeles reasonable fees and costs; and,

8.      Grant any further relief that this Court may deem fit and proper.

Dated:  August 22, 2018

Respectfully Submitted:

By:  /s/ *Michael N. Feuer*
      MICHAEL N. FEUER
      City Attorney

MITCHELL A. KAMIN
NEEMA T. SAHNI
Covington & Burling LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, California 90067-4643

DAVID M. ZIONTS, *pro hac vice*
application forthcoming
IVANO M. VENTRESCA, *pro hac vice*
application forthcoming
BENJAMIN L. CAVATARO, *pro hac
vice* application forthcoming
Covington & Burling LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001

*Attorneys for Plaintiff City of Los Angeles*

JAMES P. CLARK
Chief Deputy City Attorney
LEELA A. KAPUR
Executive Assistant City Attorney
VALERIE L. FLORES
Managing Senior Assistant City Attorney
MICHAEL DUNDAS
Deputy City Attorney
DANIA MINASSIAN
Deputy City Attorney
200 North Main Street, City Hall
East Room 700
Los Angeles, California 90012
Telephone: (213) 978-8344
Facsimile: (213) 978-8312