MICHAEL N. FEUER, SBN 111529
City Attorney
JAMES P. CLARK, SBN 64780
Chief Deputy City Attorney
LEELA A. KAPUR, SBN 125548
Executive Assistant City Attorney
VALERIE L. FLORES, SBN 138572
Managing Senior Assistant City Attorney
MICHAEL DUNDAS, SBN 226930
DANIA MINASSIAN, SBN 198928
STEVEN H. HONG, SBN 212727
Deputy City Attorney
200 North Main Street, City Hall East
Suite 800
Los Angeles, California 90012
james.p.clark@lacity.org
Telephone:  (213) 978-8347
Facsimile:  (213) 978-8312

MITCHELL A. KAMIN, SBN 202788
NEEMA T. SAHNI, SBN 274240
Covington & Burling LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, California 90067-4643
mkamin@cov.com
Telephone:  (424) 332-4800
Facsimile:  (424) 332-4749

DAVID M. ZIONTS, *pro hac vice*
IVANO M. VENTRESCA, *pro hac vice*
BENJAMIN L. CAVATARO, *pro hac vice*
Covington & Burling LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
dzionts@cov.com
Telephone:  (202) 662-6000
Facsimile:  (202) 662-5987

*Attorneys for Plaintiff City of Los Angeles*

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF LOS ANGELES,<br><br>        Plaintiff,<br><br>        v.<br><br>JEFFERSON B. SESSIONS, III, in his official capacity as Attorney General of the United States; LAURA ROGERS, in her official capacity as Acting Principal Deputy Assistant Attorney General of the Office of Justice Programs; UNITED STATES DEPARTMENT OF JUSTICE.<br><br>        Defendants. | Case No.: 2:18-cv-07347-R-JC<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION[1]**

1.      The City of Los Angeles ("Los Angeles" or "City") files this Complaint seeking declaratory and injunctive relief to prevent the United States Department of Justice ("DOJ" or "Department") from unconstitutionally seeking to wield authority it does not have to advance policy objectives it cannot lawfully effectuate in such a manner—all at the expense of public safety and community trust in Los Angeles and other communities.

2.      Numerous courts nationwide, including this Court, already have enjoined DOJ from using federal funding to punish jurisdictions like Los Angeles for refusing to abandon successful community policing practices built on engendering community trust by participating in the civil immigration enforcement policies of the Trump Administration.

3.      The federal funds at issue in this Complaint are two DOJ grants:  (1) Fiscal Year ("FY") 2018 Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG"), 34 U.S.C. §§ 10151-58; and (2) FY 2018 Gang Suppression Planning Grants Program ("Juvenile Gang Prevention Grant"), Pub. L. 115-141, 132 Stat 348, 423; 34 U.S.C. §§ 11171, 11172.

**The Byrne JAG Program**

4.      Congress established the Byrne JAG Program specifically to authorize federal grants "for use by the State or unit of local government" in order to provide "additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice."  34 U.S.C. § 10152(a)(1). Byrne JAG grants are awarded through a statutory formula based on population and rate

---

[1] DOJ has provided written consent to Los Angeles's filing of its First Amended Complaint and Los Angeles may file the First Amended Complaint as a matter of course. *See* Fed. R. Civ. P. 15(a)(1), (2); *McGucken v. Chive Media Grp., LLC*, No. CV 18-01612-RSWL-KS, 2018 WL 3410095, at *5 (C.D. Cal. July 11, 2018) ("Federal Rule of Civil Procedure 15(a) provides that a party may amend their complaint once 'as a matter of course' before a responsive pleading is served.").

of violent crime.  They are administered by a component of DOJ, the Bureau of Justice Assistance ("BJA") within DOJ's Office of Justice Programs ("OJP").

5.     Four conditions on the FY 2018 Byrne JAG grant are materially identical to the conditions on the FY 2017 Byrne JAG grants that have been enjoined by courts, including two conditions enjoined by this Court.  The FY 2018 Byrne JAG conditions require States and localities to:  (1) comply with 8 U.S.C. § 1373, which provides that States and localities "may not prohibit, or in any way restrict" government entities and officials from "sending to, or receiving from" the United States Department of Homeland Security ("DHS") information "regarding the citizenship or immigration status, lawful or unlawful, of any individual"; (2) comply with 8 U.S.C. § 1644, which provides that no States and localities "may be prohibited, or in any way restricted" from "sending to or receiving from" DHS "the immigration status, lawful or unlawful, of an alien in the United States"; (3) provide 48 hours' advance notice to DHS, "where feasible" and when requested, before releasing an alien from state or local custody; and (4) provide DHS agents with "access to any correctional facility in order to meet with an alien (or an individual believed to be an alien) and inquire as to his right to be or remain in the United States."[2]  Although DOJ did not make this argument in defending the materially identical conditions on the FY 2017 Byrne JAG grants, for the 2018 Byrne JAG grants DOJ now suggests in the solicitation that compliance with the third and fourth conditions relating to "Notice" and "Access" is required under various statutory provisions of the Immigration and Nationality Act, 8 U.S.C. § 1101, *et seq.* ("INA").

6.     DOJ also adds new and equally unlawful conditions, mandatory certifications, and a questionnaire.  These new unlawful conditions require that jurisdictions will "not . . . publicly disclose federal law enforcement information in an attempt to conceal, harbor, or shield certain individuals from detection, including in

---

[2] FY 2018 Byrne JAG Solicitation ("2018 Solicitation") at 36-37, *available at* https://www.bja.gov/funding/JAGLocal18.pdf.

violation of 8 U.S.C. § 1324(a)" and include a certification that the jurisdiction does not have "any law, rule, policy, or practice" that would "require or authorize the public disclosure of federal law enforcement information in order to conceal, harbor, or shield from detection fugitives from justice or aliens illegally in the United States."  Section 1324(a) is a statute that criminally punishes persons who, among other things, harbor illegal aliens.  The conditions also include certifying compliance with 8 U.S.C. § 1366, a statute that requires the Attorney General to make reports to Congress.

7.     The 2018 Solicitation states that applicants, to accept the FY 2018 award, "must submit[] the specific certifications regarding compliance," which contain the above conditions.  2018 Solicitation at 1.

8.     Nothing in the Byrne JAG legislation that Congress enacted permits BJA to condition federal funding to a local jurisdiction on that jurisdiction's willingness to engage in federal civil immigration enforcement.  To the contrary, such conditions are antithetical to the purpose for which Congress created the funding program—that is, to support local criminal justice programs.

### The Juvenile Gang Prevention Grant Program

9.     The Juvenile Gang Prevention Grant is issued under authority of Subchapter II, Part E of the Juvenile Justice and Delinquency Prevention Act of 1974, as amended ("Juvenile Justice Act").[3]  Under that part of the Juvenile Justice Act, Congress authorized the Office of Juvenile Justice and Delinquency Prevention ("OJJDP") to make grants to units of local government "to carry out projects for the development, testing, and demonstration of promising initiatives and programs *for the prevention, control, or reduction of juvenile delinquency*."  34 U.S.C. § 11171(a) (emphasis added).  The

---

[3]  Office of Juvenile Justice and Delinquency Prevention, Office of Justice Programs, U.S. Department of Justice, "OJJDP FY 2018 Gang Suppression Planning Grants Program," at 7, *available at* http://www.ojjdp.gov/grants/solicitations/FY2018/GangPlan.pdf ("OJJDP Solicitation")

Juvenile Gang Prevention Grant is a competitive grant and is being awarded for the first time.[4]  In the 2018 Consolidated Appropriations Act, Pub. L. No. 115-141, Mar. 23, 2018, 132 Stat. 348, 423, Congress provided "$27,500,000 for *delinquency prevention*, as authorized by section 505 of the Juvenile Justice Act, of which, pursuant to sections 261 and 262 [34 U.S.C. §§ 11171 and 11172] thereof . . . (B) $4,000,000 shall be for gang and youth violence education, prevention and intervention, and related activities." (emphasis added).

10.     This Program is administered by OJJDP, which is a component of DOJ's OJP.  OJJDP's stated goals for the grant include to "[r]educe and sustain reductions in community youth violence, particularly gun and gang violence, and victimization" and "[i]ncrease the safety, well-being, and healthy development of children, youth, and families."  OJJDP Solicitation at 7.

11.     The OJJDP Solicitation contains four conditions materially identical to the conditions on the FY 2017 Byrne JAG grant that have been enjoined by courts, including two enjoined by this Court.  Again, these conditions require States and localities to:  (1) comply with 8 U.S.C. § 1373, which provides that States and localities "may not prohibit, or in any way restrict" government entities and officials from "sending to, or receiving from" DHS information "regarding the citizenship or immigration status, lawful or unlawful, of any individual"; (2) comply with 8 U.S.C. § 1644, which provides that no States and localities "may be prohibited, or in any way restricted" from "sending to or receiving from" DHS "the immigration status, lawful or unlawful, of an alien in the United States"; (3) provide 48 hours' advance notice to DHS, "where feasible" and when requested, before releasing an alien from state or local custody; and (4) provide DHS

---

[4]  Office of Juvenile Justice and Delinquency Prevention, Office of Justice Programs, U.S. Department of Justice, "Frequently Asked Questions, OJJDP FY 2018 Gang Suppression Planning Grants Program," *available at* http://www.ojjdp.gov/grants/solicitations/FY2018/FAQ/GangPlan.pdf ("OJJDP FAQ").

agents with "access to any correctional facility in order to meet with an alien (or an individual believed to be an alien) and inquire as to his right to be or remain in the United States."[5]  And, again, although it did not make this argument in defending the materially identical conditions on the FY 2017 Byrne JAG grants, DOJ now suggests that compliance with the third and fourth conditions relating to "Notice" and "Access" is required under various statutory provisions of the INA.

12.     DOJ's unlawful conditions also require that jurisdictions will "not . . . publicly disclose federal law enforcement information in an attempt to conceal, harbor, or shield certain individuals from detection, including in violation of 8 U.S.C. § 1324(a)" and include a certification that the jurisdiction does not have "any law, rule, policy, or practice" that would "require or authorize the public disclosure of federal law enforcement information in order to conceal, harbor, or shield from detection fugitives from justice or aliens illegally in the United States."  Section 1324(a) is a statute that criminally punishes persons who harbor illegal aliens.  The conditions also include certifying compliance with 8 U.S.C. § 1366, a statute that requires the Attorney General to make reports to Congress.

13.     DOJ's solicitation states that "in order validly to accept an FY 2018 award under this solicitation, the chief legal officer of that entity must properly execute, and the applicant must submit, the specific certifications regarding compliance with certain federal laws," which contain the above conditions.  OJJDP Solicitation, at 2.

14.     The Juvenile Gang Prevention Grant solicitation also contains a priority consideration which provides that an "applicant may receive priority consideration by explaining how it would address the problem area identified in its application through cooperation with immigration authorities . . . ."  OJJDP Solicitation, at 10.

---

[5]  Both the Notice and Access conditions include the following parenthetical note, with no further elaboration: "Note: this condition will apply only with respect to alien adult detainees and only in jurisdictions where law enforcement is assisting in implementing this program."

15.     Congress did not authorize OJJDP to condition Juvenile Gang Prevention Grant funds on a jurisdiction's participation in federal civil immigration enforcement, and to do so is contrary to the purpose for which Congress created the program—that is to "support State and local programs that prevent juvenile involvement in delinquent behavior," 34 U.S.C. § 11102(1); "assist State and local governments in promoting public safety by encouraging accountability for acts of juvenile delinquency," *id*. § 11102(2); and "assist State and local governments in addressing juvenile crime through the provision of technical assistance, research, training, evaluation, and the dissemination of information on effective programs for combating juvenile delinquency," *id*. § 11102(3).

## Unlawful Conditions

16.     The immigration conditions that DOJ has imposed on the FY 2018 Byrne JAG and Juvenile Gang Prevention Grant flout the rationale of earlier rulings by this Court, which has enjoined the imposition of immigration-related conditions as to both the FY 2017 Byrne JAG and a different DOJ-administered federal grant program related to community-oriented policing.[6]

17.     In addition to re-imposing those conditions for the FY 2018 Byrne JAG and Juvenile Gang Prevention Grant that have previously been enjoined for FY 2017 Byrne JAG grants, DOJ adds new and equally unlawful conditions, mandatory certifications,

---

[6] Plaintiff here, the City of Los Angeles, previously filed a lawsuit in this District Court challenging FY 2017 Byrne JAG grant conditions, along with conditions on the FY 2017 Community Oriented Policing Services ("COPS") Hiring Program grant, in *City of Los Angeles v. Sessions*, Case No. 2:17-cv-07215-R-JCx.  The Court granted summary judgment to the City against the immigration-related conditions on the COPS grant causes of action and permanently enjoined DOJ from imposing those conditions in future COPS grant cycles.  *City of Los Angeles v. Sessions*, 293 F. Supp. 3d 1087 (C.D. Cal. 2018), appeal pending.  And, the Court granted Los Angeles' motion for a preliminary injunction against similar conditions on the FY 2017 Byrne JAG  (Case No. 2:17-CV-07215-R-JC).  Moreover, the United States Court of Appeals for the Seventh Circuit and federal district courts in Chicago and Philadelphia all have enjoined the conditions on the FY 2017 Byrne JAG.

and a questionnaire, all of which seek to deny funds to jurisdictions like Los Angeles that use their funds and resources for local criminal justice programs rather than to participate in federal civil immigration enforcement.  The immigration-related conditions, questions, and certifications that permeate both the 2018 Byrne JAG and the Juvenile Gang Prevention Grant solicitations are facially unconstitutional and otherwise unlawful for a number of reasons.

18.    ***First***, the immigration-related conditions, questions, and certifications violate the constitutional doctrine of separation of powers.  The constitutional authority to spend federal government money, and to attach reasonable and lawful terms and conditions to the receipt of federal funds, belongs to Congress, not the Executive Branch. DOJ, as an agency of the Executive Branch, may not unilaterally impose terms on federal grants to States and local governments in the absence of a specific and unambiguous authorization from Congress, which has not occurred with respect to the immigration-related conditions DOJ seeks to attach to the FY 2018 Byrne JAG and Juvenile Gang Prevention Grant.  On this basis alone, the funding conditions violate the Constitution.

19.    DOJ's actions also offend the basic separation of powers principle that an Executive Branch agency has no power to act unless Congress has delegated authority to it.  *See City & Cty. of San Francisco v. Trump*, 897 F.2d 1225, 1234 (9th Cir. 2018) (holding that the Executive Order conditioning all federal funding on compliance with 8 U.S.C. § 1373 is an unlawful attempt by the Trump Administration to "coopt" for itself Congress's exclusive spending power).

20.    DOJ's FY 2018 immigration-related conditions are not authorized by, and indeed are incompatible with, the statute Congress enacted establishing the Byrne JAG Program because the conditions cannot be reconciled with Congress's directive that funds be allocated for local criminal justice efforts through an explicit funding formula involving only two factors:  community population and rates of violent crime.  DOJ's conditions also undermine Congress's express directive that Byrne JAG funds be used only to provide seven types of support for community criminal justice efforts, through

eight types of specified local criminal justice programs. DOJ's conditions would redirect those funds to State and local law enforcement agencies that participate in federal civil immigration enforcement. On September 13, 2018, this Court issued an order granting the City's request for a preliminary injunction enjoining DOJ's efforts to impose two immigration-related conditions on 2017 Byrne JAG grants. This Court ruled that those DOJ conditions were "a violation of the separation of powers doctrine and *ultra vires*." Order Granting Plaintiff's Application for Preliminary Injunction, at 4; *City of Los Angeles v. Sessions*, 2:17-CV-07215-R-JC (Dkt. 93). Multiple other courts nationwide have reached the same conclusion. *City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 943 (N.D. Ill. 2017); *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 659 (E.D. Pa. 2017); *City of Chicago v. Sessions*, 888 F.3d 272, 293 (7th Cir. 2018); *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 321, 331 (E.D. Pa. 2018); *City of Chicago v. Sessions*, No. 17 C 5720, 2018 WL 3608564, at *13 (N.D. Ill. July 27, 2018).

21.    Similarly, DOJ's immigration-related conditions are not authorized by, and are incompatible with, the statutes establishing the Juvenile Gang Prevention Grant program. The conditions cannot be reconciled with Congress's directive that grants of federal funds be made to States and units of local government "to carry out projects for the development, testing, and demonstration of promising initiatives and programs for the prevention, control, or reduction of juvenile delinquency." 34 U.S.C. § 11171(a). Congress did not mention the term "immigration," or any variation of that term, in any of the enabling legislation for the Juvenile Gang Prevention Grant. Further, Congress did not include anything in this enabling legislation to indicate that a local jurisdiction's cooperation or collaboration with federal immigration enforcement authorities furthers the purpose of grants made under the Juvenile Justice Act's authority, such as the Juvenile Gang Prevention Grant. To the contrary, the Juvenile Justice Act identifies the collaborative element in juvenile delinquency prevention programs as being local in nature, involving "juveniles, their families, local public agencies, and community based organizations[.]" *Id.* The enabling legislation states that "[c]oordinated juvenile justice

and delinquency prevention projects that meet the needs of juveniles through the collaboration of the many *local* service systems juveniles encounter can help prevent juveniles from becoming delinquent and help delinquent youth return to a productive life." *Id.* § 11101(a)(11) (emphasis added).  Indeed, OJJDP's own Comprehensive Gang Model echoes the idea of local collaboration by identifying "Suppression" as "community policing with formal and informal social controls and accountability measures."[7]  Many communities, like the City of Los Angeles, have made the public safety determination that participation by local law enforcement agencies in federal civil immigration enforcement agencies works in opposition to engendering trust with local youth, who may be undocumented or be citizens with undocumented parents or other family members.

22.    DOJ's conditions are unrelated to the Juvenile Gang Prevention Grant's three statutorily authorized purposes: "to support State and local programs that prevent juvenile involvement in delinquent behavior," *id.* § 11102(1); "assist State and local governments in promoting public safety by encouraging accountability for acts of juvenile delinquency," *id.* § 11102(2); and "assist State and local governments in addressing juvenile crime through the provision of technical assistance, research, training, evaluation, and the dissemination of information on effective programs for combating juvenile delinquency," *id.* § 11102(3).  The reasoning of this Court and others in the cases cited above, concluding that such conditions violate the separation of powers and are *ultra vires*, is equally applicable to the Juvenile Gang Prevention Grant.

23.    DOJ cannot mount an end-run around these court rulings by now claiming that the same unconstitutional conditions are justified as conditions on these grants

---

[7]  Office of Juvenile Justice and Delinquency Prevention, Office of Justice Programs, U.S. Department of Justice, Nat'l Gang Ctr., "A Law Enforcement Official's Guide to the OJJDP Comprehensive Gang Model," at 1, *available at* https://www.nationalgangcenter.gov/Content/Documents/LE-Officials-Guide-to-OJJDP-Comprehensive-Gang-Model.pdf ("OJJDP Solicitation").

because they relate to other federal statutes. As part of the Byrne JAG application, an applicant must certify that it "will comply with all provisions of this part and all other *applicable* Federal laws." 34 U.S.C. § 10153(a)(5)(D) (emphasis added). But, the federal laws in which DOJ purports to ground its immigration-related conditions are not "applicable" laws. The civil immigration-related conditions have no relevance to federal grants, the local criminal justice subject matter of the Byrne JAG Program, or the local juvenile delinquency prevention subject matter of the Juvenile Gang Prevention Grant. Moreover, the civil immigration-related conditions are not valid federal laws, because they are either facially unconstitutional or unconstitutional as DOJ seeks to interpret and apply them here.

24.     The FY 2018 Byrne JAG and Juvenile Gang Prevention Grant applications also contravene Congress's statutory mandate in 34 U.S.C. § 10228(a) prohibiting DOJ's use of the Byrne JAG statute to "exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof."

25.     ***Second***, even if the solicitations' immigration-related conditions had been imposed by Congress rather than DOJ, they would be unconstitutional under the Spending Clause and Tenth Amendment to the United States Constitution, which limit the power of the federal government to restrict federal funding for the States (and their municipalities) based on matters of law and policy that are properly reserved to the States.

26.     When Congress attaches new terms to federal funds, it must meet several requirements to ensure that it is not exceeding its spending power to improperly regulate State and local officials. Under the Spending Clause, terms that Congress imposes on use of federal funds by a State or local government must be unambiguous and sufficiently related to the purpose of those federal funds. Congress created the Byrne JAG Program for the express purpose of funding local criminal justice efforts through statutorily-specified types of support and programs. Congress created the Juvenile Gang Prevention

FIRST AMENDED COMPLAINT

Grant program to provide funds to States and units of local government "to carry out projects for the development, testing, and demonstration of promising initiatives and programs for the prevention, control, or reduction of juvenile delinquency." 34 U.S.C. § 11171(a). DOJ's immigration-related conditions do not relate to these purposes or to the types of support and programs that Congress specified in the applicable establishing statute. Rather, DOJ is attempting to use these grant programs to reward localities that participate in federal civil immigration enforcement, and punish those that do not. In addition, certain of the conditions that DOJ included in the FY 2018 Byrne JAG solicitation and the Juvenile Gang Prevention Grant are so ambiguous as to make it difficult for Los Angeles to ascertain what is expected of it.

27.     ***Third***, the conditions and certifications that DOJ has imposed in the FY 2018 Byrne JAG and the Juvenile Gang Prevention Grant applications are a clear indication that DOJ unconstitutionally seeks to commandeer local police agencies to enforce federal civil immigration laws, in violation of the Tenth Amendment, confirmed by the recent U.S. Supreme Court decision in *Murphy v. NCAA,* 138 S. Ct. 1461, 1477 (2018) ("The Federal Government may not command [either in the affirmative or through prohibitive language] the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." (citation omitted)). Specifically, both the FY 2018 Byrne JAG grant and the Juvenile Gang Prevention Grant require as a condition to receiving funds a certification of compliance with 8 U.S.C. §§ 1373 and 1644. Both statutes violate the Tenth Amendment by giving direct orders to State and local governments. *See id.* at 1476; *see also Philadelphia*, 309 F. Supp. 3d at 331 (holding Section 1373 unconstitutional under the anticommandeering doctrine); *Chicago*, 2018 WL 3608564, at *13 (same); *City & Cty. of San Francisco v. Sessions*, No. 3:17-cv-04642, Dkt. 145 at 23-31 (N.D. Cal. Oct. 5, 2018) (same); *United States v. California*, 314 F. Supp. 3d 1077, 1101 (E.D. Cal. 2018) (stating that "the constitutionality of Section 1373 is highly suspect").

28.     In addition, DOJ requires, as a condition for receiving FY 2018 Byrne JAG funds and Juvenile Gang Prevention Grant funds, that jurisdictions certify that they will not "impede" the exercise of authority of federal agents under a number of federal statutes including 8 U.S.C. §§ 1226(a),(c), 1231(a), 1357(a)(1), and 1366(1),(3).[8] Jurisdictions also must "not . . . publicly disclose federal law enforcement information in an attempt to conceal, harbor, or shield certain individuals from detection, including in violation of 8 U.S.C. § 1324(a)" and must certify that they do not have "any law, rule, policy, or practice" that would "require or authorize the public disclosure of federal law enforcement information in order to conceal, harbor, or shield from detection fugitives from justice or aliens illegally in the United States."

29.     But those statutes do not concern States or localities and thus have no bearing here.  DOJ's apparent interpretations of those provisions as imposing mandates on State and local governments is an unconstitutional effort to commandeer those States and localities to participate in federal civil immigration enforcement.  *See Chicago*, 888 F.3d at 282; *California*, 314 F. Supp. 3d at 1106-08.

30.     These requirements are especially disturbing because they do not exist in a vacuum.  High-ranking members of the Trump Administration have publicly proposed arresting and prosecuting local elected officials in jurisdictions that decline to participate in federal civil immigration enforcement for "harboring."

31.     In short, the required certifications put elected officials in Los Angeles in the untenable position of either:  (1) certifying compliance with statutes that are not applicable and could not constitutionally be applicable to the City, and undermining the Los Angeles Police Department's ("LAPD") relationship with the immigrant community and threatening public safety; or (2) forfeiting FY 2018 Byrne JAG funding and Juvenile

---

[8]  The 2018 Byrne JAG grant requires the certifications be executed by the Mayor and the Chief Legal Officer.  The Juvenile Gang Prevention solicitation requires the City Attorney execute the certifications.

Gang Prevention Grant funding used to support local criminal justice and juvenile delinquency prevention efforts through combating gangs and violent crime.

32.     **Fourth**, the conditions placed by DOJ on recipients of the FY 2018 Byrne JAG funding and the Juvenile Gang Prevention Grant funding violate the Administrative Procedure Act ("APA") because, in promulgating the new conditions, DOJ did not rely on any analysis or findings to support its implicit premise that individuals whom DHS believes may be unlawfully present in the United States commit more crime than do individuals legally resident in the country, and in fact failed to consider the substantial evidence to the contrary.  For this reason, DOJ's attempt to attach the immigration-related conditions to FY 2018 Byrne JAG funding and the Juvenile Gang Prevention Grant funding is arbitrary and capricious in violation of the APA.

33.     In short, DOJ's unilateral and unauthorized attempt to hold hostage federal funding that Congress authorized to support State and local criminal justice programs and local juvenile delinquency prevention, and to instead cause State and local agencies to assist with federal civil immigration enforcement, is unconstitutional and unlawful, and cannot be allowed to stand.  Los Angeles seeks injunctive relief to ensure that DOJ does not evade constitutional restraints, Congressional intent, and judicial rulings protecting federal funding for State and local law enforcement criminal justice and local juvenile delinquency prevention efforts.

## JURISDICTION AND VENUE

34.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346.  The Court also has authority to award the relief requested pursuant to 5 U.S.C. §§ 702, 705, 706, and 28 U.S.C. §§ 1361, 2201–2202.

35.     Venue is proper in this District under 28 U.S.C. § 1391(e) because Plaintiff resides in this District and a substantial part of the events or omissions giving rise to this action occurred in this District.

## PARTIES

36.     Plaintiff Los Angeles is a municipal corporation organized and existing under the laws of the State of California, and is a charter city pursuant to Article XI of the California Constitution.

37.     Defendant Jefferson B. Sessions, III is the Attorney General of the United States.  The Attorney General is charged with the administration and enforcement of federal criminal law and policy, and oversees the U.S. Department of Justice, which administers both the Byrne JAG and the Juvenile Gang Prevention Grants.  Defendant Sessions has supervisory responsibility and is sued in his official capacity.

38.     Defendant U.S. Department of Justice is an agency of the United States. The Bureau of Justice Assistance ("BJA") is a component of OJP.  BJA's stated mission is "to provide leadership and services in grant administration and criminal justice policy development to support local, state, and tribal justice strategies to achieve safer communities."  BJA administers the Byrne JAG Program.  OJJDP is also a component of OJP.  OJJDP's mission is to "provide national leadership, coordination, and resources to prevent and respond to juvenile delinquency and victimization."  OJJDP administers the Juvenile Gang Prevention Grant.

39.     Defendant Laura Rogers is Acting Principal Deputy Assistant Attorney General of OJP at DOJ and oversees both BJA and OJJDP.  Defendant Rogers has supervisory responsibility and is sued in her official capacity.

## FACTUAL ALLEGATIONS

### A.     Policies and Practices of the City of Los Angeles' Police Department

40.     For nearly four decades, LAPD has implemented policies and practices designed to promote the public safety of the residents of Los Angeles by engendering cooperation and trust between its law enforcement agencies and officers on the one hand, and members of the City's many immigrant communities on the other.  The fundamental goal of these local policies and practices has been to encourage crime victims and witnesses of criminal conduct to cooperate with LAPD, irrespective of their immigration

status.  The policy is critical to public safety, especially in Los Angeles, in light of the significant size of the immigrant population here.  Central to these policies has been the determination by local law enforcement and its civilian overseers to devote local resources to local criminal justice efforts and leave to the federal government the investigation and enforcement of federal civil immigration laws.

41.     For example, approximately 40 years ago, in 1979, LAPD began a policy known as "Special Order 40"—adopted by the Los Angeles Board of Police Commissioners and signed by then-Chief of Police Daryl Gates—that restricts an LAPD officer from initiating a police action with the objective of discovering a person's immigration status, and also prohibits arrests based solely on that status.

42.     The policy behind Special Order 40, as expressed by the LAPD Board of Police Commissioners nearly 40 years ago, is "the principle that effective law enforcement depends on a high degree of cooperation between the Department and the public it serves."  This policy was adopted to ensure that individuals, regardless of their civil immigration status, would report crimes to the LAPD and assist the LAPD in apprehending and prosecuting those individuals responsible for criminal acts.

43.     The provisions of Special Order 40, which are reflected in various forms in LAPD's existing policies and procedures, are also consistent with current federal and State law, because the policy restricts LAPD's initiating a detention based on an individual's civil immigration status, and arresting an individual for a misdemeanor violation that did not occur in the officer's presence.

44.     The LAPD policies promulgated after Special Order 40 are compliant with existing federal law.  In the 2009 case, *Sturgeon v. Bratton*, the California Court of Appeal rejected a legal challenge to Special Order 40—as set forth in Section 4/264.50 of the LAPD Manual—ruling that the language of the policy does not conflict with 8 U.S.C. § 1373 ("Section 1373"), and is not invalid.  As the Court of Appeal recognized, Section 1373 addresses certain communications between federal and State or local authorities; Special Order 40 does not address that issue, but rather prohibits police officers from

initiating police action to determine immigration status and making arrests for illegal entry.  174 Cal. App. 4th 1407 (Cal. Ct. App. 2009).  It has nothing to do with communications between LAPD and federal authorities.

45.     In 2014, LAPD adopted a practice of refusing to detain individuals, otherwise eligible for release from custody under State law, on the basis of requests from U.S. Immigration and Customs Enforcement ("ICE") unless the requests are supported by a judicial determination of probable cause, or a valid warrant from a judicial officer.  This practice was developed in response to judicial decisions declaring compliance with warrantless ICE requests to be unconstitutional, and thereby subjecting LAPD to potentially significant liability for violations of the Fourth Amendment.  *See, e.g.*, *Miranda-Olivares v. Clackamas County*, No. 3:12-cv-02317-ST, 2014 WL 1414305, at *11 (D. Or. Apr. 11, 2014).  In addition, this practice supports LAPD's robust community policing strategy focused on preventing crime through community partnerships, collaborative problem solving, and building public trust consistent with the law— essential components to reducing crime and protecting the public from harm.

46.     When a member of LAPD arrests an individual in connection with a criminal offense, the arrestee may be cited and released in the field where circumstances warrant, or taken to one of LAPD's ten jail detention facilities for booking.  Those LAPD jail facilities are categorized by the State of California as Type I facilities, which are local detention facilities used for the temporary, short-term detention of persons who may be held for no more than 96 hours.  In practice, persons arrested by members of LAPD generally are kept in LAPD custody for no more than 48 hours after arrest because of the limitations imposed by State law and the Constitution with respect to the period of time within which law enforcement agencies must:  (1) obtain a probable cause determination that an arrested individual committed a criminal offense to support the detention of the individual without a warrant; and (2) transfer a detainee to court for arraignment.  *See* Cal. Pen. Code § 825; *Cty. of Riverside v. McLaughlin*, 500 U.S. 44 (1991).

47.     In many situations, arrestees are eligible for release from custody within a few hours of arrest and booking, including by posting bail or bond, on their own recognizance, or by a certificate of release.

48.     While arrestees are in LAPD custody, LAPD permits DHS and ICE personnel access to LAPD detention facilities to interview individual arrestees regarding civil immigration status.  LAPD does so consistent with the State statutory requirement that such persons be provided with advance written notice explaining the purpose of the interview, that the interview is voluntary, and that the person may decline to speak or opt to be interviewed only in the presence of his or her attorney.  *See* California TRUTH Act, Cal. Gov. Code § 7283 *et seq*.  LAPD obtains a written expression of the arrestee's willingness prior to the interview.  If the arrestee declines the interview, LAPD does not provide DHS and ICE personnel access to that individual in its facilities.

**B.     The Edward Byrne Memorial Justice Assistance Grant Program**

49.     Congress established the Byrne JAG Program to make grants "for use by the State or unit of local government" in order to provide seven types of support for criminal justice efforts, *i.e.*, "additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice."  34 U.S.C. § 10152(a)(1).  Congress specified that these funds be used "for any one or more of the following programs":

- "Law enforcement programs."
- "Prosecution and court programs."
- "Prevention and education programs."
- "Corrections and community corrections programs."
- "Drug treatment and enforcement programs."
- "Planning, evaluation, and technology improvement programs."
- "Crime victim and witness programs (other than compensation)."
- "Mental health programs and related law enforcement and corrections programs, including behavioral programs and crisis intervention teams."

*Id.* § 10152(a)(1)(A)-(H).

50.     Byrne JAG funding is administered by BJA within OJP.  *Id.* §§ 10151-58. Each fiscal year, BJA provides State and local government awardees with funds that, in general, may be used over a period of four years.

51.     In awarding funds, BJA must follow the congressionally-mandated formula to allocate funds to eligible States and local governments.  By statute, Congress required that funding be allocated based on two factors:  population and rate of violent crime.  The Attorney General must allocate 50 percent of the available funds to each State recipient in amounts proportionate to its population.  *Id.* § 10156(a).  The remaining 50 percent of the funds is allocated to each State recipient in amounts proportionate to its rate of violent crime.  *Id.*  Of the total amount allocated to a State, 60 percent is provided as a direct grant to the State, and 40 percent as grants for local governments in that State.  *Id.* § 10156(b)(2), (d).

52.     Local governments wishing to receive a grant must submit an award application to BJA.  In order to be eligible for an award, Congress specified that an applicant must furnish certain reasonable and grant-specific certifications and assurances related to the application or administration of the grant.  Specifically, Congress enumerated two certifications and three assurances that an applicant must make:

- "A certification that Federal funds made available under this part will not be used to supplant State or local funds, but will be used to increase the amounts of such funds that would, in the absence of Federal funds, be made available for law enforcement activities."  *Id.* § 10153(a)(1).

- "An assurance that, not fewer than 30 days before the application (or any amendment to the application) was submitted to the Attorney General, the application (or amendment) was submitted for review to the governing body of the State or unit of local government (or to an organization designated by that governing body)."  *Id.* § 10153(a)(2).

- "An assurance that, before the application (or any amendment to the application) was submitted to the Attorney General (A) the application (or amendment) was made public; and (B) an opportunity to comment on the application (or amendment) was provided to citizens and to neighborhood or community-based organizations, to the extent applicable law or established procedure makes such an opportunity available." *Id.* § 10153(a)(3).

- "An assurance that, for each fiscal year covered by an application, the applicant shall maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require." *Id.* § 10153(a)(4).

- "A certification . . . that (A) the programs to be funded by the grant meet all the requirements of this part; (B) all the information contained in the application is correct; (C) there has been appropriate coordination with affected agencies; and (D) the applicant will comply with all provisions of this part and all other applicable Federal laws." *Id.* § 10153(a)(5).

53.     Byrne JAG applications are accepted through an online program.  In order to complete the application, a representative of the applicant is required to electronically sign a page stating that the applicant will comply with standard "assurances" promulgated by the Office of Management and Budget.  These assurances include that, "throughout the period of performance for the award," "the Applicant will comply with all award requirements."

54.     When BJA approves an application for a Byrne JAG award, BJA requires the recipient to agree to an additional set of "Special Conditions."  These conditions generally relate to the administration of the grant or the use of grant funds.  The "Special Conditions" imposed in Los Angeles' fiscal year FY 2016 grant award (the last year in which Byrne JAG funds were released to Los Angeles) governed various aspects of how the City would be required to administer its Byrne JAG award, such as a "[r]equirement for data on performance and effectiveness under the award," "[r]equirements related to

System for Award Management and Unique Entity Identifiers," compliance with civil rights and nondiscrimination regulations in the administration of the award, and reporting of any fraud, waste, and abuse in the award implementation.

### C.     The City of Los Angeles Uses Byrne JAG Funds For Critical Local Criminal Justice Needs

55.     Each year since 1997, the City of Los Angeles has been approved for more than $1 million in funding under the Byrne JAG Program (and its predecessor).

56.     In the FY 2016 application cycle, Los Angeles applied for and received approximately $1.8 million in Byrne JAG funding for FY 2016 through FY 2019. Approximately $800,000 of the funding went to the County of Los Angeles as a subgrantee, and $1 million remained with the City.  For FY 2016, Los Angeles received its funding directly from the federal government as part of a formula grant, *see* 34 U.S.C. § 10156(d), not as a distribution from the Byrne JAG funds awarded separately to the State of California.

57.     Byrne JAG funds support important criminal justice programs in Los Angeles.  Specifically, the City's FY 2016 Byrne JAG funds assist in funding its Community Law Enforcement and Recovery ("CLEAR") program, which aims to reduce gang violence in Los Angeles and rehabilitate communities that have experienced significant criminal activity.  Through effective collaboration among several city, county, and state criminal justice agencies, the program targets high-crime areas and promotes community recovery by working closely with special criminal investigative units, an aggressive vertical prosecutorial program, probation and parole officers, youth intervention organizations, and schools.

58.     The CLEAR program has been successful.  In 2014, the CLEAR program areas had 22 percent less gang crime over a three-year period than similar non-CLEAR areas.  For FY 2016, the Byrne JAG funds supported 20 to 30 percent of the salaries for nine Deputy City Attorneys, nine Deputy District Attorneys, and nine Deputy Probation officers related to the CLEAR program.

59.     The City's use of Byrne JAG funds to support the CLEAR program and reduce local violent crime advances the core criminal justice mission of the Byrne JAG Program.  The CLEAR program's key to success in reducing violent crime in targeted neighborhoods has been the dedication of various agency assets to the goal of reducing crime in CLEAR sites.  Each CLEAR site includes an operational team made up of representatives from LAPD, the County District Attorney's Office, the City Attorney's Office, and the County Probation Department.  In addition to their focus on reducing crime, the CLEAR team members collaborate with residents within each CLEAR site through the creation of a Community Impact Team.  Community members on the team identify effective community organizations in their CLEAR area, and facilitate a relationship between those organizations and CLEAR team members to secure support from individuals and businesses within the community.

60.     The year-over-year federal funding for the CLEAR program has been a catalyst for turning Los Angeles into a leader on coordinated approaches to seemingly intractable issues related to local violent crime in general, and gang-related violence in particular.  The CLEAR model was innovative, and went beyond the traditional methods of criminal suppression.  It combined, in one program, elements which have been copied by numerous other jurisdictions, and are now a common approach to addressing not only gang violence, but violent crimes generally.  These elements, such as vertical prosecution of all cases, regular sharing of best practices from public safety teams in various parts of the City, and community outreach, have significantly informed the creation of other innovative approaches to criminal justice in the City, such as the City Attorney's neighborhood prosecutor program.

61.     On October 4, 2018, Los Angeles received its 2017 Byrne JAG award. Despite this Court's entry of a preliminary injunction prohibiting DOJ from imposing its unlawful immigration conditions, *see City of Los Angeles v. Sessions*, No. 17-cv-07215-R, Order Granting Plaintiff's Application for Preliminary Injunction, Dkt. 93 (C.D. Cal.

Sept. 13, 2018), DOJ has included the unlawful conditions in Los Angeles's FY 2017 Byrne JAG award document.

62.     The City submitted its application for FY 2018 Byrne JAG funding, in advance of the deadline of August 22, 2018.  If Los Angeles were to be deprived of its statutorily authorized FY 2018 Byrne JAG funding as well, Los Angeles would lose valuable resources needed to enhance its local criminal justice efforts and advance public safety.  Consistent Byrne JAG funding ensures that the CLEAR staff can continue to dedicate their time to their roles within the CLEAR team.  The funding also ensures that the City's continued dedication to cross-agency collaboration will pave the way for future successes and innovations still to come.

**D.The Juvenile Gang Prevention Grant Program**

63.     Congress created the Juvenile Gang Prevention Grant under authority of Subchapter II, Part E of the Juvenile Justice Act.  In the 2018 Consolidated Appropriations Act, Pub. L. No. 115-141, Mar. 23, 2018, 132 Stat. 348, 423, Congress provided "$27,500,000 for *delinquency prevention*, as authorized by section 505 of the [Juvenile Justice] Act, of which, pursuant to sections 261 and 262 [34 U.S.C. §§ 11171 and 11172] thereof . . . (B) $4,000,000 shall be for gang and youth violence education, prevention and intervention, and related activities." (emphasis added).

64.     Congress specified three purposes in Subchapter I and Subchapter II of the Juvenile Justice Act: "to support State and local programs that prevent juvenile involvement in delinquent behavior," 34 U.S.C. § 11102(1); "to assist State and local governments in promoting public safety by encouraging accountability for acts of juvenile delinquency," *id*. § 11102(2), and "to assist State and local governments in addressing juvenile crime through the provision of technical assistance, research, training, evaluation, and the dissemination of information on effective programs for combating juvenile delinquency," *id.* § 11102(3).

65.     Congress, in Part E of Subchapter II,  authorized OJJDP to "make grants to . . . units of general local government . . . to carry out projects for the development,

testing, and demonstration of promising initiatives and programs for the prevention, control, or reduction of juvenile delinquency." *Id.* § 11171(a). In enacting the Juvenile Justice Act, Congress declared that the problem of local juvenile delinquency should be addressed through a "2-track common sense approach that addresses the needs of individual juveniles and society at large by promoting (A) quality prevention programs that (i) work with juveniles, their families, local public agencies, and community-based organizations, and take into consideration such factors as whether or not juveniles have been victims of family violence (including child abuse and neglect); and (ii) are designed to reduce risks and develop competencies in at-risk juveniles that will prevent, and reduce the rate, violent delinquent behavior; and (B) programs that assist in holding juveniles accountable for their actions and in developing the competencies necessary to become responsible and productive members of their communities . . . ." *Id.* § 11101(a)(10).

66. The Juvenile Gang Prevention Grant is administered by the OJJDP within OJP. *Id.* §§ 11111(a), 11171(a). This is the first fiscal year for which OJJDP will provide award funds under the Juvenile Gang Prevention Grant. *See* OJJDP FAQ at 1. OJJDP expects to make up to five awards of up to $200,000 each for an 18-month period of grant performance. *See* OJJDP Solicitation at 12.

67. In order to be eligible for an award, applicants must submit an application to OJJDP "at such time, in such form, and containing such information as the Administrator may reasonably require by rule." 34 U.S.C. § 11173. Although not a formula grant, Congress limited the discretion of OJJDP by requiring such grants to be made, "to the extent reasonable and practicable, . . .to achieve an equitable geographical distribution of such projects throughout the United States." *Id.* § 11171(a).

68. The Juvenile Gang Prevention Grant program applications are accepted through an online program. In order to receive award funds, a representative of the

applicant is required to execute "Certified Standard Assurances".[9]  These assurances include that "throughout the period of performance for the award," the "Applicant will comply with all award requirements[.]"

69.     OJJDP will require any applicant selected for funding under the Juvenile Gang Prevention Grant program to agree to a set of "award conditions."  These conditions generally relate to the administration of the grant or the use of grant funds, such as "[r]equirement for data on performance and effectiveness under the award," "[r]equirements related to System for Award Management and Unique Entity Identifiers," compliance with civil rights and nondiscrimination regulations in the administration of the award, and reporting of any fraud, waste, and abuse in the award implementation.  The "award conditions" may also include additional conditions that may relate to the particular statute, program, or solicitation under which the award is made. *Id.*

70.     Along with the "award conditions," a successful applicant will be required to execute certifications regarding lobbying; debarment, suspension and other responsibility matters, and drug-free workplace requirements. *Id.*

**E.     The City of Los Angeles Intends to Use the Juvenile Gang Prevention Grant Funds To Combat Local Juvenile Crime Perpetrated by MS-13 and Other Criminal Gangs**

71.     Since 2012, criminal activity in and around the MacArthur Park area of the City has increased.  Crime data and interviews with community members suggests that the increase may be a direct result of suspected gang activities of the MS-13 gang.  Thus, the City has an important need to study and curtail the activities and recruitment efforts

---

[9] *See* OJJDP Solicitation at 38.  *See also* Certified Standard Assurances, U.S. Department of Justice, OMB Approval Number 1121-0140, available at http://ojp.gov/funding/Apply/Resources/StandardAssurances.pdf.

of the MS-13 gang in Los Angeles and to develop strategies to prevent related juvenile delinquency in local communities.

72.     The LAPD is seeking the Juvenile Gang Prevention Grant funds to create a framework and strategic plan to combat local juvenile gang crime and violence that involves the MS-13 gang.  During the 18-month project, the LAPD will undertake strategic planning and capacity building through a data-driven approach.  The project will be coordinated by LAPD's Detective Bureau and will involve the Gang and Narcotics Division, detectives and patrol officers at specific Patrol Divisions, a research team from Justice & Security Strategies, Inc. (JSS) and Arizona State University, and internal and external experts.  Other partners will be included as the project develops.

73.     The Juvenile Gang Prevention Grant funds would support LAPD's goals of: (1) using gang intelligence to achieve an enhanced understanding of MS-13 and how it is affecting local communities; (2) reducing gun and gang violence among youth in specific areas of the City that are identified through data analysis; (3) preventing violence within affected local communities; and (4) increasing safety among youth, families, and local communities affected by MS-13.

### F.     Multiple Courts Have Rejected DOJ's Imposition of These Types Of Federal Civil Immigration-Related Conditions for FY 2017 Byrne JAG Awards

74.     In the FY 2017 funding cycle, DOJ imposed immigration-related conditions in its solicitation for the FY 2017 Byrne JAG applications.  On August 3, 2017, BJA issued that solicitation for applications from local governments for FY 2017 Byrne JAG grants.  One immigration-related condition in the agency's solicitation stated that applicants were required to certify compliance with Section 1373 in order to qualify for Byrne JAG funding (the "1373 Condition").[10]  The FY 2017 Byrne JAG application

---

[10]  Bureau of Justice Assistance, Office of Justice Programs, U.S. Department of Justice, "Edward Byrne Memorial Justice Assistance Grant Program:  FY 2017 Local Solicitation," *available at* https://www.bja.gov/Funding/JAGLocal17.pdf ("Solicitation").

would not be considered complete without that certification, which meant jurisdictions that were awarded Byrne JAG funds but that did not complete the 1373 Certification would be prohibited from drawing down grant funds.

75.     Separately, DOJ's FY 2017 solicitation stated that the agency's award would include two other, immigration-related conditions.  Those two conditions, referred to below as the "2017 Access Condition" and the "2017 Notice Condition"—as presented in FY 2017 Byrne JAG awards that DOJ has already disbursed—required that "as of the date the recipient accepts [its] award," the recipient must have in place "[a] local ordinance, -rule, -regulation, -policy, or -practice (or an applicable State statute, -rule, -regulation, -policy, or -practice)" that is "designed to ensure" that:

  a. "agents of the United States acting under color of federal law in fact are given access [to] a local-government (or local-government-contracted) correctional facility for the purpose of permitting such agents to meet with individuals who are (or are believed by such agents to be) aliens and to inquire as to such individuals' right to be or remain in the United States" (the "2017 Access Condition"); and

  b. "when a local-government (or local-government contracted) correctional facility receives from DHS a formal written request authorized by the Immigration and Nationality Act that seeks advance notice of the scheduled release date and time for a particular alien in such facility, then such facility will honor such request and--as early as practicable (see 'Rules of Construction' incorporated by para. 4.B. of this condition--provide the requested notice to DHS." (the "2017 Notice Condition").

Greenville Award, ¶ 56(1) (emphasis added), attached hereto as Exhibit A.

76.     In addition, the "Rules of Construction" referenced in DOJ's 2017 Notice Condition stated:  "Nothing in this condition shall be understood to authorize or require any recipient, any subrecipient at any tier, any State or local government, or any other entity or individual to maintain (or detain) any individual in custody beyond the date and

time the individual would have been released in the absence of this condition." *Id.* ¶¶ 55-56, at Para. 4.B.

77.    The DOJ 2017 Rules of Construction also stated:  "Current DHS practice is ordinarily to request advance notice of scheduled release 'as early as practicable (at least 48 hours, if possible).' (See DHS Form I-247A (3/17)).  In the event that (e.g., in light of the date DHS made such request) the scheduled release date and time for an alien are such as not to permit the advance notice that DHS has requested, it shall not be a violation of this condition to provide only as much advance notice as practicable." *Id.*

78.    This Court, in an order issued on September 13, 2018, held that DOJ's Access Condition and the Notice Condition for the FY 2017 Byrne JAG grant were *ultra vires* and violated the separation of powers.[11]

### G.    DOJ Imposes Conditions, Certifications, and Questions Relating to Federal Civil Immigration Enforcement on the Agency Solicitation for the FY 2018 Byrne JAG and the Juvenile Gang Prevention Grant Despite Contrary Court Rulings in FY 2017 Byrne JAG Litigation.

79.    In the FY 2018 Byrne JAG and the Juvenile Gang Prevention Grant funding solicitations, released on July 20, 2018 and September 7, 2018, respectively, DOJ doubles-down by:  (1) employing new versions of the conditions that have previously been enjoined as unlawful, now disguised as requirements purportedly imposed by various preexisting statutes; (2) adding new, unconstitutional conditions; (3) requiring unlawful certifications by the City's Mayor and/or Chief Legal Officer after implied threats of criminal arrest of local officials in jurisdictions that do not cooperate with federal immigration enforcement; and (4) mandating that the City disclose to the federal

---

[11]   Additionally, the United States Court of Appeals for the Seventh Circuit, as well as federal district courts in Chicago and Philadelphia, held that the Access Condition and the Notice Condition for the FY 2017 Byrne JAG grant were *ultra vires* and violated the separation of powers.  The Chicago and Philadelphia district courts also held that the 1373 Condition was unlawful because 8 U.S.C. § 1373 is unconstitutional.

government information relating to civil immigration practices in Los Angeles (collectively referred to as the "Challenged Conditions").

80.    For both grants, DOJ requires that applicants, "in order to validly accept" the grant award, "must submit[] the specific certifications regarding compliance with certain federal laws attached to" each solicitation.  2018 Solicitation at 1; OJJDP Solicitation at 2.  Confirming the finality of its decision, DOJ has included the Challenged Conditions when disbursing FY 2018 Byrne JAG awards.  *See* FY 2018 Byrne JAG Award for the City of Providence, attached as Exhibit B. Accordingly, DOJ will not provide federal funds to applicants unless they certify to the Conditions.

**(1)    The "1373 and 1644" Condition**

81.    DOJ imposes in both the 2018 Byrne JAG and the Juvenile Gang Prevention Grant solicitations conditions on the receipt of an award that would require compliance with an interpretation of various federal statutes which would violate the Tenth Amendment if construed to impose such a requirement.  Not only does DOJ carry over the unconstitutional requirement for agencies to certify compliance with 8 U.S.C. § 1373,[12] but now also requires agencies to certify compliance with 8 U.S.C. § 1644.[13]

82.    8 U.S.C. §§ 1373 and 1644 are not "applicable" laws within the meaning of 34 U.S.C. § 10153(a)(5)(D), and thus cannot support a certification of compliance requirement because they have no relevance to federal grants or the subject matter of the either the Byrne JAG or the Juvenile Gang Prevention Grant program.  Moreover, Section 1373 is not a valid federal law at all, as it violates the Tenth Amendment, as

---

[12]  *See Philadelphia*, 309 F. Supp. 3d at 331 (holding Section 1373 unconstitutional under the anticommandeering doctrine); *Chicago*, 2018 WL 3608564, at *13 (same); *San Francisco*, No. 3:17-cv-04642, Dkt. 145 at 23-31 (same); *see also California*, 2018 WL 3301414, at *14.

[13]  Section 1644 is similar to Section 1373 in that it states no State or local government may be prohibited or restricted "from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States."  8 U.S.C. § 1644.

recognized by the *Chicago* and *Philadelphia* district courts.  Section 1644, as applied by DOJ here to impose a mandate on States and local governments, is likewise unconstitutional.  Accordingly, DOJ lacks authority to require Byrne JAG or Juvenile Gang Prevention Grant applicants to certify compliance with either statute.  This Court's intervention is required to invalidate these unconstitutional conditions.

### (2)    The "Notice and Access" Conditions.

83.    DOJ included in both the 2018 Byrne JAG and the Juvenile Gang Prevention Grant solicitations "Notice and Access" conditions that, in substance, are the same as those that DOJ was enjoined from imposing by this Court and by federal courts in Chicago and Philadelphia.[14]  Specifically, DOJ intends to condition the award of funding under the Grants on a jurisdiction agreeing:

- "[n]ot to impede the exercise of the authority of the federal government under 8 U.S.C. § 12[2]6(a) & (c)" (authorizing federal arrest and detention of certain aliens based on a federal warrant, and providing mandatory federal detention of certain criminal aliens) and 8 U.S.C. § 1231(a)(4) (relating to completion of criminal terms of imprisonment prior to removal from the United States, and exceptions allowing for removal of federal, state, and local nonviolent offenders in some circumstances before completion of prison term).  The solicitations specify that recipients are required to do so by providing "(where feasible) at least 48 hours' advance notice to DHS regarding the scheduled release date and time of an alien in the recipient's custody when DHS requests such notice in order to take custody of the alien pursuant to the Immigration and Nationality Act." ("Notice Condition")

- "[n]ot to impede the exercise by DHS agents, 'anywhere in or outside the United States' (8 C.F.R. § 287.5(a)(1)), of their authority under 8 U.S.C. §

---

[14]  *City of Los Angeles v. Sessions*, 293 F. Supp. 3d 1087 (C.D. Cal. 2018); *City of Los Angeles v. Sessions*, No. 17-cv-07215-R-JCx, Order Granting Plaintiff's Application for Preliminary Injunction [Dkt. 93], (C.D. Cal. Sept. 13, 2018).

1357(a)(1) to 'interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States.'"  The solicitations specify that recipients are required to do so by permitting "DHS agents to have access to any correctional facility in order to meet with an alien (or an individual believed to be an alien) and inquire as to his right to be or remain in the United States." ("Access Condition," collectively "Notice and Access Conditions")[15]

84.     In the face of court orders enjoining DOJ based on a ruling that FY 2017 Notice and Access Conditions are unconstitutional, DOJ has shifted its tactics, apparently attempting to justify its imposition of these conditions on recipient States and local governments under the Byrne JAG statute's "applicable Federal laws" provision.  *See* 34 U.S.C. § 10153(a)(5)(D) (applicants must comply with "all provisions of this part and all other applicable Federal laws").  DOJ has not identified any analogous statutory provision under the Juvenile Gang Prevention Grant.  Even in their new statutory garb, the conditions remain unconstitutional.  The statutes on which DOJ now attempts to rely plainly do not impose any requirement on State and local governments, and construing them to create a mandate on State and local governments to participate in federal civil immigration enforcement and adjust their resources and practices accordingly would violate the Tenth Amendment.  The statutes also have nothing to do with federal grants, local criminal justice, or juvenile delinquency reduction and prevention.

85.     DOJ's 2018 Byrne JAG solicitation also provides that "[t]he reasonable costs . . . of complying with these conditions, including honoring any duly authorized

---

[15]  *See* 2018 Solicitation at 36-37; *See also* https://ojp.gov/funding/Explore/pdf/ FY18JAG_LOCAL_VARIOUS_Rev1003.pdf (Byrne JAG certification of compliance citing 8 U.S.C. §§ 1357(a), 1226(a), (c), and 1231(a)); https://ojp.gov/funding/Explore/pdf/FY18_GANGPLAN_VARIOUS_Rev1003.pdf (Juvenile Gang Prevention Grant certification of compliance, citing 8 U.S.C. §§ 1357(a), 1226(a), (c), and 1231(a)); Ex. B  ¶¶ 45 (citing 8 U.S.C. § 1357(a)), 46 (citing 8 U.S.C. §§ 1226, 1231, and 1366).  *See also* OJJDP Solicitation at 39-40.

requests from DHS that is encompassed by these conditions, will be allowable costs under the award." 2018 Solicitation at 37. This provision would use the grant funds, which Congress expressly designated for support of local criminal justice to unlawfully *fund* State and local participation in federal civil immigration enforcement.

86. This Court's intervention is required to invalidate these unlawful conditions.

### (3)   The "Harboring" Condition

87. Trump Administration officials have threatened to arrest local officials in so-called "sanctuary" jurisdictions—*i.e.*, jurisdictions the Trump Administration deems to be uncooperative in federal civil immigration enforcement because the jurisdictions prioritize their resources for use to protect the health and safety of their local residents and leave to the federal government the enforcement of federal civil immigration laws. In testimony before the Senate Judiciary Committee at a hearing on "Homeland Security Oversight," Secretary of Homeland Security Kirstjen Nielsen confirmed that, at DHS's request, DOJ is exploring such prosecution of local elected officials under 8 U.S.C. § 1324. Then-Acting Director of U.S. Immigration and Customs Enforcement Thomas Homan likewise stated that the Justice Department should "file charges against the sanctuary cities [referring to criminal prosecution of local officials and law enforcement under 8 U.S.C. § 1324]" and "hold back their funding."[16] He stated that "we gotta start charging some of these [sanctuary city] politicians with crimes."[17]

88. Following these threats, DOJ's Solicitations now condition a jurisdiction's statutorily-authorized FY 2018 Byrne JAG and Juvenile Gang Prevention Grant award on the jurisdiction agreeing: "Not to violate, or aid or abet any violation of, 8 U.S.C. § 1324(a) (forbidding any 'person,' in 'knowing or in reckless disregard of the fact that an

---

[16]  Brandon Conradis, *Trump ICE Pick: Politicians Who Run Sanctuary Cities Should Be Charged With Crimes*, THE HILL, Jan. 2, 2018, http://thehill.com/homenews/administration/367167-trump-ice-pick-politicians-who-run-sanctuary-cities-should-be-charged (quoting interview of then-acting ICE acting Director Thomas Homan with Fox News).

[17]  *Id.*

alien has come to, entered, or remains in the United States in violation of law,' to 'conceal, harbor, or shield from detection, or attempt to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation' or to 'engage in any conspiracy to commit any of the preceding acts'…'or aid or abet the commission of any of the preceding acts').'"  As with the Notice and Access Conditions, the FY 2018 Byrne JAG solicitation provides that "[t]he reasonable costs . . . of complying with" the Harboring Condition is an "allowable cost[] under the award."

89.    The certification with respect to the Harboring Condition requires that jurisdictions "not . . . publicly disclose federal law enforcement information in an attempt to conceal, harbor, or shield certain individuals from detection, including in violation of 8 U.S.C. § 1324(a)."[18]    In addition, jurisdictions must certify that they will not "require or authorize the public disclosure of federal law enforcement information in order to conceal, harbor, or shield from detection fugitives from justice or aliens illegally in the United States."  *Id.*

90.    It is not clear what state and local laws and policies DOJ intends to capture with its Harboring Condition.

91.    DOJ's imposition of the Harboring Condition is unlawful because 8 U.S.C. § 1324 does not apply to States and local governments and could not be construed to do so without violating the Tenth Amendment.  The statute also has nothing to do with federal grants, local criminal justice, or juvenile delinquency reduction and prevention. This Court's intervention is required to invalidate this unlawful condition.

### (4)    The "Questionnaire" Condition

---

[18] *See* https://ojp.gov/funding/Explore/pdf/FY18JAG_LOCAL_VARIOUS_Rev1003.pdf (Byrne JAG certification of compliance, citing 8 U.S.C. § 1324(a)); https://ojp.gov/funding/Explore/pdf/FY18_GANGPLAN_VARIOUS_Rev1003.pdf (Juvenile Gang Prevention Grant certification of compliance, citing 8 U.S.C. § 1324(a)); *see also* Ex. B ¶ 44 (citing 8 U.S.C. 1324 and 18 U.S.C. §§ 1071 and 1072).

92.     DOJ attempts to tether 2018 Byrne JAG and the Juvenile Gang Prevention Grants awards to federal civil immigration enforcement through mandating that States and local governments respond to certain civil immigration-related questions.  Those questions are:

- (1)     "Does your jurisdiction have any laws, policies, or practices related to whether, when, or how employees may communicate with DHS or ICE?"

- (2)     "Is your jurisdiction subject to any laws from a superior political entity (e.g., a state law that binds a city) that meet the description in question 1?"  2018 Solicitation at 52; OJJDP Solicitation at 30; Ex. B ¶ 62.

93.     If the answer to either question is yes, the State or local government must provide a copy of each law or policy; describe each practice; and explain how the law, policy, or practice complies with Section 1373.  Because the City of Los Angeles passes through a portion of its Byrne JAG grant monies to other localities, the condition also requires the City to collect this information from local governments that are its subgrantees.  The same would be true for the Juvenile Gang Prevention Grant.  If any subgrantee of money received by the City under the Juvenile Gang Prevention Grant is a governmental agency, the City would be required to collect the requisite information from the subgrantee.

94.     For the 2018 Byrne JAG award, DOJ states that responses to the questions "*must* be provided by the applicant as part of the JAG application" and that an agency "will not be able to access award funds (and its award will include a condition that withholds funds) until it submits these responses."  2018 Solicitation at 28 (emphasis added).

95.     The Juvenile Gang Prevention Grant solicitation states that the questionnaire "should" be submitted as an attachment to an agency's applications and also says that reviewers will, "as appropriate," consider attachments, of which the questionnaire is one, when rating applications.  OJJDP Solicitation at 30.

96.     The information sought by DOJ is not relevant to either of the two Grants and, in any event, has already been provided by the City to DOJ on multiple occasions in different contexts (although not as a prerequisite to receiving grant funding).  The apparent purpose of the questionnaire is to help DOJ enforce its other unlawful immigration-related conditions.

97.     This Court's intervention is required to invalidate this unlawful condition.

### (5) The 1366 Condition

98.     DOJ also conditions Byrne JAG and Juvenile Gang Prevention grants on a jurisdiction's certification of compliance with 8 U.S.C. § 1366(1) and (3).  *See* Ex. B ¶ 46.

99.     8 U.S.C. § 1366(1) and (3) require the Attorney General to submit various reports to Congress.  Section 1366 states that "the Attorney General shall submit to the Committees on the Judiciary of the House of Representatives and of the Senate a report detailing--(1) the number of illegal aliens incarcerated in Federal and State prisons for having committed felonies, stating the number incarcerated for each type of offense . . . [and] (3) programs and plans underway in the Department of Justice to ensure the prompt removal from the United States of criminal aliens subject to removal . . . ."  Those provisions do not concern federal grants, local criminal justice, or juvenile delinquency reduction and prevention.  They are also not directed to States and local governments.

100.    This Court's intervention is required to invalidate this unlawful condition.

## COUNT ONE
### (2018 Byrne JAG:  Violation of Separation of Powers / Ultra Vires Agency Action)

101.    Los Angeles incorporates and re-alleges each and every allegation contained above as if fully set forth herein.

102.    Defendants' imposition of immigration-related conditions, questionnaires, and certifications on Byrne JAG grant applicants violates constitutional principles of separation of powers and exceeds DOJ's lawful authority.

103.    The Constitution confers the power of the Spending Clause on Congress, not

the Executive Branch.  *See* U.S. Const. art. I, § 8, cl. 1.  It is Congress, not an Executive Branch agency, that has the constitutional authority to impose conditions on the receipt of federal funds, and even that power is subject to limitations such as relatedness and clarity. Defendants here are attempting to wield authority that is vested in Congress, not in DOJ.

104.    Congress specifically directed that Byrne JAG funds be issued as grants "for use by the State or unit of local government" in order to provide seven types of support for local criminal justice efforts—"additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice."  34 U.S.C. § 10152(a)(1).  Congress further enumerated eight types of criminal justice programs appropriate for funding, such as "[l]aw enforcement programs," "[p]rosecution and court programs," and "[p]revention and education programs." *Id.* § 10152(a)(1)(A)-(H).  Enforcing federal civil immigration laws is not among the enumerated programs.

105.    The programs to which Congress directed Byrne JAG funding do not require inducing State and local support for federal investigations of civil immigration status. Yet, the FY 2018 Byrne JAG application authorizes funding for civil immigration-related programs, and requires all jurisdictions to promise to assist in civil immigration enforcement as a condition of receiving funding.  Accordingly, DOJ has expressly and unlawfully shifted money that Congress appropriated to advance local criminal justice programs away from that clear statutory purpose to fund, instead, federal civil immigration enforcement, in violation of the statute.

106.    Congress specifically recognized when it created the Byrne JAG Program that State and local governments maintain the sovereign police power to protect the public health and safety of their residents by providing police departments with the "flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution."  H.R. Rep. No. 109-233, at 89 (2005).  The record shows Congress intended to "lessen the administrative burden of applying for the grants."  *Id.*  DOJ's blatant attempt to syphon monies from locally-driven Byrne JAG funded criminal justice

programs, like the City's CLEAR program, into a complex, "one size fits all" effort to support federal civil immigration enforcement, clearly runs afoul of this congressional enactment and purpose.

107.   The Challenged Conditions are grossly inconsistent with the funding formula for Byrne JAG grants established in 34 U.S.C. § 10156.  BJA is required, by congressional mandate, to allocate Byrne JAG funds based on a prescribed formula that takes into account a State's population, and the violent crime rates in a given State or locality.  34 U.S.C. § 10156(a), (d).  Congress enumerated specific certifications and assurances the applicant must make to access these funds.  Again, Congress did not include a condition mandating local law enforcement involvement in federal civil immigration enforcement.

108.   The Challenged Conditions also violate an express rule of construction imposed by Congress.  Congress directed that the statute creating the Byrne JAG Program not be construed to authorize DOJ to exercise "any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof."  34 U.S.C. § 10228(a).  The Challenged Conditions do just that, asserting DOJ's federal control over Los Angeles and its police department in the operation of the City's detention facilities.

109.   Imposition of the Challenged Conditions also exceeds DOJ's authority under the statutory requirement that the applicant certify it "will comply with all provisions of this part and all other applicable Federal laws."  34 U.S.C. § 10153(a)(5)(D).

110.   **The 1373 Condition**:  8 U.S.C. § 1373 is not an "applicable" law within the meaning of Section 10153(a)(5)(D) because it has no relevance to federal grants or the local criminal justice subject matter of the Byrne JAG Program.  It is also not a valid federal law, because it violates the Tenth Amendment.  Accordingly, DOJ lacks authority to require Byrne JAG applicants to certify compliance with 8 U.S.C. § 1373.

111.   **The 1644 Condition**:  8 U.S.C. § 1644 is not an "applicable" law within the meaning of Section 10153(a)(5)(D), because it has no relevance to federal grants or the

local criminal justice subject matter of the Byrne JAG Program.  Moreover, any application of Section 1644 to impose a mandate on States and local governments would violate the Tenth Amendment.  Accordingly, DOJ lacks authority to require Byrne JAG applicants to certify compliance with 8 U.S.C. § 1644.

112.   **The Notice and Access Conditions**:  DOJ cannot justify imposing the Notice and Access Conditions for the 2018 grant process by requiring applicants to certify that they do not "impede" federal officials' performance of their duties under 8 U.S.C. §§ 1226(a), (c), 1231(a), and 1357(a)(1).  These provisions do not purport to impose any obligations on States and local governments, and so cannot be "applicable" Federal laws within the meaning of Section 10153(a)(5)(D) for which an applicant could be required to certify that it complies.  If these statutes were construed to impose requirements on States and local governments, any such application would violate the Tenth Amendment.  And even if these laws could constitutionally impose obligations on States and local governments, and did in fact do so, they do not concern federal grants or the local criminal justice subject matter of the Byrne JAG Program.  For all of these reasons, DOJ lacks authority to require Byrne JAG applicants to certify compliance with 8 U.S.C. § 1226(a), (c), 1231(a), and 1357(a)(1).

113.   **The Harboring Condition**:  8 U.S.C. § 1324(a) does not apply to States and local governments.  If this statute were construed to impose requirements on States and local governments, any such application would violate the Tenth Amendment.  And even if this law could constitutionally impose obligations on States and local governments, and did in fact do so, it does not concern federal grants or the local criminal justice subject matter of the Byrne JAG Program.  For all of these reasons, DOJ lacks authority to require Byrne JAG applicants "not to publicly disclose federal law enforcement information in an attempt to conceal, harbor, or shield certain individuals from detection, including in violation of 8 U.S.C. § 1324(a)" or to certify that they will not "require or authorize the public disclosure of federal law enforcement information in order to

conceal, harbor, or shield from detection fugitives from justice or aliens illegally in the United States."

114.   **The Questionnaire Condition**:  DOJ has not identified any federal law requiring States and local governments to complete its questionnaire concerning participation in federal civil immigration enforcement.  Accordingly, the requirement of certifying compliance with applicable Federal laws cannot justify imposition of the Questionnaire Condition.

115.   **The 1366 Condition:** 8 U.S.C. § 1366(1) and (3) require the Attorney General to submit various reports to Congress.  Those provisions do not concern federal grants or the local criminal justice subject matter of the Byrne JAG Program.  They are also not directed to States and local governments.

116.   In sum, DOJ is attempting to exercise a power it does not have.  Defendants' attempt to condition federal funding of local criminal justice programs in cities like Los Angeles on the willingness of the award grantee to engage in federal civil immigration enforcement violates the separation of powers enshrined in our Constitution and is *ultra vires* in violation of the Byrne JAG statute.

## COUNT TWO
### (2018 Byrne JAG:  Violation of the Spending Clause)

117.   Los Angeles incorporates and re-alleges each and every allegation contained above as if fully set forth herein.

118.   Even if Congress could delegate the constitutional spending power to DOJ to impose the Challenged Conditions (which it cannot), and even if it had done so (which it has not), such power would be subject to constitutional restrictions that are not met here. It is well established that the Spending Clause requires that conditions on providing federal funds to States and local governments must, *inter alia*, be unambiguous, and be sufficiently germane to the purpose of the federal funds.  Otherwise, the "condition" amounts to impermissible regulation and commandeering of States and local

governments, in violation of the Tenth Amendment.  The Challenged Conditions fail both of these requirements.

119.   Conditions placed on the use by States and localities of federal funds must be stated unambiguously.  "The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts" the conditions, and there can be "no knowing acceptance if a State [or city] . . . is unable to ascertain what is expected of it." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).  It is Congress, not an agency, that must speak clearly in defining the type of conditions at issue.  But even if DOJ could satisfy this requirement by speaking with the requisite clarity, it has not done so here.  For example, it is not clear what state and local laws and policies that DOJ intends to address with the Harboring Condition.  Nor has DOJ clearly and unambiguously stated whether the version of the Notice Condition included in its FY 2018 solicitation would require States or localities to detain individuals beyond their scheduled release date.  These ambiguities do not allow Los Angeles to ascertain exactly what is expected of it.

120.   Conditions imposed on recipients of federal funding must "bear some relationship to the purpose of the federal spending."  *New York v. United States*, 505 U.S. 144, 167 (1992).  The Challenged Conditions concern federal civil immigration enforcement, which is not sufficiently related—or related at all—to the purpose of the Byrne JAG Program created by Congress specifically to support State and local criminal justice efforts through certain types of support and programs.

## COUNT THREE
### (2018 Byrne JAG:  Violation of Tenth Amendment and Anticommandeering)

121.   Los Angeles incorporates and re-alleges each and every allegation contained above as if fully set forth herein.

122.   The Tenth Amendment prohibits the federal government from requiring States and municipalities "to govern according to Congress' instructions," *New York*, 505 U.S. at 162, or "commanding the States' officers . . . to administer or enforce a

federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997).  The various federal statutes that DOJ attempts to use to justify the Challenged Conditions are either unconstitutional in violation of the Tenth Amendment on their face, as applied to State and local governments, or as DOJ interprets them to apply to State and local governments.

123.    **The 1373 Condition**:  DOJ's interpretation of 8 U.S.C. § 1373 to require State and local governments to participate in federal civil immigration enforcement violates the Tenth Amendment making it unconstitutional on its face.  Section 1373 purports to "unequivocally dictate[ ] what a state legislature may and may not do" by prohibiting States and localities from restricting their employees from communicating with the federal government about a person's citizenship and immigration status.  *See Murphy*, 138 S. Ct. at 1478; *Philadelphia*, 309 F. Supp. 3d at 331; *Chicago*, 2018 WL 3608564, at *10.

124.    **The 1644 Condition**:  8 U.S.C. § 1644 does not impose mandates solely on State and local governments, but to the extent it imposes on States and local governments mandates similar to those imposed by 8 U.S.C. § 1373, it is unconstitutional as applied for the same reasons.

125.    **The Notice and Access Conditions**:  8 U.S.C. §§ 1226(a), (c), 1231(a), and 1357(a)(1) do not purport to impose any obligations on States and local governments.  However, if DOJ were permitted to interpret those statutes to impose an obligation on States and local governments to participate in federal civil immigration enforcement, those statutes would be unconstitutional as applied.

126.    **The Harboring Condition**:  8 U.S.C. § 1324 does not purport to impose any obligations on States and local governments.  However, if DOJ were permitted to interpret that statute to apply to State and local officials, that statute would be unconstitutional as applied.

127.    **The 1366 Condition:**  8 U.S.C. § 1366(1) and (3) do not impose any obligations on States and local governments.  However, if DOJ were permitted to

interpret that statute to require participation in federal civil immigration enforcement from States and local governments, that statute would be unconstitutional as applied.

128.   Because these federal statutes are unconstitutional violations of the Tenth Amendment, or would be unconstitutional to the extent they were construed and applied as DOJ suggests, *i.e.*, to impose obligations on State and local governments to participate in federal civil immigration enforcement, DOJ cannot require jurisdictions to comply with its interpretation of these laws as a condition of receiving any Byrne JAG funds or any other federal funding.

### COUNT FOUR
### (2018 Byrne JAG:  Violation of the Administrative Procedure Act - Arbitrary and Capricious Agency Action)

129.   Los Angeles incorporates and re-alleges each and every allegation contained above as if fully set forth herein.

130.   Agency actions are unlawful and must be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

131.   DOJ's decision to impose civil immigration-related conditions and certifications in the FY 2018 Byrne JAG grant solicitation is arbitrary and capricious because DOJ imposed those conditions and certifications without any reasoned basis, provided no support for its linkage between participation by State and local law enforcement officials in federal civil immigration enforcement and the local criminal justice efforts that are the authorized purpose of the Byrne JAG grant, and appears to have relied on clearly erroneous and debunked interpretations of existing studies.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT FIVE
### (Juvenile Gang Prevention Grant:  Violation of Separation of Powers / Ultra Vires Agency Action)

132.  Los Angeles incorporates and re-alleges each and every allegation contained above as if fully set forth herein.

133.  Defendants' imposition of immigration-related conditions, questionnaires, and certifications on the 2018 Juvenile Gang Prevention Grant applicants violates constitutional principles of separation of powers and exceeds DOJ's lawful authority.

134.  The Constitution confers the power of the Spending Clause on Congress, not the Executive Branch.  *See* U.S. Const. art. I, § 8, cl. 1.  It is Congress, not an Executive Branch agency, that has the constitutional authority to impose conditions on the receipt of federal funds, and even that power is subject to limitations such as relatedness and clarity. Defendants here are attempting to wield authority that is vested in Congress, not in DOJ.

135.  The Juvenile Gang Prevention Grant is authorized under Part E of Subchapter II of the Juvenile Justice Act.  In passing that part of the Juvenile Justice Act, Congress granted authority to OJJDP to make grants to units of local government "to carry out projects for the development, testing, and demonstration of promising initiatives and programs for the prevention, control, or reduction of juvenile delinquency."  34 U.S.C. § 11171(a).  Congress specified three specific purposes for OJJDP grants: to "support State and local programs that prevent juvenile involvement in delinquent behavior," 34 U.S.C. § 11102(1);  "assist State and local governments in promoting public safety by encouraging accountability for acts of juvenile delinquency," *id*. § 11102(2); and "assist State and local governments in addressing juvenile crime through the provision of technical assistance, research, training, evaluation, and the dissemination of information on effective programs for combating juvenile delinquency." *Id.* § 11102(3).  Congress did not include the term "immigration," nor any variation of that term in the enabling legislation for the Juvenile Gang Prevention Grant, and enforcing

federal civil immigration laws is not stated or intimated as one of the purposes of the Juvenile Gang Prevention Grant.

136.   In the 2018 Consolidated Appropriations Act, Pub. L. No. 115-141, Mar. 23, 2018, 132 Stat. 348, 423, Congress provided "$27,500,000 for *delinquency prevention*, as authorized by section 505 of the [Juvenile Justice] Act, of which, pursuant to sections 261 and 262 [34 U.S.C. §§ 11171 and 11172] thereof . . . (B) $4,000,000 shall be for gang and youth violence education, prevention and intervention, and related activities." (emphasis added).

137.   The programs for which Congress authorized funding under the Juvenile Justice Act, including the Juvenile Gang Prevention Grant, do not include inducing State and local support for federal investigations of civil immigration status.  Yet, DOJ seeks to require all applicants for the FY 2018 Juvenile Gang Prevention Grant to promise to assist in civil immigration enforcement as a condition of receiving funding.  Accordingly, DOJ has expressly and unlawfully conditioned money that Congress appropriated to advance local juvenile delinquency prevention efforts on federal civil immigration enforcement, without statutory authorization to do so.

138.   In authorizing OJJDP grants to State and local governments, Congress specifically recognized that juvenile delinquency problems should be addressed through prevention programs that "work with juveniles, their families, local public agencies, and community based organizations[.]" *Id.* § 11101(a)(10)(A)(i).  Congress reinforced the importance of collaboration between local public agencies and the community when it explicitly found that "[c]oordinated juvenile justice and delinquency prevention projects that meet the needs of juveniles through the collaboration of the many *local* service systems juveniles encounter can help prevent juveniles from becoming delinquent and help delinquent youth return to a productive life." *Id.* § 11101(a)(11) (emphasis added). DOJ's attempt to condition monies for programs that assist locally-driven juvenile delinquency prevention efforts, such as the Juvenile Gang Prevention Grant program, on

state and local participation in federal civil immigration enforcement, is contrary to the text and purpose of the statute.

139.   The Challenged Conditions are also inconsistent with Congress's direction that "[t]he Administrator shall ensure that, to the extent reasonable and practicable, such grants are made to achieve an equitable distribution of such projects throughout the United States." 34 U.S.C. § 11171(a).  Congress granted limited discretion to DOJ to impose conditions unrelated to the purpose of the grant.  By allocating grant funds only to those jurisdictions willing to accede to the Challenged Conditions, DOJ is acting contrary to the authority given to it under the statute.

140.   **The 1373 Condition**:  The Juvenile Gang Prevention Grant statute does not authorize the imposition of immigration-related conditions.  8 U.S.C. § 1373 has no relevance to federal grants or the local criminal justice subject matter of the Juvenile Gang Prevention Grant.  It is also not a valid federal law, because it violates the Tenth Amendment.  Accordingly, DOJ lacks authority to require Juvenile Gang Prevention Grant applicants to certify compliance with 8 U.S.C. § 1373.

141.   **The 1644 Condition**:  The Juvenile Gang Prevention Grant statute does not authorize the imposition of immigration-related conditions.  8 U.S.C. § 1644 has no relevance to federal grants or the locally driven juvenile delinquency prevention effort which is the subject matter of the Juvenile Gang Prevention Grant.  Moreover, any application of Section 1644 to impose a mandate on States and local governments would violate the Tenth Amendment. Accordingly, DOJ lacks authority to require the Juvenile Gang Prevention Grant Program applicant to certify compliance with 8 U.S.C. § 1644.

142.   **The Notice and Access Conditions**:  The Juvenile Gang Prevention Grant statute does not authorize the imposition of immigration-related conditions.  DOJ cannot justify imposing the Notice and Access Conditions for the Juvenile Gang Prevention Grant process by requiring applicants to certify that they do not "impede" federal officials' performance of their duties under 8 U.S.C. §§ 1226(a), (c), 1231(a), and 1357(a)(1).  These provisions do not purport to impose any obligations on States and

local governments.  If these statutes were construed to impose requirements on States and local governments, any such application would violate the Tenth Amendment.  And even if these laws could constitutionally impose obligations on States and local governments, and did in fact do so, they do not concern federal grants or the juvenile delinquency reduction and prevention subject matter of the Juvenile Gang Prevention Grant.  For all of these reasons, DOJ lacks authority to require Juvenile Gang Prevention Grant applicants to certify compliance with 8 U.S.C. §§ 1226(a), (c), 1231(a), and 1357(a)(1).

143.   **The Harboring Condition**:  The Juvenile Gang Prevention Grant statute does not authorize the imposition of immigration-related conditions.  8 U.S.C. § 1324(a) does not apply to States and local governments.  If this statute were construed to impose requirements on States and local governments, any such application would violate the Tenth Amendment.  And even if this law could constitutionally impose obligations on States and local governments, and did in fact do so, it does not concern federal grants or the juvenile delinquency reduction and prevention subject matter of the Juvenile Gang Prevention Grant.  For all of these reasons, DOJ lacks authority to require Juvenile Gang Prevention Grant applicants "not to publicly disclose federal law enforcement information in an attempt to conceal, harbor, or shield certain individuals from detection, including in violation of 8 U.S.C. § 1324(a)" or to certify that they will not "require or authorize the public disclosure of federal law enforcement information in order to conceal, harbor, or shield from detection fugitives from justice or aliens illegally in the United States."

144.   **The Questionnaire Condition**:  The Juvenile Gang Prevention Grant statute does not authorize the imposition of immigration-related conditions.  DOJ has not identified any federal law requiring States and local governments to complete its questionnaire concerning participation in federal civil immigration enforcement.  Accordingly, the Questionnaire Condition is unlawful.

145.   **The 1366 Condition:** The Juvenile Gang Prevention Grant statute does not authorize the imposition of immigration-related conditions.  8 U.S.C. § 1366(1) and (3)

require the Attorney General to submit various reports to Congress. Those provisions do not concern federal grants, and are not directed to States and local governments.

146. In sum, DOJ is attempting to exercise a power it does not have. Defendants' attempt to condition federal funding of local juvenile delinquency prevention programs in cities like Los Angeles on the willingness of the award grantee to engage in federal civil immigration enforcement violates the separation of powers enshrined in our Constitution and is *ultra vires* in violation of Congressional legislation authorizing the Juvenile Gang Prevention Grant.

## COUNT SIX
### (Juvenile Gang Prevention Grant: Violation of the Spending Clause)

147. Los Angeles incorporates and re-alleges each and every allegation contained above as if fully set forth herein.

148. Even if Congress could delegate the constitutional spending power to DOJ to impose the Challenged Conditions (which it cannot), and even if it had done so (which it has not), such power would be subject to constitutional restrictions that are not met here. It is well established that the Spending Clause requires that conditions on providing federal funds to States and local governments must, *inter alia*, be sufficiently germane to the purpose of the federal funds. Otherwise, the "condition" amounts to impermissible regulation and commandeering of States and local governments, in violation of the Tenth Amendment. The Challenged Conditions fail both of these requirements.

149. Conditions placed on the use by States and localities of federal funds must be stated unambiguously. "The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts" the conditions, and there can be "no knowing acceptance if a State [or city] . . . is unable to ascertain what is expected of it." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). It is Congress, not an agency, that must speak clearly in defining the type of conditions at issue. But even if DOJ could satisfy this requirement by speaking with the requisite clarity, it has not done so here. For example, it is not clear what state and

local laws and policies that DOJ intends to address with the Harboring Condition. Nor has DOJ clearly and unambiguously stated whether the version of the Notice Condition included in its Juvenile Gang Prevention Grant solicitation would require States or localities to detain individuals beyond their scheduled release date. These ambiguities do not allow Los Angeles to ascertain exactly what is expected of it.

150. Conditions imposed on recipients of federal funding must "bear some relationship to the purpose of the federal spending." *New York*, 505 U.S. at 167. The Challenged Conditions concern federal civil immigration enforcement, which is not sufficiently related—or related at all—to the purpose of the Juvenile Gang Prevention Grant Program created by Congress to assist State and local governments "to carry out projects for the development, testing, and demonstration of promising initiatives and programs for the prevention, control, or reduction of juvenile delinquency." 34 U.S.C. § 11171(a).

### COUNT SEVEN
### (Juvenile Gang Prevention Grant:  Violation of Tenth Amendment and Anticommandeering)

151. Los Angeles incorporates and re-alleges each and every allegation contained above as if fully set forth herein.

152. The Tenth Amendment prohibits the federal government from requiring States and municipalities "to govern according to Congress' instructions." *New York*, 505 U.S. at 162, or "commanding the States' officers . . . to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997). The various federal statutes that DOJ attempts to use to justify the Challenged Conditions are either unconstitutional in violation of the Tenth Amendment on their face, as applied to State and local governments, or as DOJ interprets them to apply to State and local governments.

153. **The 1373 Condition**:  DOJ's interpretation of 8 U.S.C. § 1373 to require State and local governments to participate in federal civil immigration enforcement

violates the Tenth Amendment making it unconstitutional on its face.  Section 1373 purports to "unequivocally dictate[ ] what a state legislature may and may not do" by prohibiting States and localities from restricting their employees from communicating with the federal government about a person's citizenship and immigration status.  *See Murphy*, 138 S. Ct. at 1478; *Philadelphia*, 309 F. Supp. 3d at 331; *Chicago*, 2018 WL 3608564, at *10.

154.   **The 1644 Condition**:  8 U.S.C. § 1644 does not impose mandates solely on State and local governments, but to the extent it imposes on States and local governments mandates similar to those imposed by 8 U.S.C. § 1373, it is unconstitutional as applied for the same reasons.

155.   **The Notice and Access Conditions**:  8 U.S.C. §§ 1226(a), (c), 1231(a), and 1357(a)(1) do not purport to impose any obligations on States and local governments.  However, if DOJ were permitted to interpret those statutes to impose an obligation on States and local governments to participate in federal civil immigration enforcement, those statutes would be unconstitutional as applied.

156.   **The Harboring Condition**:  8 U.S.C. § 1324 does not purport to impose any obligations on States and local governments.  However, if DOJ were permitted to interpret that statute to apply to State and local officials, that statute would be unconstitutional as applied.

157.   **The 1366 Condition:**  8 U.S.C. § 1366(1) and (3) do not impose any obligations on States and local governments.  However, if DOJ were permitted to interpret that statute to require participation in federal civil immigration enforcement from States and local governments, that statute would be unconstitutional as applied.

158.   Because these federal statutes are unconstitutional violations of the Tenth Amendment, or would be unconstitutional to the extent they were construed and applied as DOJ suggests, *i.e.*, to impose obligations on State and local governments to participate in federal civil immigration enforcement, DOJ cannot require jurisdictions to comply with its interpretation of these laws as a condition of receiving any Juvenile Gang

Prevention Grant funds or any other federal funding.

## COUNT EIGHT

**(Juvenile Gang Prevention Grant:  Violation of the Administrative Procedure Act - Arbitrary and Capricious Agency Action)**

159.   Los Angeles incorporates and re-alleges each and every allegation contained above as if fully set forth herein.

160.   Agency actions are unlawful and must be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

161.   DOJ's decision to impose civil immigration-related conditions and certifications in the Juvenile Gang Prevention Grant solicitation is arbitrary and capricious because DOJ imposed those conditions and certifications without any reasoned basis, provided no support for its linkage between participation by State and local law enforcement officials in federal civil immigration enforcement and the local juvenile delinquency prevention efforts that are the authorized purpose of the Juvenile Gang Prevention Grant, and appears to have relied on clearly erroneous and debunked interpretations of existing studies.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff City of Los Angeles respectfully requests that this Court enter judgment in its favor, and grant the following relief:

1.   Declare that the Challenged Conditions in the FY 2018 Byrne JAG solicitation are unconstitutional or otherwise unlawful;

2.   Set aside the Challenged Conditions on FY 2018 Byrne JAG funds, and permanently enjoin Defendants from using the Challenged Conditions or substantively similar conditions in awarding Byrne JAG funding and from withholding or delaying Byrne JAG funding based on the Challenged Conditions;

3.   Declare that the Challenged Conditions in the FY 2018 Juvenile Gang Prevention Grant solicitation are unconstitutional or otherwise unlawful;

4.      Set aside the Challenged Conditions on FY 2018 Juvenile Gang Prevention Grant funds, and permanently enjoin Defendants from using the Challenged Conditions or substantively similar conditions in awarding Juvenile Gang Prevention Grant funding and from withholding or delaying Juvenile Gang Prevention Grant funding based on the Challenged Conditions;

5.      Declare that 8 U.S.C. § 1373 is unconstitutional as applied to State and local governments;

6.      Declare that 8 U.S.C. § 1644 is unconstitutional as applied to State and local governments;

7.      Declare that 8 U.S.C. §§ 1226(a), (c), 1231(a), 1324, 1357(a)(1), and 1366(1), (3) do not require State and local governments to participate in federal civil immigration enforcement, and would be unconstitutional as applied to the extent that they did;

8.      Issue a writ of mandamus compelling Defendants to immediately disburse Los Angeles's FY 2018 Byrne JAG award, without further delay.;

9.      Award Plaintiff City of Los Angeles reasonable fees and costs; and,

10.     Grant any further relief that this Court may deem fit and proper.

FIRST AMENDED COMPLAINT

Dated: October 5, 2018

MITCHELL A. KAMIN
NEEMA T. SAHNI
Covington & Burling LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, California 90067-4643

DAVID M. ZIONTS, *pro hac vice*
IVANO M. VENTRESCA, *pro hac vice*
BENJAMIN L. CAVATARO, *pro hac vice*
Covington & Burling LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001

Respectfully Submitted,

By: _____
      MICHAEL N. FEUER
      City Attorney

JAMES P. CLARK
Chief Deputy City Attorney
LEELA A. KAPUR
Executive Assistant City Attorney
VALERIE L. FLORES
Managing Senior Assistant City
   Attorney
MICHAEL DUNDAS
Deputy City Attorney
DANIA MINASSIAN
STEVEN H. HONG
200 North Main Street, City Hall
   East Room 700
Los Angeles, California 90012
Telephone: (213) 978-8344
Facsimile: (213) 978-8312

*Attorneys for Plaintiff*
*City of Los Angeles*