JOSEPH H. HUNT
Assistant Attorney General
NICOLA T. HANNA
United States Attorney
JOHN R. TYLER
Assistant Director
W. SCOTT SIMPSON (Va. Bar #27487)
Senior Trial Counsel
Department of Justice, Civil Division
318 South Sixth Street, Room 244
Springfield, Illinois 62701
Telephone:   (202) 514-3495
Facsimile:   (217) 492-4888
E-mail:        scott.simpson@usdoj.gov

COUNSEL FOR DEFENDANTS

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF LOS ANGELES,<br><br><br>Plaintiff,<br><br>v.<br><br><br>MATTHEW G. WHITAKER,<br>Acting Attorney General, *et al.*,<br><br><br>Defendants. | Case No. 2:18-cv-07347-R-JC<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL DISMISSAL OR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES; OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT OR PRELIMINARY INJUNCTION**<br><br>Date:        January 7, 2019<br>Time:        10:00 a.m. |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................iii

NOTICE OF MOTION AND MOTION TO DISMISS OR
FOR SUMMARY JUDGMENT ............................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES........................................... 1

INTRODUCTION ................................................................................................ 1

STATUTORY AND ADMINISTRATIVE BACKGROUND ................................. 3

    I.     The Immigration and Nationality Act........................................................ 3

    II.    Gang Suppression Planning Grants Program ........................................... 3

    III.   Edward Byrne Memorial Justice Assistance Grant Program.................. 9

ARGUMENT ...................................................................................................... 11

    I.     Plaintiff Lacks Standing to Challenge the Requirements in
        the FY 2018 Gang Suppression Planning Grants Program................... 11

    II.    The Challenged Requirements in the FY 2018 Gang Suppression
        Program Are Permissible........................................................................ 13

        A.    The Gang Suppression Requirements Are Authorized
             by Statute and Do Not Violate the Separation of Powers.......... 13

        B.    The Gang Suppression Requirements Are Consistent
             with the Spending Clause ........................................................... 18

            1.    The Requirements Are Related to the Purposes
                  of the Gang Suppression Program.................................... 18

            2.    The Gang Suppression Requirements Are
                  Unambiguous .................................................................. 20

i

C.     The Gang Suppression Requirements Are Consistent
       with the Tenth Amendment .......................................................22

III.   The Public-Disclosure Condition and the Requirement to
       Provide Information about Laws and Policies in the FY
       2018 Byrne JAG Program Are Permissible............................................24

       A.     The Public-Disclosure Condition and the Requirement
              to Provide Information about Laws and Policies Are
              Authorized by Statute and Do Not Violate the
              Separation of Powers ...................................................................24

       B.     The Public-Disclosure Condition and the Requirement
              to Provide Information about Laws and Policies
              Are Consistent with the Spending Clause...................................27

IV.    All of the Challenged Requirements Are Consistent with
       the Administrative Procedure Act ..........................................................28

V.     Plaintiff Does Not Met the Requirements for
       Preliminary Relief...................................................................................31

VI.    Any Injunction Should Be Limited to Los Angeles ..............................31

CONCLUSION.................................................................................................32

1

# TABLE OF AUTHORITIES

2

3

**CASES**

4   *Arizona v. United States*, 567 U.S. 387 (2012) ...........................................3, 4, 5, 31

5   *Barbour v. Wash. Metro. Area Transit Auth.*, 374 F.3d 1161 (D.C. Cir. 2004) ......19

6

7   *Bell v. Reno*, 218 F.3d 86 (2d Cir. 2000)...................................................................25

8   *Benning v. Georgia*, 391 F.3d 1299 (11th Cir. 2004) ...............................................22

9   *Bigelow v. Virginia*, 421 U.S. 809 (1975) .................................................................12

10

11   *Bravo v. Green*, No. CV 16-4937 (JLL), 2017 WL 2268315
      (D.N.J. May 24, 2017) ...........................................................................................19

12

13   *Calmo v. Sessions*, No. C 17-07124 WHA, 2018 WL 2938628
      (N.D. Cal. June 12, 2018) .......................................................................................19

14

15   *Champaign Cty., Ill. v. U.S. Law Enf't Assistance Admin.*,
      611 F.2d 1200 (7th Cir. 1979) ...................................................................6, 7, 9, 10

16

17   *Charles v. Verhagen*, 348 F.3d 601 (7th Cir. 2003)..................................................22

18   *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971)............29, 31

19   *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018)..................32

20

21   *Clinton v. City of N.Y.*, 524 U.S. 417 (1998)............................................................13

22   *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*,
      527 U.S. 666 (1999)................................................................................................18

23

24   *DKT Mem'l Fund Ltd.*, 887 F.2d 275 ......................................................................13

25   *Duvall v. Atty. Gen. of U.S.*, 436 F.3d 382 (3d Cir. 2006) .......................................27

26

27   *Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832 (9th Cir. 2003) .....................................22

28   *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ...............................29, 30

*Gill v. Whitford,* 138 S. Ct. 1916 (2018) ...................................................... 32

*International Union v. Donovan,* 746 F.2d 855 (D.C. Cir. 1984) ............... 15, 16, 29

*J & G Sales Ltd. v. Truscott,* 473 F.3d 1043 (9th Cir. 2007) .................................. 29

*Johnson v. Consumerinfo.com, Inc.,* 745 F.3d 1019 (9th Cir. 2014) ................ 25, 26

*Koslow v. Pennsylvania,* 302 F.3d 161 (3d Cir. 2002) ............................................ 28

*Lincoln v. Vigil,* 508 U.S. 182 (1993) .......................................... 2, 15, 16, 29

*Los Angeles Haven Hosp. v. Sebelius,* 638 F.3d 644 (9th Cir. 2011) ..................... 32

*Mayweathers v. Newland,* 314 F.3d 1062 (9th Cir. 2002) ................................. 18, 22

*Nat'l Fed'n of Indep. Bus. v. Sebelius,* 567 U.S. 519 (2012) ............................. 18, 22

*Navarro v. Block,* 250 F.3d 729 (9th Cir. 2001) ...................................................... 11

*New Comm Wireless Servs., Inc. v. SprintCom, Inc.,*
   287 F.3d 1 (1st Cir. 2002) ................................................................................. 31

*New York v. United States,* 505 U.S. 144 (1992) .............................................. 18, 22

*Padilla v. Kentucky,* 559 U.S. 356 (2010) .............................................................. 28

*Providence Yakima Med. Ctr. v. Sebelius,* 611 F.3d 1181 (9th Cir. 2010) ............. 29

*South Dakota v. Dole,* 483 U.S. 203 (1987) ................................................ 18, 20, 21

*Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83 (1998) ................................... 12

*Thomas v. Zachry,* 256 F. Supp. 3d 1114 (D. Nev. 2017) ....................................... 31

*Town of Chester v. Laroe Estates, Inc.,* 137 S. Ct. 1645 (2017) ............................. 32

*Trump v. Hawaii,* 138 S. Ct. 2392 (2018) .............................................................. 32

*Van Wyhe v. Reisch,* 581 F.3d 639 (8th Cir. 2009) ................................................. 22

iv

*Virginia Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379 (4th Cir. 2001) ...........32

*Whitmore v. Arkansas*, 495 U.S. 149 (1990)..............................................................12

*Winter v. NRDC*, 555 U.S. 7 (2008) .........................................................................31

## STATUTES AND LEGISLATIVE HISTORY

5 U.S.C. § 701(a)(2) ...................................................................................................29

8 U.S.C. § 1227(a)(2) ............................................................................................4, 27

8 U.S.C. § 1324.........................................................................................................23

8 U.S.C. § 1324(a) ......................................................................................................7

8 U.S.C. § 1357(a)(1) ............................................................................................4, 8

8 U.S.C. § 1373(a) ....................................................................................................21

8 U.S.C. § 1373(b) ....................................................................................................21

8 U.S.C. § 1226(c) ....................................................................................4, 8, 19, 27

8 U.S.C. § 1226(d) ....................................................................................................31

8 U.S.C. § 1227(a)(2) ............................................................................................4, 27

8 U.S.C. § 1228(a) ..............................................................................................19, 27

8 U.S.C. § 1229a..........................................................................................................4

8 U.S.C. § 1231(a) ....................................................................................4, 8, 19, 27

8 U.S.C. § 1324(a) ......................................................................................................7

8 U.S.C. § 1357(a)(1) ..................................................................................................8

8 U.S.C. § 1357(g).....................................................................................................31

8 U.S.C. § 1373 ................................................................................3, 8, 30, 31

8 U.S.C. § 1378 ......................................................................................19, 27

8 U.S.C. § 1644 ............................................................................................3, 8

18 U.S.C. § 521 ...............................................................................................19

18 U.S.C. § 1071 .........................................................................................7, 20

28 U.S.C. § 510 ...............................................................................................25

28 U.S.C. § 530C(a)(4) ....................................................................................2

34 U.S.C. § 10102(a)(2) ...........................................................................passim

34 U.S.C. § 10102(a)(6) ................................................................3, 9, 24, 25

34 U.S.C. § 10122(c)(2)(F) ...........................................................................18

34 U.S.C. § 10141(b) ......................................................................................25

34 U.S.C. § 10152(a)(1) ...................................................................9, 19, 27

34 U.S.C. § 10153(a) .....................................................................2, 9, 10, 17

34 U.S.C. § 10156 .............................................................................................9

34 U.S.C. § 10202(c)(1)(B) ...........................................................................10

34 U.S.C. § 10228 ...........................................................................................17

34 U.S.C. § 10228(a) ................................................................................17, 26

34 U.S.C. § 10251(a)(1) ...................................................................................9

34 U.S.C. § 11171 ...........................................................................................14

34 U.S.C. § 11172 ...........................................................................................14

42 U.S.C. § 3712(a)(6) (2005) .......................................................................24

Pub. L. No. 90-351, 82 Stat. 197 (1968) ....................................................... 1

Pub. L. No. 96-157, 93 Stat. 1167 (1979) ................................................... 18

Pub. L. No. 107-273, 116 Stat. 1758 (2002) ............................................... 14

Pub. L. No. 109-162, 119 Stat. 2960 (2006) .......................................... 24, 25

Pub. L. No. 115-141, 132 Stat. 348 (2018) ............................................ 6, 14

H.R. Rep. No. 109-233 (2005) .................................................................... 25

**EXECUTIVE MATERIALS**

8 C.F.R. § 287.5(a)(1) ............................................................................... 4, 8

Exec. Order No. 13,688, 80 Fed. Reg. 3451 (Jan. 16, 2015) ..................... 10

Exec. Order No. 13,809, 82 Fed. Reg. 41,499 (Aug. 28, 2017) ................. 10

**NOTICE OF MOTION AND MOTION TO DISMISS
OR FOR SUMMARY JUDGMENT**

PLEASE TAKE NOTICE that on Monday, January 7, 2019, at 10:00 a.m., or as soon thereafter as counsel may be heard, before The Honorable Manuel L. Real, in Courtroom 880 on the Eighth Floor of the Edward R. Roybal Federal Building and United States Courthouse, 255 East Temple Street, Los Angeles, the defendants will move, and hereby do move, for partial dismissal of this action under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, or, alternatively, for partial summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Defendants seek dismissal or judgment as to (1) all of plaintiff's claims regarding the Fiscal Year 2018 Gang Suppression Planning Grants Program, and (2) plaintiff's challenges to the public-disclosure condition and the requirement to provide information regarding the applicant's laws and policies in the FY 2018 Edward Byrne Memorial Justice Assistance Grant Program.

This motion is based on the following Memorandum of Points and Authorities, Defendants' Request for Judicial Notice, the "Statement of Uncontro-verted Facts in Support of Defendants' Motion for Partial Summary Judgment; Response to Plaintiff's Statement of Facts," the evidence and records on file in this action, and any other written or oral evidence or argument that may be presented at or before the time this motion is heard by the Court.

Dated:  November 13, 2018

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

NICOLA T. HANNA
United States Attorney

JOHN R. TYLER
Assistant Director

1

2 /s/ W. Scott Simpson

3 _____
W. SCOTT SIMPSON (Va. Bar #27487)
4 Senior Trial Counsel

5 Department of Justice, Civil Division
6 318 South Sixth Street, Room 244
Springfield, Illinois 62701
7 Telephone:  (202) 514-3495
8 Facsimile:   (217) 492-4888
E-mail:      scott.simpson@usdoj.gov
9
10 COUNSEL FOR DEFENDANTS

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

Law enforcement in this country is a cooperative endeavor.  Unlawful acts often implicate the jurisdiction of more than one agency, and thus local, state, tribal, and federal officials work together in a variety of ways to fight crime and ensure public safety.  Unfortunately, plaintiff rejects this proposition.  It prefers to release into the community aliens it saw fit to arrest for criminal violations rather than sharing law enforcement-related information with the Federal Government that might lead to immigration enforcement against those individuals.  That the Department of Justice ("Department") would expect basic cooperation when it gives out federal funds should be unsurprising.  When Congress created the Department's primary grant-making component, the Office of Justice Programs ("OJP"), it made a specific finding that "law enforcement efforts must be better coordinated, intensified, and made more effective at all levels of government."  Pub. L. No. 90-351, 82 Stat. 197 (1968).  The grant requirements challenged in this case all reflect a very basic application of this important principle – the ability of one law enforcement agency to obtain relevant information from and take custody of those held by another law enforcement agency.  This basic type of cooperation is specifically contemplated by the Immigration and National Act ("INA") and fully consistent with the grant programs at issue here.

Los Angeles challenges certain program requirements in the Fiscal Year 2018 Gang Suppression Planning Grant ("Gang Suppression") and the Edward Byrne Memorial Justice Assistance Grant Program ("Byrne JAG Program").  The City challenges these requirements under the Separation of Powers, the Spending Clause, the Tenth Amendment, and the Administrative Procedure Act.  Plaintiff mistakes the nature of these grants and their requirements, and is not entitled to the relief it seeks.

This Court has previously considered certain conditions on the Byrne JAG formula grant program from the previous fiscal year.  Defendants respectfully

disagree with the Court's holdings in that case, and hereby reiterate, incorporate, and preserve for further review the arguments they made therein.[1]  But, as explained below, the Court need not revisit its rulings in order to reject the full relief plaintiff seeks here.

First, the Gang Suppression grant is a new program that the Department created this fiscal year to address gang violence including, especially, transnational gangs; it is a discretionary grant that works differently from the Byrne JAG grant this Court considered earlier this year.  The funds for this competitive program come from a lump sum appropriation, giving the Department exceedingly broad authority to determine how these funds should be spent.  *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) ("[T]he very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way."); *see* 28 U.S.C. § 530C(a)(4) (authorizing the Attorney General to carry out Department activities "through any means, including . . . through . . . grants").  Recognizing the role of the Department of Homeland Security ("DHS") in combatting transnational gangs, the Department expects grant recipients to provide access and information to DHS about criminal aliens in their criminal custody.

Second, plaintiff challenges aspects of both grants that have not previously been addressed.  In relation to both the Gang Suppression program and the Byrne JAG Program, plaintiff also challenges a question in the grant application related to an applicant's information-sharing policies.  This is not an award condition, and the Department has considerable discretion in crafting its grant applications.  Indeed, Byrne JAG applicants must submit an application "in such form as the Attorney General may require."  34 U.S.C. § 10153(a).

---

[1] *See Los Angeles v. Whitaker*, No. 2:17-cv-07215-R-JC (C.D. Cal.), Dkt. Nos. 86, 89.  Defendants will not discuss at length herein certain FY 2018 grant conditions that are very similar to FY 2017 conditions that this Court has already enjoined.

Plaintiff also challenges a prohibition in both grants on publicly disclosing information obtained through law enforcement channels for the purpose of frustrating law enforcement operations. The purpose of such a requirement is obvious: if law enforcement partners at various levels of government are going to work together to address public safety, they must be free to share information without fear that the information will be misappropriated and misused. OJP's authority to include this condition is clear: it is authorized to "maintain liaison with . . . State governments in matters relating to criminal justice." 34 U.S.C. § 10102(a)(2).

Finally, plaintiff challenges FY 2018 requirements calling for compliance with two federal laws, 8 U.S.C. §§ 1373 and 1644. Those laws preclude local policies that bar the sharing of immigration-related information. Los Angeles did not challenge this condition with respect to the FY 2017 grant, but does so now. This requirement is authorized by the Department's authority to require compliance with all "applicable Federal laws," *id*. § 10153(a)(5)(D), to place "special conditions on all grants," and to determine "priority purposes for formula grants," 34 U.S.C. § 10102(a)(6).

For these reasons, all of plaintiff's claims should be dismissed or judgment should be entered for the defendants on those claims and challenges, and plaintiff's motion for partial summary judgment or preliminary injunction should be denied.[2]

## STATUTORY AND ADMINISTRATIVE BACKGROUND

### I.    The Immigration and Nationality Act

Enforcement of the immigration laws, including and especially the investigation and apprehension of criminal aliens, is quintessentially a law enforcement function. The INA gives the Executive Branch considerable authority and discretion to conduct and direct immigration enforcement pursuant to federal policy objectives. *See Arizona v. United States*, 567 U.S. 387, 396-97 (2012). For example, federal

---

[2] As noted at note 6 *infra*, plaintiff's claims regarding the custody condition, the interview condition, and the information condition on FY 18 Byrne JAG grants should be stayed because they are already subject to a permanent injunction.

immigration authorities are empowered, "without warrant . . . to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States," 8 U.S.C. § 1357(a)(1), and the governing regulations authorize conducting such interrogation "anywhere in or outside the United States," 8 C.F.R. § 287.5(a)(1).

Several outcomes and federal agency responsibilities under the INA turn on the existence and timing of local or state criminal proceedings against aliens. For example, the INA provides that aliens who have committed certain classes of crimes – whether federal, state, or local – shall be removed from the United States upon order of the Attorney General or the Secretary of Homeland Security. *See*, *e.g.*, 8 U.S.C. § 1227(a)(2). Among other things, an alien convicted of an "aggravated felony" is deportable, as is an alien "convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct." *Id.* § 1227(a)(2)(A)(ii), (iii). Further, if an alien has been convicted of a certain subset of the crimes listed, the INA *requires* the Attorney General or Secretary to take custody of the alien "when the alien is released" from criminal custody. *Id.* § 1226(c)(1). Once an immigration judge has ordered the removal of an alien, the alien must be removed from the country within 90 days, *id.* § 1231(a)(1); *see id.* § 1229a, except (among other exceptions not relevant here) that an alien sentenced to imprisonment may not be removed "until the alien is released from imprisonment," *id.* § 1231(a)(4), in which case the mandatory 90-day removal period begins on "the date the alien is released from detention or confinement," *id.* § 1231(a)(1)(B).

The connection between immigration law and criminal law is also reflected in the fact that the INA contains a number of criminal provisions related to immigration. For example, the statute imposes criminal penalties on an alien for failing to register with federal authorities and for failing to notify federal authorities of a change of address. *Id.* § 1306(a), (b). More seriously, the INA imposes criminal penalties on any person who conceals, harbors, or shields an alien from detention "in any place, including any building or any means of transportation," "knowing or in

reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law." *Id*. § 1324(a)(1)(A)(iii).

The INA repeatedly contemplates coordination between federal officials and state and local officials on immigration enforcement.  For example, state and local officers are authorized to make arrests for violation of the INA's prohibitions against smuggling, transporting, or harboring aliens, *id*. § 1324(c), and to arrest certain felons who have unlawfully returned to the United States, *id*. § 1252c; *see id*. § 1357(g)(1) (authorizing formal cooperative agreements under which trained and qualified state and local officers may perform specified "[f]unction[s] of a federal immigration officer in relation to the investigation, apprehension, or detention of aliens"); *id*. § 1357(g)(10) (authorizing cooperation in "identification, apprehension, detention, or removal of aliens not lawfully present in the United States" even in absence of formal agreement).  Consistent with this coordination and with the importance of state and local criminal proceedings under the INA, certain provisions of federal immigration law protect the transfer of information regarding aliens between and among federal officials and state and local government entities.  Section 1373 of Title 8 provides that "a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from [federal immigration authorities] information regarding the citizenship or immigration status, lawful or unlawful, of any individual."  Section 1644 of Title 8 contains substantially the same proscription.  Section 1373 also states that no person or agency may prohibit or restrict a federal, state, or local government entity from "[m]aintaining such information" or from "[e]xchanging such informa-tion with any other Federal, State, or local government entity."  By the same token, the INA requires federal immigration authorities to "cooperate with the States" to ensure that state and local officials have information to assist them in making arrests under the INA.  *Id*. § 1252c(b).

## II.   Gang Suppression Planning Grants Program

In the Fiscal Year 2018 appropriation for the Department of Justice, Congress included funds for certain purposes that were not previously included in any Department program.  Specifically, the appropriation included the following:

> For grants, contracts, cooperative agreements, and other assistance authorized by the Juvenile Justice and Delinquency Prevention Act of 1974 ("the 1974 Act") . . . $282,500,000, to remain available until expended as follows . . .
>
> (3) $27,500,000 for delinquency prevention, as authorized by section 505 of the 1974 Act, of which, pursuant to sections 261 and 262 thereof . . .
>
> (B) *$4,000,000 shall be for gang and youth violence education, prevention and intervention, and related activities . . . .*
>
> (E) *$8,000,000 shall be for community-based violence prevention initiatives, including for public health approaches to reducing shootings and violence . . . .*

Pub. L. No. 115-141, 132 Stat. 348, 420, 422-23 (2018) (emphasis added).

To carry out the italicized language, OJP created two new programs within OJP's Office of Juvenile Justice and Delinquency Prevention, one of which, the FY 2018 Gang Suppression Planning Grants Program, is involved here.[3]  In contrast to the Byrne JAG Program previously considered by this Court, this is a competitive, discretionary grant program rather than a formula grant program, meaning that only certain of the applicants will receive an award.  *See* Declaration of Caren Harp ¶ 2 (Attachment 1 hereto); *see also Champaign Cty., Ill. v. U.S. Law Enf't Assistance Admin.*, 611 F.2d 1200, 1203 (7th Cir. 1979).  Other than the subject matter, the statutory authorization does not set out the details of the program; every facet of the program is left to agency discretion, as is common with appropriations acts.  The solicitation for the Gang Suppression program sought proposals from jurisdictions with "high levels of youth-perpetrated gun crime and gang violence" to undertake "strategic planning and capacity-building work through multidisciplinary and

---

[3] Plaintiff calls this the "Juvenile Gang Prevention Grant," but that term does not appear in the appropriation or the solicitation.

6

community partnerships."  Admin. Record at AR01482 (2018 Solicitation at 7).[4]

The Gang Suppression grant includes a particular focus on transnational gangs:  "[OJP] will give priority consideration to applicants that demonstrate and articulate their knowledge of its local gang issues, particularly those that are impacted by transnational gangs such as MS-13 or M-18.  *Id.* at AR01485 (MS-13 and M-18 are two transnational gangs with a significant presence in North and Central America.)  Consistent with this focus, the solicitation notified applicants that a feature of the new program would be modest cooperation between federal law enforcement and local law enforcement with respect to criminal aliens in local law enforcement's criminal custody.  *Id*. at AR01514-15 (2018 Solicitation at 39-40).  In order to assess the accuracy of each recipient's certification that it could fulfill these requirements, the solicitation stated that each applicant would be required to identify any governing "laws, policies, or practices related to whether, when, or how [the applicant's] employees may communicate" with federal immigration authorities.  *Id.* at AR01505 (2018 Solicitation at 30).  OJP has received eighteen applications for the FY 2018 Gang Suppression program, and the Office has not yet determined which applicants will receive an award.  *See* Harp Decl. ¶¶ 3-4.

Once issued, awards under this program will include the following requirements:

- Consistent with the objectives of federal law enforcement statutes – including 8 U.S.C. § 1324(a), the smuggling/harboring statute referred to above, and 18 U.S.C. § 1071 – not to publicly disclose any sensitive federal law enforcement information in an attempt to harbor or shield an alien or fugitive from detection, regardless of whether the disclosure would violate 8 U.S.C. § 1324(a) ("public-disclosure requirement"), Admin. Record at AR01748 (Marion, Ohio, Byrne JAG Award ¶ 44); *see* Harp Decl. ¶ 4;

---

[4] The Administrative Record in this action was filed with a Notice of Filing of Administrative Record on November 13, 2018.  Dkt. No. 47.

- Consistent with federal law enforcement statutes and regulations – including 8 U.S.C. § 1357(a)(1), the INA interrogation statute referred to above, and 8 C.F.R. § 287.5(a)(1) – not to interfere with the exercise of that authority by impeding the access of immigration officials to any correctional facility to meet with an alien for such an interrogation (the "interview requirement"), Admin. Record at AR01749 (¶ 45); *see* Harp Decl. ¶ 4;

- Consistent with federal law enforcement statutes – including 8 U.S.C. §§ 1231(a) and 1226(c)(1), the statutes requiring federal immigration officials to take custody of a criminal alien "when the alien is released" from state or local custody – not to interfere with the removal process by failing to notify immigration officials "as early as practicable" regarding the scheduled release date and time of an alien in the grantee's custody when requested by immigration officials (the "custody requirement"), Admin. Record at AR01750 (¶ 46); *see* Harp Decl. ¶ 4; and

- To comply with 8 U.S.C. §§ 1373 and 1644, and not to obligate or draw down grant funds if the recipient is subject to any prohibition or restriction against providing information regarding immigration status to federal authorities (the "information requirement"), Admin. Record at AR01745-47 (¶¶ 41, 42, 43); *see* Harp Decl. ¶ 4.[5]

The Gang Suppression awards will include "Rules of Construction" making clear that nothing in the custody requirement will require an award recipient to detain "any individual in custody beyond the date and time the individual otherwise would have been released." Admin. Record at AR01750 (¶ 46). The award documents will also make clear that this requirement imposes no obligations in

---

[5] Plaintiff's characterization of these requirements is based primarily on the FY 2018 *solicitations* rather than the actual award documents. The First Amended Complaint calls the above-listed requirements the "harboring condition," the "access condition," the "notice condition," and the "1373 and 1644 condition," respectively.

relation to any requests from federal immigration authorities to detain non-citizens, and that it requires "only as much advance notice as practicable" before the release of an alien. *Id*. Further, the awards will define "impeding" access to a correctional facility, for purposes of the interview requirement, as taking any action or following any law or policy that "is designed to prevent or to significantly delay or compli-cate" such access or that "has the effect of preventing or of significantly delaying or complicating" such access. Admin. Record at AR01749 (¶ 45); *see* Harp Decl. ¶ 4.

## III. Edward Byrne Memorial Justice Assistance Grant Program

As described in prior filings before this Court, the Assistant Attorney General ("AAG") for OJP possesses "[s]pecific, general and delegated powers," including the power to "maintain liaison with . . . State governments in matters relating to criminal justice." 34 U.S.C. § 10102(a)(2). The statute also authorizes the AAG to "exercise such other powers and functions as may be vested in [him] pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants." *Id.* § 10102(a)(6).

The predecessor to the Byrne JAG Program was created in the same statute that created OJP. Under this program, OJP is authorized to "make grants to States and units of local government . . . to provide additional personnel, equipment . . . and information systems for criminal justice, including for any one or more of [certain enumerated] programs." *Id.* § 10152(a)(1). In the same chapter, "criminal justice" is defined broadly to include various activities of the police, the courts, and "related agencies." *Id.* § 10251(a)(1).

The Byrne JAG Program provides "formula grants" – that is, grants that, when awarded, must follow a statutory formula based on population, the rate of violent crime, and other factors. *Id.* § 10156. By statute, in order to request a Byrne JAG grant, the chief executive officer of a State or unit of local government must submit an application "in such form as the Attorney General may require," *id*. § 10153(a), and the application must include, among other things, "[a] certification, made in a

9

1    form acceptable to the Attorney General . . . that . . . the applicant will comply with

2    . . . all . . . applicable Federal laws," *id.* § 10153(a)(5)(D).

3          OJP has historically included a variety of conditions in Byrne JAG awards.

4    For example, the Office has imposed, without objection, conditions related to

5    information sharing and privacy protection, *see* Defs' Request for Judicial Notice

6    ("RJN") (Attachment 2 hereto), Ex. A ¶ 27 (Los Angeles 2016 award), research

7    using human subjects, *see id.*, Ex. A ¶ 26, and training, *see id.*, Ex. A ¶¶ 29-30.

8    Other historical conditions imposed by the AAG have been inspired by Executive

9    Branch prerogatives, and in some instances resulted in *subsequent* congressional

10   codification.  One such condition, which prohibits use of Byrne JAG funds to

11   purchase military style equipment, relates in part to an Executive Order issued by

12   President Obama.  *See id.,* Ex. A ¶ 43; Exec. Order No. 13,688, 80 Fed. Reg. 3451

13   (Jan. 16, 2015), *rescinded by* Exec. Order No. 13,809, 82 Fed. Reg. 41,499 (Aug.

14   28, 2017).  Since 2012, other conditions have required that recipients (a) comply

15   with specific national standards when purchasing body armor and (b) institute a

16   "mandatory wear" policy for any purchased armor.  RJN, Ex. A ¶¶ 36-37.  While

17   those conditions have now been codified, *see* 34 U.S.C. § 10202(c)(1)(B), (C), they

18   originated as exercises of the Department's authority to impose special conditions.

19   And the AAG has imposed an "American-made" requirement for body armor

20   purchases, something Congress did not choose to codify last year.  RJN, Ex. A ¶ 36.

21   The conditions attached to Byrne JAG grants have varied over time, depending on

22   national law enforcement necessities and Department priorities.

23         Fiscal Year 2018 Byrne JAG grants contain the same immigration-related

24   requirements described above in relation to the Gang Suppression program.

25   Admin. Record at AR01690-777.  Plaintiff received its FY 2018 award on November

26   13, 2018.  RJN, Ex. C.

27

28

**ARGUMENT**

Defendants move for dismissal of this action under Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure or for summary judgment under Rule 56. A motion under Rule 12(b)(1) challenges the subject matter jurisdiction of the court to reach a claim, and a motion under Rule 12(b)(6) "tests the legal sufficiency of a claim." *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir. 2001). A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

With respect to certain FY 2018 Byrne JAG conditions, defendants recognize that this Court has ruled against conditions used in the FY 2017 Byrne JAG Program that were similar to the FY 2018 interview, custody, and information conditions. Defendants also recognize that the injunction in *California v. Whitaker*, No. 3:17-cv-04701-WHO (N.D. Cal.), benefits the plaintiff and applies to future grant years.[6] Defendants respectfully disagree with those rulings, but do not now repeat in full their arguments in defense of the interview, custody, and information conditions in the FY 2018 Byrne JAG Program, other than to incorporate herein their arguments made previously and to preserve them for further review. *See Los Angeles v. Whitaker*, No. 2:17-cv-07215-R-JC (C.D. Cal.), Dkt. Nos. 86, 89. Defendants retain their right to elaborate upon those arguments based on the outcome of *Los Angeles v. Whitaker*, No. 18-56292 (9th Cir.), and other cases.

**I.      Plaintiff Lacks Standing to Challenge the Requirements in the FY 2018 Gang Suppression Planning Grants Program**

Article III of the Constitution limits federal court jurisdiction to live "Cases" and "Controversies." To satisfy the "irreducible constitutional minimum" of standing, a plaintiff must demonstrate an "injury in fact," a "fairly traceable" causal

---

[6] In light of this injunction and the pendency of defendants' appeal in that case, this Court should stay plaintiff's current claims regarding the FY 2018 interview, custody, and information conditions.

connection between the injury and defendant's conduct, and redressability. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102-03 (1998). The injury needed for standing must be "concrete," "objective," and "palpable," not merely "abstract" or "subjective." *See Whitmore v. Arkansas*, 495 U.S. 149, 155, 178 (1990); *Bigelow v. Virginia*, 421 U.S. 809, 816-17, 830 (1975). Additionally, the injury must be "certainly impending" rather than "speculative." *Whitmore*, 495 U.S. at 157, 158.

Under these principles, Los Angeles lacks standing to challenge the FY 2018 Gang Suppression requirements because it is unknown whether the City will be chosen to receive an award, without regard to the requirements challenged here. As noted earlier, this is a discretionary, competitive grant program, such that OJP will need to choose recipients from among the various applicants. *See* Harp Decl. ¶ 2. The grant requirements will have no effect on the plaintiff if it is not chosen to receive a Gang Suppression grant. Therefore, it is "speculative" whether Los Angeles will suffer any "concrete" injury from the requirements, such that the City lacks standing to challenge them. *See Whitmore*, 495 U.S. at 155, 156.

The situation here – and the reasons for plaintiff's lack of standing in relation to the Gang Suppression program – are very different from the situation regarding the COPS Hiring Program ("CHP") that this Court considered in *Los Angeles v. Whitaker*, No. 2:17-cv-07215-R-JC (C.D. Cal.), Dkt. No. 75. In that case, the City challenged certain immigration-related scoring factors under CHP, and the Court held that plaintiff had standing because application of the resulting bonus points would put the City at a "competitive disadvantage" compared to applicants that could secure those bonus points. *Id*. at 3, 11. Here, in contrast, Los Angeles challenges award requirements that are not imposed until *after* the selection of recipients, such that the challenged requirements may never affect the City at all. Additionally, whereas Los Angeles had received a CHP grant in prior years, here there is no such history in relation to the Gang Suppression program.

## II. The Challenged Requirements in the FY 2018 Gang Suppression Program Are Permissible

On the merits, plaintiff alleges that the above-described features and requirements of the FY 2018 Gang Suppression grant program, and only those requirements, violate the Separation of Powers, the Spending Clause, and the Tenth Amendment.  Even if plaintiff had standing to challenge those requirements, its claims would be without merit.[7]

### A. The Gang Suppression Requirements Are Authorized by Statute and Do Not Violate the Separation of Powers

In Count Five of its First Amended Complaint, plaintiff alleges that the Gang Suppression requirements exceed the Department's statutory authority and intrude upon the powers of Congress.  First Am. Compl. ¶¶ 132-146.  The nature of the congressional authorization for this program, however, gives the Department significant discretion in developing the program, including the discretion to adopt the challenged requirements.

As a preliminary matter, it is well-established that Congress may, consistent with the separation of powers, properly delegate to the Executive Branch the authority to impose requirements on recipients of agency spending.  *See*, *e.g.*, *Clinton v. City of N.Y.*, 524 U.S. 417, 488 (1998) ("Congress has frequently delegated the President the authority to spend, or not to spend, particular sums of money.") (Breyer, J. dissenting); *DKT Mem'l Fund Ltd.*, 887 F.2d 275 at 280-81 (upholding conditions on spending where statute authorized President to set certain "terms and conditions as he may determine").  Accordingly, plaintiff's assertion

---

[7] The requirement to provide information about the applicant's laws and policies is not a program requirement in the same sense as the public-disclosure, interview, custody, and information requirements, even though this brief will sometimes include it under the rubric "requirement" for the sake of brevity.  OJP requires the provision of that information as part of the application, but the requirement does not relate to a recipient's conduct during the course of the grant as do the four other requirements.

13

that Congress itself does not currently impose immigration-related requirements on the receipt of grant funds, First Am. Compl. ¶ 105, is wholly beside the point. Rather, the sole relevant question here is whether Congress has *delegated* sufficient authority to the Department to impose these requirements.

Based on the nature of the legislation that prompted the Gang Suppression program, the existence of such delegation here is inescapable.  Besides appropriating funds specifically for an established program – as with annual appropriations for the Byrne JAG Program – Congress may appropriate funds without tying them to a specific program.  These take the form of either a "lump-sum" appropriation for the agency generally or a "one-line" appropriation for a stated purpose within the agency's responsibilities.  *See* GAO, Principles of Federal Appropriations Law, 3d ed., ch. 6, § C.1, GAO-06-382SP, *available at* https://www.gao.gov/ legal/ appropriations-law-decisions/ red-book (last visited Nov. 13, 2018).  The appropriations that became the FY 2018 Gang Suppression program are of the final type – one-line appropriations not tied to an established program.  Congress appropriated $4 million for the Department to use "for gang and youth violence education, prevention and intervention, and related activities" and $8 million "for community-based violence prevention initiatives, including for public health approaches to reducing shootings and violence."  Pub. L. No. 115-141, 132 Stat. at 423.[8]  Where Congress appropriates funds for a stated purpose not within an estab-

---

[8] Although Congress stated that the funds were appropriated "pursuant to sections 261 and 262" of the Juvenile Justice and Delinquency Prevention Act of 1974 ("1974 Act"), 132 Stat. at 422-23, the appropriation was related to those provisions only in a general sense.  Section 261, now codified at 34 U.S.C. § 11171, authorizes OJJDP to "carry out projects for the development, testing, and demonstration of promising initiatives and programs for the prevention, control, or reduction of juvenile delinquency."  Section 262, codified at 34 U.S.C. § 11172, authorized grants for "technical assistance" to carry out projects under Section 261. Section 505 of the 1974 Act, also referred to in the appropriation, was simply an "authorization of appropriations" for Fiscal Years 2004 through 2008.  Pub. L. No. 107-273, 116 Stat. 1758 (2002).

lished program, the agency must either incorporate the funds into an established program or create a program to carry out the stated purpose using those funds.

In the case of either a lump-sum appropriation for an agency's purposes generally or a one-line appropriation not tied to a particular program, the agency's discretion in determining how to spend the appropriated funds is at its zenith.  In *Lincoln v. Vigil*, 508 U.S. 182 (1993), plaintiffs challenged the termination of a program that the Indian Health Service of the Department of Health and Human Services had carried out for several years based on Congress' annual appropriations for the agency's overall expenses and its general authority to provide health care for Native Americans.  *Id*. at 185-88.  The Supreme Court held that the program's termination was unreviewable under the APA.  The Court noted:

> The allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion.  After all, the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way.

*Id*. at 192.

Also reflecting these principles is *International Union v. Donovan*, 746 F.2d 855 (D.C. Cir. 1984) (opinion by Scalia, C.J.).  There, the Department of Labor had created a program pursuant to specific statutory authorization, but decided not to allocate any funding to the program out of a later lump-sum appropriation that did not mention the program.  *Id*. at 857-58.  The court held that the decision not to fund the program was unreviewable, stating that "[a] lump-sum appropriation leaves it to the recipient agency . . . to distribute the funds among some or all of the permissible objects as it sees fit."  *Id*. at 861.  Thus, the court said, "[t]he issue here is not how Congress expected or intended the Secretary to behave, but how it *required* him to behave, through the only means by which it can (as far as the courts are concerned, at least) require anything – the enactment of legislation.  Our focus, in other words, must be upon the text of the appropriation."  *Id*. at 860-61.

Here, Congress appropriated funding for OJP, through its Office of Juvenile Justice and Delinquency Prevention, to provide for "gang and youth violence education, prevention and intervention, and related activities" and "community-based violence prevention," and the agency created the FY 2018 Gang Suppression program to carry out that directive.  Under *Lincoln* and *International Union*, an agency is authorized to carry out such an appropriation as it "sees fit," subject to the language of the appropriation and the nature of agency's responsibilities.  In the face of such an appropriation, the agency has authority to "meet its statutory responsibilities in what it sees as the most effective or desirable way." *Lincoln*, 508 U.S. at 192.  The focus is on "the text of the appropriation." *International Union*, 746 F.2d at 861.  This is especially true in relation to discretionary, competitive grants such as the Gang Suppression grant.  OJP implemented the language of Congress's recent appropriation by creating, as Congress directed, a program for "community-based violence prevention" and "gang and youth violence education, prevention and intervention, and related activities."

The Department's substantial discretion to craft a competitive program based on this appropriations language includes the authority to advance particular law enforcement strategies to address gang violence.  Consistent with this principle, OJP gives "priority consideration" to applicants that demonstrate knowledge of and are impacted by "transnational gangs such as MS-13 or M-18."  Admin. Record at AR01485.  Plaintiff does not challenge this feature of the program.  And, OJP is requiring participants to employ strategies that ensure criminal aliens in their custody are turned over to DHS rather than released back into the community – a strategy that reflects the *transnational* nature of transnational gangs.

OJP's established statutory authority further supports the Office's authority to craft the Gang Suppression grant program as it has.  The public-disclosure requirement and the requirement regarding the applicant's laws and policies are closely related to OJP's statutory responsibility to "maintain liaison" among federal,

state, and local authorities.  34 U.S.C. § 10102(a)(2).  Federal, state, and local law enforcement priorities may differ, and federal authorities are entitled to know when state and local laws or policies may conflict with federal priorities.  An agency statutorily charged with maintaining that "liaison" is naturally empowered to secure information regarding state and local laws and policies.  And where federal law enforcement officials do work with state and local officials, federal officials are naturally entitled to insist on the protection of sensitive federal law enforcement information.  Coordination among federal, state, and local law enforcement officials necessarily requires maintaining the confidentiality of shared information.  Additionally, the requirement to provide information about the applicant's laws and policies is an exercise of OJP's express authority to dictate the form of an application under the Byrne JAG Program.  *Id.* § 10153(a).

Finally, plaintiff argues that the challenged requirements violate 34 U.S.C. § 10228(a), which provides that nothing in the federal statutes "shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof."  First Am. Compl. ¶ 108.  But nothing in the challenged requirements has that effect.  To begin with, Gang Suppression grantees voluntarily consent to award requirements in return for receiving federal funds.  This is a *voluntary* program.  If grantees are unhappy with its features, they are free to decline the award and thus avoid any obligation to comply with its requirements.  Additionally, requiring modest cooperation with federal law enforcement in exchange for federal law enforcement funds does not constitute exercising "direction, supervision, or control."  Rather, the program features challenged here only enhance coordination among federal, state, and local law enforcement officers, which Congress expressly encourages. For example, concurrent with the enactment of 34 U.S.C. § 10228, Congress created the National Institute of Justice (a component of OJP), *see* An Act to

Restructure the Federal Law Enforcement Assistance Administration, Pub. L. No. 96-157, §§ 202, 815, 93 Stat. 1167, 1172, 1206 (1979), which has as one of its express statutory purposes "to develop programs and projects . . . to improve and expand cooperation among the Federal Government, States, and units of local government . . . ."  34 U.S.C. § 10122(c)(2)(F).

### B.   The Gang Suppression Requirements Are Consistent with the Spending Clause

Count Six of plaintiff's First Amended Complaint alleges that the Gang Suppression program requirements violate the Spending Clause.  First Am. Compl. ¶¶ 147-150.  Under its spending authority, Congress "may offer funds to the States, and may condition those offers on compliance with specified conditions." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 537 (2012) ("*NFIB*").  It is well-established that the Spending Clause confers broad authority, such that conditions imposed pursuant to this authority may permissibly require States to "tak[e] certain actions that Congress could not [otherwise] require them to take." *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 686 (1999). Nevertheless, the spending authority is subject to certain discrete limitations, two of which are purportedly at issue here:  (1) "conditions on federal grants may be illegitimate if they are unrelated to the federal interest in particular national projects or programs"; and (2) conditions must be "unambiguous[]." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987).  The Gang Suppression requirements easily satisfy both of these aspects of *Dole*.

### 1.   The Requirements Are Related to the Purposes of the Gang Suppression Program

Initially, it is well-established that the "relatedness" aspect of *Dole* does not pose a difficult hurdle; to the contrary, the Ninth Circuit has emphasized that this is a "low-threshold" inquiry that "is a far cry from . . . an exacting standard for relatedness." *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002); *see New York v. United States*, 505 U.S. 144, 167 (1992) (stating that only "some rela-

tionship" is necessary between spending conditions and "the purpose of the federal spending."). As the D.C. Circuit has observed, the Supreme Court has never "overturned Spending Clause legislation on relatedness grounds." *Barbour v. Wash. Metro. Area Transit Auth.*, 374 F.3d 1161, 1168 (D.C. Cir. 2004).

As noted earlier, "criminal aliens" are a core concern of the INA. 34 U.S.C. § 10152(a)(1); 8 U.S.C. §§ 1226(c), 1228(a), 1231(a)(6), 1378. Furthermore, gang activity is a significant concern in the enforcement of both immigration law and criminal law. *Compare*, *e.g.*, *Calmo v. Sessions*, No. C 17-07124 WHA, 2018 WL 2938628, at *1 (N.D. Cal. June 12, 2018) (noting that immigration judge had considered gang membership, among other things, in determining whether alien posed danger to community), *and Bravo v. Green*, No. CV 16-4937 (JLL), 2017 WL 2268315, at *1 (D.N.J. May 24, 2017) (same), *with*, *e.g.*, 18 U.S.C. § 521 (providing that sentence for certain federal criminal offenses shall be increased by up to 10 years if defendant participated in violent criminal gang).

Further, a focus of this particular grant program is transnational gangs, Admin. Record at AR01485, and the challenged requirements reflect the importance of cooperation at all levels of law enforcement to address transnational gang violence. *See, e.g.*, https://www.justice.gov/opa/pr/22-ms-13-members-and-associates-charged-federally-ice-s-ms-13-targeted-operation-raging-bull (noting a significant operation against MS-13 resulting in 267 arrests, which included coopera-tion between the Department, DHS, and local law enforcement). Ensuring that DHS can take custody of criminal aliens – particular those who may be gang members – in the custody of local law enforcement partners is an essential component of the strate-gies the Department is seeking to promote through this highly discretionary program.

The need for one of the program features – the public-disclosure requirement – and its relationship to the purposes of the Gang Suppression program (and the Byrne JAG Program) is even clearer in light of recent events. Included in the Administrative Record in this action are public Twitter and Facebook posts by the

19

mayor of a U.S. city informing residents of an impending operation by federal immigration authorities.  Admin. Record at AR01038-39.  In those communications, the executive of a U.S. jurisdiction specifically made a "public disclosure [of] federal law enforcement information in a direct or indirect attempt to conceal, harbor, or shield from detection . . . any alien who [had] come to, entered, or remain[ed] in the United States" in violation of law.  Federal law enforcement officials must be able to inform state and local officials of impending operations without fear of compromising those operations.  Such basic coordination is essential not only for the success of operations but also for the safety of law enforcement personnel and the public.

In sum, ensuring that jurisdictions receiving federal funds to fight gang activity do not hinder the enforcement of immigration law supports the purposes the Gang Suppression program.

### 2.    The Gang Suppression Requirements Are Unambiguous

Another limitation on the spending power is that when the Federal Government "desires to condition the States' receipt of federal funds, it must do so unambiguously, enabling the States to exercise their choice knowingly, cognizant of the consequences of their participation."  *Dole*, 483 U.S. at 207 (citation omitted).  The Gang Suppression award requirements easily satisfy this aspect of *Dole*, especially in light of the accompanying "Rules of Construction."

The public-disclosure requirement states very clearly that it prohibits the "public disclosure [of] federal law enforcement information in a direct or indirect attempt to conceal, harbor, or shield from detection any fugitive from justice under 18 U.S.C. ch. 49, or any alien who has come to, entered, or remains in the United States in violation of 8 U.S.C. ch. 12 – without regard to whether such disclosure would constitute (or could form a predicate for) a violation of 18 U.S.C. [§§] 1071 or 1072 or of 8 U.S.C. [§] 1324(a).  The Rules of Construction, moreover, define "alien," "federal law enforcement information," and "public disclosure" in detail.

Similarly, in the solicitation, the requirement to provide information regarding the applicant's laws or policies asks very clearly whether the recipient has "any laws, policies, or practices related to whether, when, or how employees may communicate with DHS or ICE" or is "subject to any [such] laws from a superior political entity (e.g., a state law that binds a city)."  Admin. Record at AR01505.

Further, the information requirement expressly defines a disqualifying "information-communication restriction," for purposes of that condition, as any policy or practice that would –

> prohibit or in any way restrict (1) any government entity or official from sending or receiving information regarding citizenship or immigration status as defined in 8 U.S.C. § 1373(a); or (2) a government entity or -agency from sending, receiving, maintaining, or exchanging information regarding immigration status as described in either 8 U.S.C. § 1373(b) or 1644.

Admin. Record at AR01746; *see* Harp Decl. ¶ 4.  The "Rules of Construction" define "immigration status" and other terms, and specify that "[n]othing in this condition shall be understood to authorize or require any recipient . . . to violate any federal law, including any applicable civil rights or nondiscrimination law." Admin. Record at AR01746.  Similarly, the interview requirement incorporates the same Rules of Construction, and specifies that the term "impede," in relation to "impeding access" to a correctional facility, "includes taking or continuing any action, or implementing or maintaining any law, policy, rule, or practice that . . . is designed to prevent or significantly delay complicate, or . . . has the effect of preventing or of significantly complicating."  *Id.* at AR01749.  The custody requirement specifies that "[n]othing in this condition shall be understood to authorize or require any recipient . . . to maintain (or detain) any individual in custody beyond the date and time the individual otherwise would have been released."  *Id.* at AR017450.  To the extent any uncertainty might possibly remain, the grant award documents specifically direct that "[a]ny questions about the meaning or scope" of the conditions "should be directed to OJP."  *Id.* at AR01746.

Finally, any arguable marginal uncertainty regarding the outer boundaries of these conditions would not render them unconstitutionally ambiguous. Indeed, "the exact nature of [grant] conditions may be largely indeterminate, provided that the existence of the conditions is clear, such that States have notice that compliance with the conditions is required." *Charles v. Verhagen*, 348 F.3d 601, 607 (7th Cir. 2003) (citation omitted); *see Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004) ("Once Congress clearly signals its intent to attach . . . conditions . . . it need not specifically identify and proscribe in advance every conceivable state action that would be improper." (citation omitted)); *see also Van Wyhe v. Reisch*, 581 F.3d 639, 650 (8th Cir. 2009) (finding notice requirement satisfied even where condition "provides a pliable standard"); *Mayweathers*, 314 F.3d at 1067 (finding notice requirement satisfied even with a "standard [that] is perhaps unpredictable because it has resulted in different determinations in different courts").

### C.   The Gang Suppression Requirements Are Consistent with the Tenth Amendment

In Count Seven, plaintiff alleges that the Gang Suppression program requirements would violate the Tenth Amendment if the federal statutes cited were construed as supporting the requirements. First Am. Compl. ¶¶ 151-158. None of the challenged requirements, however, compels the plaintiff to "enact or administer a federal regulatory program" or to "act on the Federal Government's behalf." *New York v. United States*, 505 U.S. 144, 188 (1992); *see NFIB*, 567 U.S. at 620. To begin with, the requirements do not "compel" the plaintiff to do anything. Rather, they are tied to the receipt of federal funds, and Los Angeles is free to accept or reject them. As the Supreme Court has held, the Federal Government "may offer funds to [state and local jurisdictions], and may condition those offers on compliance with specified conditions." *Id.* at 537; *cf. Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 847 (9th Cir. 2003) ("[A]s long as the alternative to implementing a federal regulatory program does not offend the Constitution's guarantees of federalism, the fact that the

alternative is difficult, expensive or otherwise unappealing is insufficient to establish a Tenth Amendment violation.") (citation omitted).

Further, the requirements relate only to whether recipients of federal law enforcement funds may *frustrate* federal law enforcement.  The requirements do not compel recipients to administer a federal program or to act on the Federal Government's behalf, but only to refrain from "impeding access" to correctional facilities to meet with aliens, to refrain from interfering with the removal of criminal aliens by providing information about the impending release of aliens, and to refrain from prohibiting or restricting the provision of information by employees.  The requirement regarding the applicant's laws and policies only seeks information on any laws or policies that would *impede* the enforcement of federal immigration law, and the public-disclosure requirement only requires refraining from public disclosure of law enforcement information received from *federal* agencies.

Finally, in relation to the public-disclosure requirement, plaintiff alleges that the federal smuggling statute, 8 U.S.C. § 1324, would violate the Tenth Amendment if defendants were "permitted to interpret [it] to apply to State and local officials." First Am. Compl. ¶ 156.  But this requirement does not seek to "apply" the federal smuggling statute to the plaintiff in the sense of prosecuting the City thereunder. Even if Los Angeles cannot be prosecuted for violating a particular federal criminal law, the Department can legitimately expect the City – as a condition of receiving federal law enforcement funds – to refrain from disclosing sensitive federal law enforcement information in an effort to defeat the law's enforcement.  In sum, this case is not about compelling state or local governments to perform federal functions, but about preventing interference with *the Federal Government's performance* of its own functions.

**III.   The Public-Disclosure Condition and the Requirement to
Provide Information about Laws and Policies in the FY
2018 Byrne JAG Program Are Permissible**

**A.   The Public-Disclosure Condition and the Requirement to
Provide Information about Laws and Policies Are Authorized
by Statute and Do Not Violate the Separation of Powers**

Plaintiff's Byrne JAG claims are also without merit.  In Count One, plaintiff
alleges that the four Byrne JAG conditions – as well as the requirement to provide
information about the applicant's laws and policies – exceed the Department's
statutory authority and intrude upon the powers of Congress.  First Am. Compl. ¶¶
101-16.  As noted above, defendants reserve their arguments regarding the FY 2018
conditions that are similar to the FY 2017 conditions, pending resolution in the
Ninth Circuit.  With respect to the other conditions, an examination of the relevant
statutes, with their framework and history, shows that the Assistant Attorney
General for OJP possesses ample authority to impose the public disclosure
condition and the grant application requirement.  As described earlier, the AAG is
authorized to place "special conditions on all grants," to determine "priority
purposes for formula grants," 34 U.S.C. § 10102(a)(6), to "maintain liaison with . . .
State governments in matters relating to criminal justice," *id*. § 10102(a)(2), and to
require compliance with all "applicable Federal laws," *id.* § 10153(a)(5)(D).
Imposition of these conditions fits comfortably within these authorities.

The history of 34 U.S.C. § 10102(a)(6) and the structure of the relevant
statutes demonstrate that Congress has delegated such authority to OJP.  Congress
created the current version of the Byrne JAG Program in 2006, when the Reauthor-
ization Act merged two earlier programs.  Pub. L. No. 109-162, 119 Stat. 2960.
Before the 2006 amendments, the relevant statute provided only that the AAG for
OJP was authorized to "exercise such other powers and functions as may be vested
in the [AAG] pursuant to this chapter or by delegation of the [AG]."  *See* 42 U.S.C.
§ 3712(a)(6) (2005).  In the Reauthorization Act, Congress expressly amended this

24

provision by inserting the words "including placing special conditions on all grants, and determining priority purposes for formula grants." Pub. L. No. 109-162, § 1152(b), 119 Stat. at 3113; *see* 34 U.S.C. § 10102(a)(6). And confirming this amendment's plain text, a committee report accompanying the Act states unequivocally that the amendment would "allow[] the Assistant Attorney General to place special conditions on all grants and to determine priority purposes for formula grants." H.R. Rep. No. 109-233, at 101 (2005).

Moreover, this authority clearly applies to the Byrne JAG Program. Section 10102(a) sets forth the general duties and authorities of the AAG for OJP, and the Bureau of Justice Assistance, which directly administers the Byrne JAG Program, is part of OJP. By statute, the Director of the Bureau of Justice Assistance "report[s] to the Attorney General through the Assistant Attorney General [for OJP]." 34 U.S.C. § 10141(b); *see* OJP, *About Us*, https://ojp.gov/about/about.htm (OJP organizational chart) (last visited Nov. 13, 2018). Thus, the authority conferred on the AAG by Section 10102(a)(6) necessarily reaches all programs under his supervision, including the Byrne JAG Program.

Plaintiff's claims fail to explain why Congress would have added the "special conditions" and "priority purposes" language, if not to confer the authority described. Another law *already* authorized the Attorney General to delegate the performance of his functions. *See* 28 U.S.C. § 510. Thus, plaintiff's denial of this authority gives no practical effect to *either* the "special condition" *or* the "priority purpose" power – and directly contravenes the "well-known canon of statutory construction that, in general, a statute should not be construed so as to render a word or clause inoperative" *Bell v. Reno*, 218 F.3d 86, 91 (2d Cir. 2000); *see*, *e.g.*, *Johnson v. Consumerinfo.com*, *Inc.*, 745 F.3d 1019, 1022 (9th Cir. 2014) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect.") (citation omitted).

Further, the independent authority to "determin[e] priority purposes for

formula grants" plainly reflects an intent to allow the AAG to exercise a degree of discretion over *formula* grants in particular.  Such discretion must, if this language is to be afforded any meaningful legal effect, encompass at least the minimal authority to (1) articulate broad priorities for a given Fiscal Year's grant program; (2) include, on program application forms, inquiries regarding the designated priority purpose; and (3) protect the confidentiality of related federal law enforce-ment information.  In other words, the authority to "determine priority purposes" necessarily includes the authority to *prioritize* federal grant monies for those state and local jurisdictions that assist in furthering relevant federal *purposes*. Additionally, because states and localities would decline to participate in – and thus, effectively annul – the Byrne JAG Program were this authority invoked to impose unreasonable conditions, any arguable risk of overreach that might otherwise inhere in this authority has a built-in structural check.

Finally, plaintiff's assertion that these conditions constitute prohibited "direction, supervision, and control" under 34 U.S.C. § 10228(a), discussed above, is further belied by Los Angele's acceptance of numerous other Byrne JAG conditions.  Plaintiff's Byrne JAG award for FY 2016, which the City accepted without challenge, imposed fifty-one "special conditions."  *See* RJN, Ex. A.  The plaintiff agreed, for example, to refrain from certain specific actions related to human trafficking, including any "[a]cts that directly support or advance trafficking in persons," *see id.*, Ex. A ¶ 6; to comply with Department regulations on civil rights and non-discrimination, including regulations prohibiting specific forms of discrimination on the basis of religion, *see id.*, Ex. A ¶ 13; to refrain from requiring employees to sign any "internal confidentiality agreement or statement that prohibits or otherwise restricts, or purports to prohibit or restrict, the reporting (in accordance with law) of waste, fraud, or abuse," *see id.*, Ex. A ¶ 17; and to partici-pate in "training events, technical assistance events, or conferences" sponsored by OJPJ's Bureau of Justice Assistance, *see id.*, Ex. A ¶ 33.  If those conditions do not

constitute exercising "direction, supervision, and control" over grantees – as shown by plaintiff's own agreement to them – then neither do the immigration-related conditions challenged here.

### B.     The Public-Disclosure Condition and the Requirement to Provide Information about Laws and Policies Are Consistent with the Spending Clause

In Count Two, plaintiff alleges that the challenged Byrne JAG conditions violate the Spending Clause.  First Am. Compl. ¶¶ 117-120.  The above discussion in relation to the Gang Suppression program establishes that these requirements satisfy the ambiguity element of the Spending Clause.  And, as set forth below, the public-disclosure condition in the Byrne JAG Program and the requirement to provide information about the grantee's laws and policies also satisfy the "relatedness" element of *Dole*.[9]

As noted already, the "relatedness" aspect of *Dole* does not pose a difficult hurdle, and these conditions easily satisfy this permissive standard.  The Byrne JAG Program promotes "criminal justice" by supporting programs such as law enforce-ment, prosecution, crime prevention, and corrections.  34 U.S.C. § 10152(a)(1).  The term "criminal justice" is defined broadly to include various activities of the police, the courts, and "related agencies."  *Id.* § 10251(a)(1).  Further, immigration enforcement, which the conditions promote, undoubtedly intersects with the Byrne JAG Program's criminal justice purposes, at a minimum for the simple reason that a conviction for any of a wide variety of criminal offenses renders an alien removable from this country.  *See* 8 U.S.C. § 1227(a)(2).  Indeed, the term "criminal alien" appears multiple times in the INA, and "[a] primary goal of several recent over-hauls of the INA has been to ensure and expedite the removal of aliens convicted of serious crimes."  8 U.S.C. §§ 1226(c), 1228(a), 1231(a)(6), 1378; *Duvall v. Atty.*

---

[9] The above discussion regarding the Gang Suppression conditions also disposes of plaintiff's allegation, in Count Three, that the Byrne JAG conditions violate the Tenth Amendment.

1   *Gen. of U.S.*, 436 F.3d 382, 391 (3d Cir. 2006); *see Padilla v. Kentucky*, 559 U.S.

2   356, 360 (2010) (observing that "deportation or removal is now virtually inevitable

3   for a vast number of noncitizens convicted of crimes") (citation omitted).  Once

4   removed, a criminal alien who has committed a removable offense – for example,

5   an aggravated felony, domestic violence, child abuse, or certain firearm offenses –

6   is no longer present in this country with the potential to re-offend.

7          Thus, the challenged requirements ensure that any "program or activity"

8   funded by the Byrne JAG Program does not thwart the federal government's

9   exercise of its ability to remove aliens not lawfully present in the United States or

10  removable due to a criminal conviction.  *See Koslow v. Pennsylvania*, 302 F.3d

11  161, 176 (3d Cir. 2002) (observing that the challenged condition "govern[ed] only a

12  'program or activity' receiving federal funds," and noting that this limitation aided

13  in satisfying "the 'relatedness' requirement articulated in *Dole*").  Declining to fund

14  jurisdictions that disclose federal law enforcement information in an attempt to

15  hinder federal law enforcement is plainly related to the criminal-justice purposes of

16  the Byrne JAG Program.

### IV.   All of the Challenged Requirements Are Consistent with the Administrative Procedure Act

17

18

19         Finally, Counts Four and Eight of the First Amended Complaint allege that

20  the decision to impose the challenged requirements was arbitrary and capricious

21  under the Administrative Procedure Act ("APA") "because DOJ imposed [the

22  challenged] conditions and certifications without any reasoned basis, provided no

23  support for its linkage between participation by State and local law enforcement

24  officials in federal civil immigration enforcement and . . . local criminal justice

25  efforts . . . and appears to have relied on clearly erroneous and debunked interpre-

26  tations of existing studies."  First Am. Compl. ¶ 131; *see id.* ¶ 161.  These claims

27  are without merit.

28         As an initial matter, if the challenged requirements are statutorily authorized

and comport with the Spending Clause and the Tenth Amendment – which, as shown above, they do – it is unclear how "arbitrary or capricious" scrutiny could otherwise limit the Department's broad discretion.  Further, the Gang Suppression requirements are entirely unreviewable under the APA because that program is authorized by one-line appropriations that commit the parameters of the program "to agency discretion by law."  5 U.S.C. § 701(a)(2); *see Lincoln*, 508 U.S. at 192; *International Union*, 746 F.2d at 861.

In any event, when a court reviews an agency's action under the "arbitrary or capricious" standard, it is "required to be 'highly deferential,'" and to "presum[e] the agency action to be valid" as long as it is supported by a rational basis. *Providence Yakima Med. Ctr. v. Sebelius*, 611 F.3d 1181, 1190 (9th Cir. 2010) (quoting *J & G Sales Ltd. v. Truscott*, 473 F.3d 1043, 1051 (9th Cir. 2007)).  This standard of review is "narrow," and does not authorize a district court "to substitute its judgment for that of the agency."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

Here, plaintiff's claims fail because "the agency's reasons for" imposing the challenged requirements "were entirely rational."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 517 (2009).  Even assuming OJP's imposition of the challenged requirements were subject to arbitrary-and-capricious review notwithstanding the absence of any statutory standards governing the choice of special conditions and priority purposes, it is reasonable for OJP to deny federal law enforcement funding to a jurisdiction that releases aliens whom the jurisdiction itself suspects of criminal conduct without allowing federal officials to interrogate or apprehend those aliens. That judgment does not depend on a factual determination of the sort that Los Angeles appears to demand.  It simply requires asking whether OJP should blind itself to the degree of cooperation provided (or not provided) by localities to federal law enforcement efforts when distributing federal law enforcement grants, as well

as to the public safety threats caused by that lack of cooperation.  Thus, the chal-

lenged requirements are "common-sense measures," Admin. Record at AR00993,

and "even in the absence of evidence, the agency's predictive judgment (which

merits deference) makes entire sense" as "an exercise in logic rather than

clairvoyance." *Fox Television*, 556 U.S. at 521.

In any event, the Administrative Record submitted by the defendants further

supports the rationality of the conditions.  Prompted partly by an Inspector General

report describing deteriorating local cooperation with "efforts to remove undocu-

mented criminal aliens from the United States," Admin. Record at AR00366, the

Department of Justice under the prior Administration instituted a requirement for

FY 2016 Byrne JAG grantees to certify compliance with 8 U.S.C. § 1373 in order

to protect the exchange of information among federal, state, and local law

enforcement.  *Id*. at AR00392-97.  For the FY 2017 grant cycle, the Department

maintained that condition and added conditions similar to the interview and custody

conditions described above, to "increase[e] information sharing between federal,

state, and local law enforcement" so that "federal immigration authorities have the

information they need to enforce the law and keep our communities safe."  *Id*. at

AR00993 (Backgrounder on Grant Requirements).  The FY 2018 requirements

challenged here responded to further developments, including, in relation to the

public-disclosure requirement, at least one instance in which an elected local

official publicly disclosed an impending federal law enforcement operation

designed to apprehend suspected illegal aliens.  *Id*. at AR01038-39.  Further, the

Gang Suppression solicitation specifically notes the Department's focus on

reducing transnational gang violence, Admin. Record at AR01485, and cooperation

with DHS with respect to criminal aliens is an important feature of that focus.

Finally, as discussed above in relation to the Spending Clause, immigration

enforcement undoubtedly relates to criminal justice.  Numerous federal statutes

expressly connect these two subjects.  *See supra* text at 4-5.  The challenged

requirements thus rationally promote interests in "maintain[ing] liaison" among tiers of government "in matters relating to criminal justice," 34 U.S.C. § 10102(a)(2), and comport with the intergovernmental cooperation that Congress plainly contemplates in immigration enforcement. *See, e.g.*, 8 U.S.C. §§ 1226(d), 1357(g), 1373; *Arizona*, 567 U.S. at 411-12 ("Consultation between federal and state officials is an important feature of the immigration system" and Congress "has encouraged the sharing of information about possible immigration violations.").

Accordingly, the challenged requirements are rational, and this Court should not "substitute its judgment" for that of the Department of Justice. *Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 416.

## V.   Plaintiff Does Not Meet the Requirements for Preliminary Relief

The above discussion effectively disposes of plaintiff's alternative motion for preliminary injunction, because likelihood of success on the merits is the "sine qua non" of preliminary relief. *See New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002), *quoted in Thomas v. Zachry*, 256 F. Supp. 3d 1114, 1118 (D. Nev. 2017). The other requirements for preliminary relief also favor the defendants. Defendants are already enjoined from using or enforcing most of the challenged conditions in the Byrne JAG Program, thus largely eliminating plaintiff's claim of irreparable harm in relation to the only formula grant involved here. Los Angeles has received its FY 2018 Byrne JAG award. RJN, Ex. C. Encouraging cooperation between local and federal law enforcement officials promotes the public interest in executing federal laws that require the removal of criminal aliens, and tips the balance of equities decidedly toward the defendants. *Winter v. NRDC*, 555 U.S. 7, 20 (2008).

## VI.   Any Injunction Should Be Limited to Los Angeles

Finally, Los Angeles expressly seeks a permanent or preliminary injunction to benefit all Byrne JAG recipients "program-wide." Pl's Memo. at 24-25. Plaintiff lacks standing to seek such an injunction, however. As the Supreme Court has

observed many times, a plaintiff "must establish standing separately for each form of relief sought," *Town of Chester v. Laroe Estates, Inc*., 137 S. Ct. 1645, 1650 (2017), and a "plaintiff's remedy must be limited to the inadequacy that produced [its] injury in fact," *Gill v. Whitford,* 138 S. Ct. 1916 (2018); see *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1244-45 (9th Cir. 2018) (reversing grant of nationwide injunction).  Moreover, as an equitable matter, nationwide injunctions "take a toll on the federal court system – preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch."  *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring); *see Virginia Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 393 (4th Cir. 2001) (noting tendency of nationwide injunctions to "thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue"), *quoted in Los Angeles Haven Hosp. v. Sebelius*, 638 F.3d 644, 664-65 (9th Cir. 2011).  Indeed, many of the issues presented herein are, in fact, pending in multiple other cases throughout the country, *California v. Sessions*, No. 3:18-cv-05169-WHO (N.D. Cal.); *San Francisco v. Sessions*, No. 3:18-cv-05146-WHO (N.D. Cal.); *Chicago v. Sessions*, No. 1:18-cv-06859 (N.D. Ill.); *City of New York v. Sessions*, No. 1:18-cv-06474-ER (S.D.N.Y.); *State of York v. Sessions*, No. 1:18-cv-06474 (S.D.N.Y.); *City of Providence v. Sessions*, No. CA-18-437-JJM-LDA (D.R.I.), and a "program-wide" injunction by this Court would risk conflicting with any orders entered by other district courts.  At minimum, therefore, if the Court were to enter a nationwide injunction, its application beyond the plaintiff should be stayed pending appeal.

### CONCLUSION

Accordingly, the Court should reject all of plaintiff's claims regarding the FY 2018 Gang Suppression program and plaintiff's challenges to the public-disclosure condition in the FY 2018 Byrne JAG Program and the requirement to provide information regarding the grantee's laws and policies.

1    Dated:  November 13, 2018

2

3                                          Respectfully submitted,

4

5                                          JOSEPH H. HUNT
                                           Assistant Attorney General
6

7                                          NICOLA T. HANNA
                                           United States Attorney
8

9                                          JOHN R. TYLER
                                           Assistant Director
10

11                                         /s/ W. Scott Simpson

12                                         _____
                                           W. SCOTT SIMPSON (Va. Bar #27487)
13                                         Senior Trial Counsel

14
                                           Department of Justice, Civil Division
15                                         318 South Sixth Street, Room 244
                                           Springfield, Illinois 62701
16                                         Telephone:  (202) 514-3495
                                           Facsimile:   (217) 492-4888
17                                         E-mail:      scott.simpson@usdoj.gov
18
                                           COUNSEL FOR DEFENDANTS
19

20

21

22

23

24

25

26

27

28