JOSEPH H. HUNT
Assistant Attorney General
NICOLA T. HANNA
United States Attorney
BRAD P. ROSENBERG
Assistant Branch Director
DANIEL D. MAULER (Va. Bar No.: 73190)
Trial Attorney
U.S. Department of Justice
Civil Division - Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Telephone: (202) 616-0773
Facsimile: (202) 616-8470
E-mail: dan.mauler@usdoj.gov
COUNSEL FOR DEFENDANTS

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF LOS ANGELES,<br><br>　　　　　　Plaintiff,<br><br>　　　v.<br><br>WILLIAM P. BARR, Attorney General of the United States, *et al.*,<br><br>　　　　　　Defendants. | No. 2:18-cv-07347-R-JC<br><br>**NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES; OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:　　November 18, 2019<br>Time:　　10:00 a.m. |

# TABLE OF CONTENTS

NOTICE OF MOTION AND
MOTION FOR PARTIAL SUMMARY JUDGMENT ............................................1

MEMORANDUM OF POINTS AND AUTHORITIES..........................................3

INTRODUCTION .................................................................3

STATUTORY AND ADMINISTRATIVE BACKGROUND ...............................6

I.    The Immigration and Nationality Act .........................................6

II.   Gang Suppression Planning Grants Program .................................8

ARGUMENT........................................................................12

I.    The Challenged Requirements in the FY 2018 Gang Suppression
      Program Are Permissible................................................12

      A.   The Gang Suppression Requirements Are Authorized by
           Statute and Do Not Violate the Separation of Powers ...................12

      B.   The Gang Suppression Requirements Are Consistent with
           the Spending Clause .......................................18

           1.   The Requirements Are Related to the Purposes of the
                Gang Suppression Program....................................19

           2.   The Gang Suppression Requirements Are Unambiguous.....21

      C.   The Gang Suppression Requirements Are Consistent with the
           Tenth Amendment................................................23

      D.   The Challenged Requirements in the FY 2018 Gang
           Suppression Program Are Consistent with the Administrative
           Procedure Act .................................................25

II.   Any Injunction Should Be Limited to Los Angeles .................................29

CONCLUSION.................................................................31

# TABLE OF AUTHORITIES

<u>Cases</u>

*Arizona v. United States*,
  567 U.S. 387 (2012) ................................................................................. 6, 28

*Barbour v. Wash. Metro. Area Transit Auth.*,
  374 F.3d 1161 (D.C. Cir. 2004) ................................................................. 19

*Benning v. Georgia*,
  391 F.3d 1299 (11th Cir. 2004) ................................................................. 23

*Bravo v. Green*,
  No. CV 16-4937 (JLL), 2017 WL 2268315 (D.N.J. May 24, 2017) .................. 19

*Calmo v. Sessions*,
  No. C 17-07124 WHA, 2018 WL 2938628 (N.D. Cal. June 12, 2018) .............. 19

*Champaign Cty., Ill. v. U.S. Law Enf't Assistance Admin.*,
  611 F.2d 1200 (7th Cir. 1979) ..................................................................... 9

*Charles v. Verhagen*,
  348 F.3d 601 (7th Cir. 2003) ..................................................................... 23

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ................................................................................. 26

*City & Cty. of San Francisco v. Trump*,
  897 F.3d 1225 (9th Cir. 2018) ................................................................... 29

*City of Los Angeles v. Barr*,
  929 F.3d 1163 (9th Cir. 2019) ............................................................. *passim*

*Clinton v. City of N.Y.*,
  524 U.S. 417 (1998) ................................................................................. 13

*Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*,
  527 U.S. 666 (1999) ................................................................................. 18

*DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.*,
  887 F.2d 275 (D.C. Cir. 1989) ................................................................... 13

iii

*Envtl. Def. Ctr., Inc. v. EPA,*
    344 F.3d 832 (9th Cir. 2003) ...................................................................24

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009)..................................................................................26, 27

*Gill v. Whitford,*
    138 S. Ct. 1916 (2018) ............................................................................29

*International Union v. Donovan,*
    746 F.2d 855 (D.C. Cir. 1984) ...............................................14, 15, 26

*J & G Sales Ltd. v. Truscott,*
    473 F.3d 1043 (9th Cir. 2007) ..............................................................26

*Lincoln v. Vigil,*
    508 U.S. 182 (1993)................................................................4, 14, 15, 26

*Los Angeles Haven Hosp. v. Sebelius,*
    638 F.3d 644 (9th Cir. 2011) ................................................................29

*Mayweathers v. Newland,*
    314 F.3d 1062 (9th Cir. 2002) .......................................................19, 23

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)....................................................................................29

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012)..........................................................................18, 23, 24

*New York v. United States,*
    505 U.S. 144 (1992)...........................................................................19, 23

*Providence Yakima Med. Ctr. v. Sebelius,*
    611 F.3d 1181 (9th Cir. 2010) ..............................................................26

*South Dakota v. Dole,*
    483 U.S. 203 (1987)...........................................................................19, 21

*Town of Chester v. Laroe Estates, Inc.,*
    137 S. Ct. 1645 (2017)...........................................................................29

iv

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018) ................................................................................29

*Van Wyhe v. Reisch*,
   581 F.3d 639 (8th Cir. 2009) ........................................................................23

*Virginia Soc'y for Human Life, Inc. v. FEC*,
   263 F.3d 379 (4th Cir. 2001) ........................................................................29

**Statutes**

5 U.S.C. § 701(a)(2) ........................................................................................25

8 U.S.C. ch. 12 ...............................................................................................21

8 U.S.C. § 1227(a)(2) ........................................................................................6

8 U.S.C. § 1324 ...............................................................................................24

8 U.S.C. § 1324(a) .......................................................................................7, 10

8 U.S.C. § 1324(c) .............................................................................................7

8 U.S.C. § 1226(c) ................................................................................6, 10, 19

8 U.S.C. § 1226(d) ...........................................................................................28

8 U.S.C. § 1228(a) ...........................................................................................19

8 U.S.C. § 1229(a) .............................................................................................6

8 U.S.C. § 1231(a) ...........................................................................6, 7, 10, 19

8 U.S.C. § 1252c .............................................................................................7, 8

8 U.S.C. § 1306 .................................................................................................7

8 U.S.C. § 1324(a) ...........................................................................................21

8 U.S.C. § 1357(a)(1) ....................................................................................6, 10

8 U.S.C. § 1357(g) ........................................................................................7, 28

8 U.S.C. § 1373.................................................................5, 11, 27, 28

8 U.S.C. § 1373(a)..........................................................................22

8 U.S.C. § 1373(b)..........................................................................22

8 U.S.C. § 1378..............................................................................19

8 U.S.C. § 1644........................................................................5, 11, 22

18 U.S.C. ch. 49..............................................................................21

18 U.S.C. § 521..............................................................................19

18 U.S.C. § 1071........................................................................10, 21

18 U.S.C. § 1072..............................................................................21

28 U.S.C. § 530C(a)(4)......................................................................13

34 U.S.C. § 10102(a)...................................................................5, 16, 28

34 U.S.C. § 10122(c)(2)(F) ...............................................................18

34 U.S.C. § 10152(a)(1) ...................................................................19

34 U.S.C. § 10228............................................................................18

34 U.S.C. § 10228(a)........................................................................17

34 U.S.C. § 11171............................................................................14

34 U.S.C. § 11171(a)........................................................................17

34 U.S.C. § 11172............................................................................14

The Omnibus Crime Control and Safe Streets Act of 1968,
    Pub. L. No. 90-351, 82 Stat. 197 (1968)....................................3

An Act to restructure the Federal Law Enforcement Assistance Administration, to
    assist State and local governments in improving the quality of their justice
    systems, and for other purposes,
    Pub. L. No. 96-157, 93 Stat. 1167 (1979)................................................................18

21st Century Department of Justice Appropriations Authorization Act,
    Pub. L. No. 107-273, 116 Stat. 1758 (2002)............................................................14

Consolidated Appropriations Act,
    Pub. L. No. 115-141, 132 Stat. 348 (2018).........................................................8, 14

**Rules**

Fed. R. Civ. P. 56(a) ......................................................................................................12

**Regulations**

8 C.F.R. § 287.5(a)(1)..............................................................................................6, 10

**Other Authorities**

Department of Justice , Office of Public Affairs, *22 MS-13 Members and Associates
    Charged Federally in ICE's MS-13 Targeted 'Operation Raging Bull' Which
    Netted a Total of 267 Arrests* (Nov. 16, 2017),
    https://www.justice.gov/opa/pr/22-ms-13-members-and-associates-charged-
    federally-ice-s-ms-13-targeted-operation-raging-bull ..........................................20

## NOTICE OF MOTION AND MOTION FOR
## PARTIAL SUMMARY JUDGMENT

PLEASE TAKE NOTICE that on Monday, November 18, 2019, at 10:00 a.m., or as soon thereafter as counsel may be heard, before The Honorable R. Gary Klausner, in Courtroom 880 on the Eighth Floor of the Edward R. Roybal Federal Building and United States Courthouse, 255 East Temple Street, Los Angeles, the defendants will move, and hereby do move, for partial summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  Defendants seek judgment as to all of plaintiff's claims regarding the Fiscal Year 2018 Gang Suppression Planning Grants Program.

This motion is based on the following Memorandum of Points and Authorities, the "Statement of Uncontroverted Facts in Support of Defendants' Motion for Partial Summary Judgment and Response to Plaintiff's Statement of Facts," the evidence and records on file in this action, and any other written or oral evidence or argument that may be presented at or before the time this motion is heard by the Court.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

NICOLA T. HANNA
United States Attorney

BRAD P. ROSENBERG
Assistant Branch Director

/s/ Daniel D. Mauler

_____

DANIEL D. MAULER
(Va.  Bar No.: 73190)
Trial Attorney

1

1

2      U.S. Department of Justice
       Civil Division - Federal Programs Branch
3      1100 L Street, NW
       Washington, D.C.  20005
4      Telephone:     (202) 202-616-0773
       Facsimile:     (202) 616-8470
5      E-mail: dan.mauler@usdoj.gov

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Law enforcement in this country is a cooperative endeavor.  Unlawful acts often implicate the jurisdiction of more than one agency, and thus local, state, tribal, and federal officials work together in a variety of ways to fight crime and ensure public safety.  Unfortunately, plaintiff rejects this proposition.  It prefers to release into the community aliens it saw fit to arrest for criminal violations rather than sharing law enforcement-related information with the Federal Government that might lead to immigration enforcement against those individuals.  That the Department of Justice ("Department") would expect basic cooperation when it gives out federal funds should be unsurprising.  When Congress created the Department's primary grant-making component, the Office of Justice Programs ("OJP"), it made a specific finding that "law enforcement efforts must be better coordinated, intensified, and made more effective at all levels of government." Pub. L. No. 90-351, 82 Stat. 197 (1968).  The grant requirements challenged in this case all reflect a very basic application of this important principle – the ability of one law enforcement agency to obtain relevant information from and take custody of those held by another law enforcement agency.  This basic type of cooperation is specifically contemplated by the Immigration and National Act ("INA") and fully consistent with the grant programs at issue here.

Los Angeles challenges certain program requirements in the Fiscal Year 2018 Gang Suppression Planning Grant ("Gang Suppression").  The Gang Suppression grant is a new program that the Department created in fiscal year 2018 to address gang violence including, especially, the dangers presented by transnational gangs, such as MS-13.  Recognizing the role of the Department of Homeland Security ("DHS") in combatting transnational gangs, the Department expects grant recipients to provide access and information to DHS about deportable criminal aliens in their custody, rather than simply releasing such persons back into

3

the community, thus reflecting a strategy that combats the *transnational* nature of such gangs. The City challenges these requirements under the Separation of Powers doctrine, the Spending Clause, the Tenth Amendment, and the Administrative Procedure Act. Because plaintiff mistakes the nature of this grant program, it is not entitled to the relief it seeks.

Plaintiff strongly wishes to conflate the Gang Suppression program with a different grant program previously considered by this Court, specifically the Edward Byrne Memorial Justice Assistances Grant Program ("Byrne JAG Program"). The Gang Suppression Program is an entirely *discretionary* grant program, meaning that Congress has provided the Department with wide and broad discretion regarding award recipients and amounts. The funds for this competitive program come from a lump sum appropriations-line-item, giving the Department extremely broad authority to determine how these funds should be spent. *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) ("[T]he very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way."). This contrasts with the Byrne JAG Program, which is a formula program, meaning that once the Department determines eligible grantees under the statute, the amount of the grant is predetermined by a statutory formula. This Court has previously considered certain conditions placed on the Byrne JAG formula grant program from the previous fiscal year. Defendants respectfully disagree with the Court's holding on that issue, which is currently pending on appeal. But, as explained below, the Court need not revisit its rulings in order to reject the full relief plaintiff seeks here.

Plaintiff questions aspects of the grant that have not previously been addressed in other court decisions. For instance, plaintiff challenges a question in the grant application related to an applicant's information-sharing policies. This is not an award condition, and the Department has considerable discretion in crafting its grant applications.

4

Plaintiff also challenges a prohibition in the grant against publicly disclosing information obtained through law enforcement channels for the purpose of frustrating law enforcement operations.  The purpose of that requirement is obvious:  if law enforcement partners at various levels of government are going to work together to address public safety, they must be free to share information without fear that the information will be misappropriated and misused.  OJP's authority to include this condition is clear:  it is authorized to "maintain liaison with . . . State governments in matters relating to criminal justice."  34 U.S.C. § 10102(a)(2).

Plaintiff challenges FY 2018 requirements calling for compliance with two federal laws, 8 U.S.C. §§ 1373 and 1644.  Those laws preclude local policies that bar the sharing of immigration-related information.  This requirement is authorized by (among other things) the Department's authority to place "special conditions on all grants," 34 U.S.C. § 10102(a)(6).

Finally, this Court should be guided by the recent Ninth Circuit decision in *City of Los Angeles v. Barr*, 929 F.3d 1163 (9th Cir. 2019).  There, the appellate court reversed the district court and approved substantively-identical immigration conditions in a similar discretionary grant program, despite similar challenges by Los Angeles.  Plaintiff attempts to minimize the impact of this on-point case, *see, e.g.*, Pl's Opening Memo., at 5, but fails to explain why this Court should not reach the same result at the Ninth Circuit here.[1]

For these reasons, judgment should be entered for the defendants on those claims, and plaintiff's motion for partial summary judgment should be denied.

---

[1] Defendants acknowledge that Los Angeles has submitted a petition for rehearing *en banc* in the Ninth Circuit.  As of the date of this filing, however, the Ninth Circuit has not acted upon that petition.

**STATUTORY AND ADMINISTRATIVE BACKGROUND**

**I.     The Immigration and Nationality Act**

Enforcement of the immigration laws, including and especially the investiga-tion and apprehension of criminal aliens, is quintessentially a law enforcement function.  The INA gives the Executive Branch considerable authority and discretion to conduct and direct immigration enforcement pursuant to federal policy objectives.  *See Arizona v. United States*, 567 U.S. 387, 396-97 (2012).  For example, federal immigration authorities are empowered, "without warrant . . . to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States," 8 U.S.C. § 1357(a)(1), and the governing regulations authorize conducting such interrogation "anywhere in or outside the United States," 8 C.F.R. § 287.5(a)(1).

Several outcomes and federal agency responsibilities under the INA turn on the existence and timing of local or state criminal proceedings against aliens.  For example, the INA provides that aliens who have committed certain classes of crimes – whether federal, state, or local – shall be removed from the United States upon order of the Attorney General or the Secretary of Homeland Security.  *See*, *e.g.*, 8 U.S.C. § 1227(a)(2).  Among other things, an alien convicted of an "aggra-vated felony" is deportable, as is an alien "convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct."  *Id*. § 1227(a)(2)(A)(ii), (iii).  Further, if an alien has been convicted of a certain subset of the crimes listed, the INA *requires* the Attorney General or Secretary to take custody of the alien "when the alien is released" from criminal custody.  *Id*. § 1226(c)(1).  Once an immigration judge has ordered the removal of an alien, the alien must be removed from the country within 90 days, *id*. § 1231(a)(1); *see id*. § 1229a, except (among other exceptions not relevant here) that an alien sentenced to imprisonment may not be removed "until the alien is released from imprisonment," *id*. § 1231(a)(4), in which case the mandatory 90-day

removal period begins on "the date the alien is released from detention or confinement," *id*. § 1231(a)(1)(B).

The connection between immigration law and criminal law is also reflected in the INA's immigration-related criminal provisions.  For example, the statute imposes criminal penalties on an alien for failing to register with federal authorities and for failing to notify federal authorities of a change of address.  *Id*. § 1306(a), (b).  Moreover, the INA imposes criminal penalties on any person who conceals, harbors, or shields an alien from detention "in any place, including any building or any means of transportation," "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law."  *Id*. § 1324(a)(1)(A)(iii).

The INA repeatedly contemplates coordination between federal officials and state and local officials on immigration enforcement.  For example, state and local officers are authorized to make arrests for violations of the INA's prohibitions against smuggling, transporting, or harboring aliens, *id*. § 1324(c), and to arrest certain felons who have unlawfully returned to the United States, *id*. § 1252c; *see id*. § 1357(g)(1) (authorizing formal cooperative agreements under which trained and qualified state and local officers may perform specified "[f]unction[s] of a federal immigration officer in relation to the investigation, apprehension, or detention of aliens"); *id*. § 1357(g)(10) (authorizing cooperation in "identification, apprehension, detention, or removal of aliens not lawfully present in the United States" even in absence of formal agreement).  Consistent with this coordination and with the importance of state and local criminal proceedings under the INA, certain provisions of federal immigration law protect the transfer of information regarding aliens between and among federal officials and state and local government entities.  Section 1373 of Title 8 provides that "a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from [federal

immigration authorities] information regarding the citizenship or immigration status, lawful or unlawful, of any individual."  Section 1644 of Title 8 contains substantially the same proscription.  Section 1373 also states that no person or agency may prohibit or restrict a federal, state, or local government entity from "[m]aintaining such information" or from "[e]xchanging such information with any other Federal, State, or local government entity."  By the same token, the INA requires federal immigration authorities to "cooperate with the States" to ensure that state and local officials have information to assist them in making arrests under the INA.  *Id*. § 1252c(b).

## II.   Gang Suppression Planning Grants Program

In the Fiscal Year 2018 appropriation for the Department of Justice, Congress included funds for certain purposes that were not set out in a separate authorizing statute.  Specifically, the appropriation included the following:

> For grants, contracts, cooperative agreements, and other assistance authorized by the Juvenile Justice and Delinquency Prevention Act of 1974 ("the 1974 Act") . . . $282,500,000, to remain available until expended as follows . . .
>
> (3) $27,500,000 for delinquency prevention, as authorized by section 505 of the 1974 Act, of which, pursuant to sections 261 and 262 thereof . . .
>
> (B) *$4,000,000 shall be for gang and youth violence education, prevention and intervention, and related activities . . . .*
>
> (E) *$8,000,000 shall be for community-based violence prevention initiatives, including for public health approaches to reducing shootings and violence . . . .*

Pub. L. No. 115-141, 132 Stat. 348, 420, 422-23 (2018) (emphasis added).

To carry out the italicized language, OJP created two new programs within OJP's Office of Juvenile Justice and Delinquency Prevention, one of which, the FY 2018 Gang Suppression Planning Grants Program, is challenged here.  In contrast to the Byrne JAG Program previously considered by this Court, this is a competitive, discretionary grant program rather than a formula grant program, meaning (among other things) that only certain applicants will receive an award.

8

*See* Declaration of Caren Harp ¶ 2 (Attachment 1 hereto); *see also Champaign Cty., Ill. v. U.S. Law Enf't Assistance Admin*., 611 F.2d 1200, 1203 (7th Cir. 1979). Other than the subject matter, the statutory authorization does not set out the details of the program; every facet of the program is left to agency discretion, as is common with many programs authorized only through appropriations acts.  The solicitation for the Gang Suppression program sought proposals from jurisdictions with "high levels of youth-perpetrated gun crime and gang violence" to undertake "strategic planning and capacity-building work through multidisciplinary and community partnerships."  Admin. Record at AR01482 (2018 Solicitation at 7).[2]

The Gang Suppression grant includes a particular focus on transnational gangs:  "[OJP] will give priority consideration to applicants that demonstrate and articulate their knowledge of its local gang issues, particularly those that are impacted by transnational gangs such as MS-13 or M-18.[3]  *Id.* at AR01485. Consistent with this focus, the solicitation notified applicants that a feature of the new program would be cooperation between federal law enforcement, on the one hand and the program or activity receiving federal financial assistance under the award, on the other, with respect to criminal aliens in local law enforcement's criminal custody.  *Id.* at AR01514-15 (2018 Solicitation at 39-40).  In order to assess the accuracy of each recipient's certification that it could fulfill these requirements, the solicitation stated that each applicant would be required to identify any governing "laws, policies, or practices related to whether, when, or how [the applicant's] employees may communicate" with federal immigration authorities.  *Id*. at AR01505 (2018 Solicitation at 30).  As part of a completed application, the prospective grantee must answer questions to identify whether the

---

[2] The Administrative Record in this action was filed with a Notice of Filing of Administrative Record on November 13, 2018.  Dkt. No. 47.

[3] MS-13 and M-18 are two transnational gangs with a significant presence in North and Central America.  Los Angeles acknowledges that MS-13 poses a public safety threat to the city.  *See* Am. Compl., ¶¶ 71-73.

9

grantee's jurisdiction has any laws, policies, or practices that affect how employees may communicate with DHS (the "Questionnaire requirement"). *See* AR01526. OJP has received eighteen applications for the FY 2018 Gang Suppression program, and the Department has not yet made a final decision as to which applicants will receive an award. *See* Harp Decl. ¶¶ 3-4.

The solicitation indicated—briefly, and in summary fashion—that each offer of award under this program would include special conditions (the specific terms of which would govern the award, if the offer of award were accepted by the successful applicant), which would be applicable *only* to the programs or activities receiving federal financial assistance under the award (*i.e.*, not to the award recipient as a whole), along the following lines:

- Consistent with the objectives of federal law enforcement statutes – including 8 U.S.C. § 1324(a), the smuggling/harboring statute referred to above, and 18 U.S.C. § 1071 – not to publicly disclose any sensitive federal law enforcement information in an attempt to harbor or shield an alien or fugitive from detection, regardless of whether the disclosure would violate 8 U.S.C. § 1324(a) ("public-disclosure requirement"), Admin. Record at AR 01514, 01748; *see* Harp Decl. ¶ 5;

- Consistent with federal law enforcement statutes and regulations – including 8 U.S.C. § 1357(a)(1), the INA interrogation statute referred to above, and 8 C.F.R. § 287.5(a)(1) – not to interfere with the exercise of that authority by impeding the access of immigration officials to any correctional facility to meet with an alien for such an interrogation (the "interview requirement"), Admin. Record at AR 01515, 01749 (¶ 45); *see* Harp Decl. ¶ 5;

- Consistent with federal law enforcement statutes – including 8 U.S.C. §§ 1231(a) and 1226(c)(1), the statutes requiring federal immigration officials to take custody of a criminal alien "when the alien is released" from state or local custody – not to interfere with the removal process by failing to

notify immigration officials "as early as practicable" regarding the scheduled release date and time of an alien in the grantee's custody when requested by immigration officials (the "custody requirement"), Admin. Record at AR 01515, 01750 (¶ 46); *see* Harp Decl. ¶ 5; and

- Not to have in place any information-communication restriction of the kind described in 8 U.S.C. §§ 1373 and 1644, and not to obligate or draw down grant funds if the recipient is subject to any prohibition or restriction against providing information regarding immigration status to federal authorities (the "information requirement"), Admin. Record at AR 01514, 01745-47 (¶¶ 41, 42, 43); *see* Harp Decl. ¶ 5.[4]

The Gang Suppression awards that are made will include "Rules of Construction" making clear that nothing in the custody requirement will require an award recipient to detain "any individual in custody beyond the date and time the individual otherwise would have been released." Admin. Record at AR01750 (¶ 46); *see* Harp Decl. ¶ 5. The award documents will also make clear that this requirement imposes no obligations in relation to any requests from federal immigration authorities to detain non-citizens, and that it requires "only as much advance notice as practicable" before the release of an alien. *Id.* Further, the awards will define "impeding" access to a correctional facility, for purposes of the interview requirement, as taking any action or following any law or policy that "is designed to prevent or to significantly delay or complicate" such access or that "has

---

[4] Plaintiff's characterization of these requirements is based primarily on the summary descriptions, in the FY 2018 *solicitations*, of what the conditions will provide, rather than on the conditions themselves, which will be included in the actual award documents (which have not yet even been issued). The First Amended Complaint calls the above-listed requirements the "harboring condition," the "access condition," the "notice condition," and the "1373 and 1644 condition," respectively. But what the solicitation contained are *not* the actual conditions that will be included in any offers of award; they are, rather, merely summary indications of the basic thrust of each of the conditions that will be included.

11

the effect of preventing or of significantly delaying or complicating" such access. Admin. Record at AR01749 (¶ 45); *see* Harp Decl. ¶ 5.

### ARGUMENT

Defendants move for partial summary judgment under Rule 56. A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## I. The Challenged Requirements in the FY 2018 Gang Suppression Program Are Permissible

On the merits, plaintiff alleges that the above-described features and requirements of the FY 2018 Gang Suppression grant program, and only those requirements, violate the Separation of Powers doctrine, the Spending Clause, and the Tenth Amendment. Even if plaintiff had standing to challenge those requirements, its claims would be without merit.[5]

### A. The Gang Suppression Requirements Are Authorized by Statute and Do Not Violate the Separation of Powers

In Count Five of its First Amended Complaint, plaintiff alleges that the Gang Suppression requirements exceed the Department's statutory authority and intrude upon the powers of Congress. First Am. Compl. ¶¶ 132-146. Plaintiff reiterates this argument in its summary judgment motion. *See* Pl.'s Opening Memo., at 11-16. The nature of the congressional authorization for this program, however, grants the Department wide latitude to develop the program, including the discretion to adopt the challenged requirements.

---

[5] The requirement to provide information about the applicant's laws and policies is not a program requirement in the same sense as the public-disclosure, interview, custody, and information requirements, even though this brief will sometimes include it under the rubric "requirement" for the sake of brevity. OJP requires the provision of that information as part of the application, but the requirement does not relate to a recipient's conduct during the course of the grant as do the four other requirements.

It is well-established that Congress may, consistent with the separation of powers doctrine, properly delegate to the Executive Branch the authority to impose requirements on recipients of agency spending. *See*, *e.g.*, *Clinton v. City of N.Y.*, 524 U.S. 417, 488 (1998) ("Congress has frequently delegated the President the authority to spend, or not to spend, particular sums of money.") (Breyer, J. dissenting); *DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.*, 887 F.2d 275, 280-81 (D.C. Cir. 1989) (upholding conditions on spending where statute authorized President to set certain "terms and conditions as he may determine"). Accordingly, plaintiff's assertion that Congress itself does not currently impose immigration-related requirements on the receipt of grant funds, First Am. Compl. ¶ 105, is wholly beside the point. *See, e.g.*, *City of Los Angeles*, 929 F.3d at 1175 n. 6 ("Here . . . Congress delegated the task of specifying these conditions to DOJ. We see no reason why the addition of an agency middleman either expands or contracts Congress's power to 'provide for the . . . general Welfare,' . . . and thus analyze DOJ's conditions under the principles of *Dole* and *NFIB*."); *see also* 28 U.S.C. § 530C(a)(4) (authorizing the Attorney General to carry out Department activities "through any means, including . . . through . . . grants"). Rather, the sole relevant question here is whether Congress has *delegated* sufficient authority to the Department to impose these requirements.

Based on the nature of the legislation that prompted the Gang Suppression program, the existence of such delegation here is inescapable. Besides appropriating funds specifically for an established program, Congress may appropriate funds without tying them to a specific program. The appropriations line item under which the FY 2018 Gang Suppression program was created by OJP is not tied to any substantive statutory program authorization. Congress appropriated $4 million for the Department to use "for gang and youth violence education, prevention and intervention, and related activities" and $8 million "for community-based violence prevention initiatives, including for public health approaches to reducing shootings

13

and violence." Pub. L. No. 115-141, 132 Stat. at 423.[6]  Where Congress appropriates funds for a stated purpose not within a substantive statutory program authorization, the agency must either incorporate the funds into an established program or create a program to carry out the stated statutory purpose for which the funds were appropriated.

In a case like this, where there is a lump-sum appropriations line-item not tied to any substantive statutory programmatic authorization, the agency's discretion in determining how to spend the appropriated funds is at its zenith.  In *Lincoln v. Vigil*, 508 U.S. 182 (1993), plaintiffs challenged the termination of a program that the Indian Health Service of the Department of Health and Human Services had carried out for several years based on Congress' annual appropriations for the agency's overall expenses and its general authority to provide health care for Native Americans.  *Id*. at 185-88.  The Supreme Court held that the program's termination was unreviewable under the APA.  The Court noted:

> The allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion.  After all, the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way.

*Id*. at 192.

Also reflecting these principles is *International Union v. Donovan*, 746 F.2d

---

[6] Although Congress provided that the funds were appropriated "pursuant to sections 261 and 262" of the Juvenile Justice and Delinquency Prevention Act of 1974 ("1974 Act"), 132 Stat. at 422-23, the appropriation was related to those provisions only in a general sense.  Section 261, now codified at 34 U.S.C. § 11171, authorizes OJJDP to "carry out projects for the development, testing, and demonstration of promising initiatives and programs for the prevention, control, or reduction of juvenile delinquency."  Section 262, codified at 34 U.S.C. § 11172, authorized grants for "technical assistance" to carry out projects under Section 261.  Section 505 of the 1974 Act, also referred to in the appropriation, was simply an "authorization of appropriations" for Fiscal Years 2004 through 2008.  Pub. L. No. 107-273, 116 Stat. 1758 (2002).

14

855 (D.C. Cir. 1984) (opinion by Scalia, C.J.).  There, the Department of Labor had created a program pursuant to specific statutory authorization, but decided not to allocate any funding to the program out of a later lump-sum appropriation that did not mention the program.  *Id.* at 857-58.  The court held that the decision not to fund the program was unreviewable, stating that "[a] lump-sum appropriation leaves it to the recipient agency . . . to distribute the funds among some or all of the permissible objects as it sees fit."  *Id.* at 861.  Thus, the court said, "[t]he issue here is not how Congress expected or intended the Secretary to behave, but how it *required* him to behave, through the only means by which it can (as far as the courts are concerned, at least) require anything – the enactment of legislation.  Our focus, in other words, must be upon the text of the appropriation."  *Id.* at 860-61.

Here, Congress appropriated funding for OJP, to provide for "gang and youth violence education, prevention and intervention, and related activities" and "community-based violence prevention," and the agency created the FY 2018 Gang Suppression program to carry out that directive.  Under *Lincoln* and *International Union*, an agency is authorized to carry out such an appropriation as it "sees fit," subject to the language of the appropriation and the nature of the agency's responsibilities.  In the face of such an appropriation, the agency has authority to "meet its statutory responsibilities in what it sees as the most effective or desirable way."  *Lincoln*, 508 U.S. at 192.  The focus is on "the text of the appropriation."  *International Union*, 746 F.2d at 861.  This is especially true in relation to discretionary, competitive grants such as the Gang Suppression grant.  OJP implemented the language of Congress's recent appropriation by creating, as Congress directed, a program for "community-based violence prevention" and "gang and youth violence education, prevention and intervention, and related activities."

The Department's substantial discretion to craft a competitive program based on this appropriations language includes the authority to advance particular law enforcement strategies to address gang violence.  Consistent with this principle,

OJP gives "priority consideration" to programs and activities of applicants that demonstrate knowledge of and are impacted by "transnational gangs such as MS-13 or M-18." Admin. Record at AR01485. Plaintiff does not challenge this feature of the program. And, OJP is requiring programs and activities receiving federal financial assistance under these awards to employ strategies that ensure criminal aliens in their custody are turned over to DHS rather than released back into the community – a strategy that reflects the *transnational* nature of transnational gangs.

OJP's established statutory authority further supports the Office's ability to craft the Gang Suppression grant program as it has. The public-disclosure requirement and the requirement regarding the applicant's laws and policies are closely related to OJP's statutory responsibility to "maintain liaison" among federal, state, and local authorities. 34 U.S.C. § 10102(a)(2). Federal, state, and local law enforcement priorities may differ, and federal authorities are entitled to know when state and local laws or policies may conflict with federal priorities. An agency statutorily charged with maintaining that "liaison" is naturally empowered to secure information regarding state and local laws and policies. And where federal law enforcement officials do work with state and local officials, federal officials are naturally entitled to insist on the protection of sensitive federal law enforcement information. Coordination among federal, state, and local law enforcement officials necessarily requires maintaining the confidentiality of shared information. Additionally, the requirement to provide information about the applicant's laws and policies is an exercise of OJP's inherent authority in a discretionary program to dictate the form of an application.

The foregoing demonstrates that the challenged conditions are lawful and permissible, despite the plaintiff's argument that such authority is lacking. *See* Pl.'s Opening Memo., at 11-16. There, plaintiff asserts that the Juvenile Justice Act somehow forecloses the challenged grant conditions (*see id.* at 12), yet acknowledges that "Congress authorized DOJ to make grants 'for the development, testing, and

demonstration of promising initiatives and programs for the prevention, control, or reduction of juvenile delinquency.'" *Id.* at 13 (quoting 34 U.S.C. § 11171(a), § 11172). Plaintiff utterly fails to recognize that a program that seeks to attack the dangerous effects of transnational gangs that prey on juveniles – like MS-13 – aids in the prevention, control, and reduction of juvenile delinquency. *Cf. City of Los Angeles*, 929 F.3d at 1178 ("First, DOJ's understanding that illegal immigration presents a public safety issues has been acknowledged by the Supreme Court . . . . Second, DOJ's determination that the techniques of community policing may be used to address this public safety issue is entirely reasonable.") Such statutory authority is ample and sufficient authorization for the challenged conditions.

Plaintiff also makes the curious argument that the challenged conditions (with the exception of the Questionnaire Requirement) are somehow invalid because they are applied as conditions to awards received by winning grantees. *See* Pl.'s Opening Memo., at 14. This argument ignores the reality that all of the conditions are identified and described in the FY 2018 grant solicitation. *See, e.g.*, AR 01514-15 (describing the public-disclosure requirement, the interview requirement, the custody requirement, and the information requirement as "Express Award Conditions."). *See also* AR 01527-28 (setting forth the certifications expected of awardees). Thus, there is no bait-and-switch, and *all* prospective applicants are put on notice of *all* significant conditions that may be expected in any offer of award. And once an offer is made, it is up to the successful applicant to review the terms of the offer (all of them being set forth in the award documents) and determine for itself whether to accept it.

Finally, plaintiff argues that the challenged requirements violate 34 U.S.C. § 10228(a), which provides that nothing in the federal statutes "shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof." First Am.

Compl. ¶ 108.  But nothing in the challenged requirements has that effect.  To begin

with, Gang Suppression grantees voluntarily consent to award requirements in

return for receiving federal funds.  This is a *voluntary* program.  If grantees are

unhappy with its features, they are free to not apply or to decline the award and thus

avoid any obligation to comply with its requirements.  Additionally, requiring

modest cooperation with federal law enforcement in exchange for federal law

enforcement funds does not constitute exercising "direction, supervision, or

control."  Rather, the program features challenged here only enhance coordination

among federal, state, and local law enforcement officers, which Congress expressly

encourages.  For example, concurrent with the enactment of 34 U.S.C. § 10228,

Congress created the National Institute of Justice (a component of OJP), *see* An Act

to Restructure the Federal Law Enforcement Assistance Administration, Pub. L.

No. 96-157, §§ 202, 815, 93 Stat. 1167, 1172, 1206 (1979), which has as one of its

express statutory purposes "to develop programs and projects . . . to improve and

expand cooperation among the Federal Government, States, and units of local

government . . . ."  34 U.S.C. § 10122(c)(2)(F).

## B. The Gang Suppression Requirements Are Consistent with the Spending Clause

Count Six of plaintiff's First Amended Complaint alleges that the Gang

Suppression program requirements violate the Spending Clause.  First Am. Compl.

¶¶ 147-150.  This same argument is also repeated in plaintiff's summary judgment

motion.  *See* Pl.'s Opening Memo., at 16-18.  Under its spending authority,

Congress "may offer funds to the States, and may condition those offers on

compliance with specified conditions."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567

U.S. 519, 537 (2012) ("*NFIB*").  It is well-established that the Spending Clause

confers broad authority, such that conditions imposed pursuant to this authority may

permissibly require States to "tak[e] certain actions that Congress could not

[otherwise] require them to take."  *Coll. Sav. Bank v. Fla. Prepaid Postsecondary*

*Educ. Expense Bd.*, 527 U.S. 666, 686 (1999).  Nevertheless, the spending authority is subject to certain discrete limitations, two of which are purportedly at issue here: (1) "conditions on federal grants may be illegitimate if they are unrelated to the federal interest in particular national projects or programs"; and (2) conditions must be "unambiguous[]."  *South Dakota v. Dole*, 483 U.S. 203, 207 (1987).  The Gang Suppression requirements easily satisfy both of these aspects of *Dole*.

### 1.  The Requirements Are Related to the Purposes of the Gang Suppression Program

Initially, it is well-established that the "relatedness" aspect of *Dole* does not pose a difficult hurdle; to the contrary, the Ninth Circuit has emphasized that this is a "low-threshold" inquiry that "is a far cry from . . . an exacting standard for relatedness."  *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002); *see New York v. United States*, 505 U.S. 144, 167 (1992) (stating that only "some relationship" is necessary between spending conditions and "the purpose of the federal spending.").  As the D.C. Circuit has observed, the Supreme Court has never "overturned Spending Clause legislation on relatedness grounds."  *Barbour v. Wash. Metro. Area Transit Auth.*, 374 F.3d 1161, 1168 (D.C. Cir. 2004).

As noted earlier, "criminal aliens" are a core concern of the INA.  34 U.S.C. § 10152(a)(1); 8 U.S.C. §§ 1226(c), 1228(a), 1231(a)(6), 1378.  Furthermore, gang activity is a significant concern in the enforcement of both immigration law and criminal law.  *Compare*, *e.g.*, *Calmo v. Sessions*, No. C 17-07124 WHA, 2018 WL 2938628, at *1 (N.D. Cal. June 12, 2018) (noting that immigration judge had considered gang membership, among other things, in determining whether alien posed danger to community), *and Bravo v. Green*, No. CV 16-4937 (JLL), 2017 WL 2268315, at *1 (D.N.J. May 24, 2017) (same), *with*, *e.g.*, 18 U.S.C. § 521 (providing that sentence for certain federal criminal offenses shall be increased by up to 10 years if defendant participated in violent criminal gang).

Further, a focus of this particular grant program is transnational gangs,

Admin. Record at AR01485, and the challenged requirements reflect the importance of cooperation at all levels of law enforcement to address transnational gang violence.  *See, e.g.*, https://www.justice.gov/opa/pr/22-ms-13-members-and-associates-charged-federally-ice-s-ms-13-targeted-operation-raging-bull (noting a significant operation against MS-13 resulting in 267 arrests, which included coopera-tion between the Department, DHS, and local law enforcement).  Ensuring that DHS can take custody of criminal aliens – particularly those who may be gang members – in the custody of local law enforcement partners is an essential component of the strategies the Department is seeking to promote through this highly discretionary program.

The need for one of the program features – the public-disclosure requirement applicable to programs and activities receiving federal financial assistance under the award – and its relationship to the purposes of the Gang Suppression program is even clearer in light of recent events.  Included in the Administrative Record in this action are public Twitter and Facebook posts by the mayor of a U.S. city informing residents of an impending operation by federal immigration authorities.  Admin. Record at AR01038-39.  In those communications, the executive of a U.S. jurisdiction specifically made a "public disclosure [of] federal law enforcement information in a direct or indirect attempt to conceal, harbor, or shield from detection . . . any alien who [had] come to, entered, or remain[ed] in the United States" in violation of law.  Federal law enforcement officials must be able to inform state and local officials of impending operations without fear of compromising those operations.  Such basic coordination is essential not only for the success of operations but also for the safety of law enforcement personnel and the public.

In sum, ensuring that the programs or activities receiving federal funds to fight gang activity do not hinder the enforcement of immigration law supports the intrinsic purposes of the Gang Suppression program.

**2.  The Gang Suppression Requirements Are Unambiguous**

Another limitation on the spending power is that when the Federal Government "desires to condition the States' receipt of federal funds, it must do so unambiguously, enabling the States to exercise their choice knowingly, cognizant of the consequences of their participation."  *Dole*, 483 U.S. at 207 (citation omitted).  The Gang Suppression award requirements easily satisfy this aspect of *Dole*, especially in light of the accompanying "Rules of Construction."

At the outset, the Ninth Circuit considered and rejected a similar challenge in the previous Los Angeles case.  *See City of Los Angeles*, 929 F.3d at 1176 ("Nor did DOJ impose surprise or ambiguous conditions on recipients of funds . . . the immigration-related conditions were clearly presented in the Application Guidelines and Certification.").  Because similar facts exist here – namely, that the challenged conditions are set forth clearly in the Gang Suppression solicitation – the Court should follow the Ninth Circuit's lead.

The public-disclosure requirement will state that it prohibits, within the program or activity receiving federal financial assistance under the award, the "public disclosure [of] federal law enforcement information in a direct or indirect attempt to conceal, harbor, or shield from detection any fugitive from justice under 18 U.S.C. ch. 49, or any alien who has come to, entered, or remains in the United States in violation of 8 U.S.C. ch. 12 – without regard to whether such disclosure would constitute (or could form a predicate for) a violation of 18 U.S.C. [§§] 1071 or 1072 or of 8 U.S.C. [§] 1324(a).  The Rules of Construction, moreover, will define "alien," "federal law enforcement information," and "public disclosure" in detail.  Similarly, in the solicitation, the requirement to provide information regarding the applicant's laws or policies asks very clearly whether the recipient has "any laws, policies, or practices related to whether, when, or how employees may communicate with DHS or ICE" or is "subject to any [such] laws from a superior political entity (e.g., a state law that binds a city)."  Admin. Record at

21

AR01505.

Further, the information requirement expressly will define a disqualifying "information-communication restriction," for purposes of that condition, as any policy or practice that would –

> prohibit or in any way restrict (1) any government entity or official from sending or receiving information regarding citizenship or immigration status as defined in 8 U.S.C. § 1373(a); or (2) a government entity or -agency from sending, receiving, maintaining, or exchanging information regarding immigration status as described in either 8 U.S.C. § 1373(b) or 1644.

Admin. Record at AR01746; *see* Harp Decl. ¶ 5. The "Rules of Construction" will define "immigration status" and other terms, and will specify that "[n]othing in this condition shall be understood to authorize or require any recipient . . . to violate any federal law, including any applicable civil rights or nondiscrimination law." Admin. Record at AR01746; *see* Harp Decl. ¶ 5. Similarly, the interview requirement will incorporate the same Rules of Construction, and specifies that the term "impede," in relation to "impeding access" to a correctional facility, "includes taking or continuing any action, or implementing or maintaining any law, policy, rule, or practice that . . . is designed to prevent or significantly delay complicate, or . . . has the effect of preventing or of significantly complicating." *Id.* at AR01749; *see* Harp Decl. ¶ 5. The custody requirement will specify that "[n]othing in this condition shall be understood to authorize or require any recipient . . . to maintain (or detain) any individual in custody beyond the date and time the individual otherwise would have been released." *Id.* at AR017450; *see* Harp Decl. ¶ 5. To the extent any uncertainty might possibly remain, the grant award documents will direct that "[a]ny questions about the meaning or scope" of the conditions "should be directed to OJP." *Id.* at AR01746.

Finally, any arguable marginal uncertainty regarding the outer boundaries of these conditions would not render them unconstitutionally ambiguous. Indeed, "the exact nature of [grant] conditions may be largely indeterminate, provided that the

22

existence of the conditions is clear, such that States have notice that compliance with the conditions is required." *Charles v. Verhagen*, 348 F.3d 601, 607 (7th Cir. 2003) (citation omitted); *see Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004) ("Once Congress clearly signals its intent to attach . . . conditions . . . it need not specifically identify and proscribe in advance every conceivable state action that would be improper." (citation omitted)); *see also Van Wyhe v. Reisch*, 581 F.3d 639, 650 (8th Cir. 2009) (finding notice requirement satisfied even where condition "provides a pliable standard"); *Mayweathers*, 314 F.3d at 1067 (finding notice requirement satisfied even with a "standard [that] is perhaps unpredictable because it has resulted in different determinations in different courts").

## C. The Gang Suppression Requirements Are Consistent with the Tenth Amendment

In Count Seven, plaintiff alleges that the Gang Suppression program requirements would violate the Tenth Amendment if the federal statutes cited were construed as supporting the requirements. First Am. Compl. ¶¶ 151-158. None of the challenged requirements, however, compels the plaintiff to "enact or administer a federal regulatory program" or to "act on the Federal Government's behalf." *New York v. United States*, 505 U.S. 144, 188 (1992); *see NFIB*, 567 U.S. at 620. To begin with, the requirements do not "compel" the plaintiff to do anything, an important point noted by the Ninth Circuit in rejecting a similar challenge brought by Los Angeles against similar grant conditions. *See City of Los Angeles*, 929 F.3d at 1177 (noting that when grant applicants "agree to give DHS personnel access to the applicant's correctional or detention facilities to meet with alien detainees, or to give DHS notice before an alien detainee is released," such agreement "does not override state laws and therefore does not give rise to any Tenth Amendment concern."). Rather, the grant requirements are tied to the programs or activities that receive federal funds, and Los Angeles (should its application be approved) would be free to accept or reject the award. As the Supreme Court has held, the Federal Government

23

"may offer funds to [state and local jurisdictions], and may condition those offers on compliance with specified conditions." *Id.* at 537; *cf. Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 847 (9th Cir. 2003) ("[A]s long as the alternative to implementing a federal regulatory program does not offend the Constitution's guarantees of federalism, the fact that the alternative is difficult, expensive or otherwise unappeal-ing is insufficient to establish a Tenth Amendment violation.") (citation omitted).

Further, the requirements relate only to whether the programs or activities receiving federal financial assistance under these awards may *frustrate* federal law enforcement. The requirements do not compel those programs or activities to administer a federal program or to act on the Federal Government's behalf, but only to refrain from "impeding access" to correctional facilities to meet with aliens, to refrain from interfering with the removal of criminal aliens by providing information about the impending release of aliens, and to refrain from prohibiting or restricting the provision of information by employees. The requirement regarding the applicant's laws and policies only seeks information on any laws or policies that would *impede* the enforcement of federal immigration law, and the public-disclosure requirement requires the program or activities only to refrain from public disclosure of law enforcement information received from *federal* agencies.

Finally, in relation to the public-disclosure requirement, plaintiff alleges that the federal smuggling statute, 8 U.S.C. § 1324, would violate the Tenth Amendment if defendants were "permitted to interpret [it] to apply to State and local officials." First Am. Compl. ¶ 156. But this requirement does not seek to "apply" the federal smuggling statute to the plaintiff in the sense of prosecuting the City thereunder. Even if Los Angeles cannot be prosecuted for violating a particular federal criminal law, the Department can legitimately expect the programs or activities receiving federal financial assistance under the award to refrain – as a condition of receiving federal law enforcement funds – from disclosing sensitive federal law enforcement information in an effort to defeat the law's enforcement. In sum, this case is not

1   about compelling state or local governments to perform federal functions, but about

2   preventing interference – from the program or activity receiving the federal

3   financial assistance – with *the Federal Government's performance* of its own

4   functions.

5   **D. The Challenged Requirements in the FY 2018 Gang**

6   **Suppression Program Are Consistent with the Administrative**

7   **Procedure Act**

8   Finally, Count Eight of the First Amended Complaint alleges that the

9   decision to impose the challenged requirements was arbitrary and capricious under

10  the Administrative Procedure Act ("APA") "because DOJ imposed [the challenged]

11  conditions and certifications without any reasoned basis, provided no support for its

12  linkage between participation by State and local law enforcement officials in

13  federal civil immigration enforcement and . . . local criminal justice efforts . . . and

14  appears to have relied on clearly erroneous and debunked interpretations of existing

15  studies." First Am. Compl. ¶ 131; *see id.* ¶ 161. This argument is also repeated in

16  plaintiff's summary judgment motion. *See* Pl.'s Opening Memo., at 18-19. These

17  claims are without merit.

18  As an initial matter, if the challenged requirements are statutorily authorized

19  and comport with the Spending Clause and the Tenth Amendment – which, as

20  shown above, they do – it is unclear how "arbitrary or capricious" scrutiny could

21  otherwise limit the Department's broad discretion. Further, the Gang Suppression

22  requirements are entirely unreviewable under the APA because that program is

23  authorized by one-line appropriations that commit the parameters of the program to

24  agency discretion. *See* 5 U.S.C. § 701(a)(2) ("This chapter applies, according to the

25  provisions thereof, except to the extent that . . . agency action is committed to

26  agency discretion by law."). Such non-reviewability of lump-sum appropriations

27  under the APA's Section 701(a)(2) is long-recognized. "[A]s long as the agency

28  allocates funds from a lump-sum appropriation to meet permissible statutory

25

objections, § 701(a)(2) gives the courts no leave to intrude.  To that extent, the decision to allocate funds is committed to the agency discretion by law." *Lincoln*, 508 U.S. at 193 (internal quotation marks, citations, and brackets omitted).  *See also International Union*, 746 F.2d at 861 ("A lump-sum appropriation leaves it to the recipient agency (as a matter of law, at least) to distribute the funds among some or all of the permissible objects as it sees fit.").

In any event, when a court reviews an agency's action under the "arbitrary or capricious" standard, it is "required to be 'highly deferential,'" and to "presum[e] the agency action to be valid" as long as it is supported by a rational basis. *Providence Yakima Med. Ctr. v. Sebelius*, 611 F.3d 1181, 1190 (9th Cir. 2010) (quoting *J & G Sales Ltd. v. Truscott*, 473 F.3d 1043, 1051 (9th Cir. 2007)). This standard of review is "narrow," and does not authorize a district court "to substitute its judgment for that of the agency."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

Here, plaintiff's claims fail because "the agency's reasons for" imposing the challenged requirements "were entirely rational."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 517 (2009).  Even assuming OJP's imposition of the challenged requirements were subject to arbitrary-and-capricious review notwithstanding the absence of any statutory standards governing the choice of special conditions and priority purposes, it is reasonable for OJP to deny federal law enforcement funding to a program or activity that releases aliens that are suspected or convicted of criminal conduct without allowing federal officials to interrogate or apprehend those aliens.  That judgment does not depend on a factual determination of the sort that Los Angeles appears to demand.  It simply requires asking whether OJP should blind itself to the degree of cooperation provided (or not provided) within certain programs or activities to federal law enforcement efforts when distributing federal law enforcement grants, as well as to the public safety threats caused by that lack of

1    cooperation.  Thus, the challenged requirements are "common-sense measures,"

2    Admin. Record at AR00993, and "even in the absence of evidence, the agency's

3    predictive judgment (which merits deference) makes entire sense" as "an exercise

4    in logic rather than clairvoyance." *Fox Television*, 556 U.S. at 521.

5         In any event, the Administrative Record submitted by the defendants further

6    supports the rationality of the conditions.  Prompted partly by an Inspector General

7    report describing deteriorating local cooperation with "efforts to remove undocu-

8    mented criminal aliens from the United States," Admin. Record at AR00366, the

9    Department of Justice under the prior Administration instituted a requirement for

10   FY 2016 Byrne JAG grantees to certify compliance with 8 U.S.C. § 1373 in order

11   to protect the exchange of information among federal, state, and local law

12   enforcement.  *Id*. at AR00392-97.  For the FY 2017 grant cycle, the Department

13   maintained that condition and added conditions similar to the interview and custody

14   conditions described above, to "increase[e] information sharing between federal,

15   state, and local law enforcement" so that "federal immigration authorities have the

16   information they need to enforce the law and keep our communities safe." *Id*. at

17   AR00993 (Backgrounder on Grant Requirements).  In FY 2018, the Department

18   adopted similar requirements for the Gang Suppression Program, which responded

19   to further developments, including, in relation to the public-disclosure requirement,

20   at least one instance in which an elected local official publicly disclosed an

21   impending federal law enforcement operation designed to apprehend suspected

22   illegal aliens.  *Id*. at AR01038-39.  Further, the Gang Suppression solicitation

23   specifically notes the Department's focus on reducing transnational gang violence,

24   Admin. Record at AR01418-20, AR01485; cooperation with DHS with respect to

25   criminal aliens is an important feature of that focus.

26        As discussed above in relation to the Spending Clause, immigration

27   enforcement undoubtedly relates to criminal justice.  *See, e.g.*, *City of Los Angeles*,

28   929 F.3d at 1179 (noting that "DOJ's determination 'that illegal immigration

enforcement is a public safety issue'" is "entirely reasonable.").  Numerous federal statutes expressly connect these two subjects.  The challenged requirements thus rationally promote interests in "maintain[ing] liaison" among tiers of government "in matters relating to criminal justice," 34 U.S.C. § 10102(a)(2), and comport with the intergovernmental cooperation that Congress plainly contemplates in immigration enforcement.  *See, e.g.*, 8 U.S.C. §§ 1226(d), 1357(g), 1373; *Arizona*, 567 U.S. at 411-12 ("Consultation between federal and state officials is an important feature of the immigration system" and Congress "has encouraged the sharing of information about possible immigration violations.").

Finally, the Ninth Circuit rejected a similar challenge brought by Los Angeles.  *See City of Los Angeles*, 929 F.3d at 1181-83.  There, Los Angeles argued that "DOJ violated the APA because it failed to engage in reasoned decision making and because its explanation for its policy [was] contrary to the evidence" (*id.* at 1181), specifically that "DOJ's action was not based on empirical evidence establishing that cooperation between state and local authorities and federal authorities on illegal immigration addresses crime or public safety issues."  *Id.* at 1182.  The Ninth Circuit held otherwise:

> We disagree.  Under the APA, an agency must give adequate reasons for its decision, and DOJ has done so here.  DOJ has reasonably determined that illegal immigration enforcement is a public safety issue that can be addressed most effectively through the principles of community policing.  And because the Certification relates to non-citizens who are being detained and who have committed crimes or are suspected of having committed crimes, DOJ reasonably concluded that working with the federal government to enforce the federal immigration laws against aliens who have committed crimes or are suspected of having committed crimes makes communities safer.

*Id.* at 1182 (internal quotation marks and brackets omitted).

This legal conclusion remains true, despite Los Angeles's alleged evidence that the "imposition of the Conditions would *harm* public safety."  Pl.'s Opening Memo., at 18 (emphasis in original).  For purposes of arbitrary-and-capricious analysis, "the studies and articles cited by Los Angeles do not undercut DOJ's

28

conclusion that removing aliens who are convicted or suspected of crimes makes communities safer." *City of Los Angeles*, 929 F.3d at 1182.

The bottom-line is best summarized by the Ninth Circuit: "Los Angeles may believe that addressing illegal immigration is not the most effective way to improve public safety, but the wisdom of DOJ's policy is not an element of our arbitrary and capricious review. We may not 'substitute [our] judgment for that of the agency.'" *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Accordingly, the challenged requirements are rational, and this Court should not substitute its judgment for that of the Department of Justice.

## II.   Any Injunction Should Be Limited to Los Angeles

Los Angeles expressly seeks a permanent injunction to benefit all grant recipients "program-wide." Pl.'s Opening Memo., at 20. Plaintiff lacks standing to seek such an injunction, however, and the plaintiff has not explained why it would need such far-reaching relief to be made whole. As the Supreme Court has observed many times, a plaintiff "must establish standing separately for each form of relief sought," *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017), and a "plaintiff's remedy must be limited to the inadequacy that produced [its] injury in fact," *Gill v. Whitford,* 138 S. Ct. 1916 (2018); *see City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1244-45 (9th Cir. 2018) (reversing grant of nationwide injunction). Moreover, as an equitable matter, nationwide injunctions "take a toll on the federal court system – preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring); *see Virginia Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 393 (4th Cir. 2001) (noting tendency of nationwide injunctions to "thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue"), *quoted in Los*

29

1    *Angeles Haven Hosp. v. Sebelius*, 638 F.3d 644, 664-65 (9th Cir. 2011).

2    Accordingly, any injunction the Court may enter should be limited to Los Angeles.

3           At minimum, if the Court were to enter a nationwide injunction, its

4    application beyond the plaintiff should be stayed for 60 days in order to allow the

5    Solicitor General to evaluate whether to authorize an appeal and, if an appeal is

6    authorized, during the pendency of any such appeal.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

For the reasons set forth above, the Court should grant partial summary judgment in defendants' favor and deny plaintiff's motion for summary judgment.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

NICOLA T. HANNA
United States Attorney

BRAD P. ROSENBERG
Assistant Branch Director

/s/ Daniel D. Mauler

_____

DANIEL D. MAULER
(Va.  Bar No.: 73190)
Trial Attorney

U.S. Department of Justice
Civil Division - Federal Programs Branch
1100 L Street, NW
Washington, D.C.  20005
Telephone: (202) 202-616-0773
Facsimile:  (202) 616-8470
E-mail:      dan.mauler@usdoj.gov

COUNSEL FOR DEFENDANTS