JOSEPH H. HUNT
Assistant Attorney General
NICOLA T. HANNA
United States Attorney
BRIGHAM J. BOWEN
Assistant Branch Director
DANIEL D. MAULER (Va.  Bar No.: 73190)
Trial Attorney
U.S. Department of Justice
Civil Division - Federal Programs Branch
1100 L Street, NW
Washington, D.C.  20005
Telephone:   (202) 616-0773
Facsimile:   (202) 616-8470
E-mail:       dan.mauler@usdoj.gov
COUNSEL FOR DEFENDANTS

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

CITY OF LOS ANGELES,

           Plaintiff,

    v.

WILLIAM P. BARR, Attorney
General of the United States, *et al*.,

           Defendants.

No.  2:18-cv-07347-R-JC

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT**

    Date:      November 18, 2019
    Time:      10:00 a.m.

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................... 1

ADDITIONAL STATUTORY BACKGROUND ............................................. 1

ARGUMENT .................................................................................................. 4

    I.    The Challenged Requirements in the FY 2018 Gang Suppression
        Program Are Permissible ...................................................................... 4

        A.    The Gang Suppression Requirements Are Authorized by
              Statute and Do Not Violate the Separation of Powers. ...................... 4

              1.    The 2018 Appropriations Act Provides Ample and
                    Sufficient Authority for the Challenged Conditions. ............. 4

              2.    The Challenged Conditions are also Authorized under
                    the Juvenile Justice Act. ......................................................... 6

        B.    The Gang Suppression Requirements Are Consistent with
              the Spending Clause. ........................................................................ 7

        C.    The Gang Suppression Requirements are Consistent with the
              Tenth Amendment. ......................................................................... 11

    II.    The Challenged Requirements Are Consistent with the
        Administrative Procedure Act. .......................................................... 12

    III.    Any Injunction Should Be Limited to Los Angeles. ................................. 12

              1.    Article III Requirements Preclude an Injunction that
                    Extends Beyond Redressing Plaintiff's Injury. .................... 13

              2.    Traditional Equitable Principles Preclude an Injunction
                    That Extends Beyond Redressing Plaintiff's Injury. ........... 14

CONCLUSION ............................................................................................. 15

1

# TABLE OF AUTHORITIES

2

## CASES

3

4
*Alvarez v. Smith*,
5
   558 U.S. 87 (2009) ................................................................. 14

6
*Benning v. Georgia*,
7
   391 F.3d 1299 (11th Cir. 2004) ............................................... 9

8
*California v. Azar*,
9
   911 F.3d 558 (9th Cir. 2018) ................................................. 13

10
*City & County of San Francisco v. Trump*,
11
   897 F.3d 1225 (9th Cir. 2018) ............................................... 13

12
*City of Chicago v. Sessions*,
13
   264 F. Supp. 3d 933 (N.D. Ill. 2017) .................................... 12

14
*City of Chicago v. Sessions*,
15
   No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018) ...... 12

16
*City of Los Angeles v. Barr*,
17
   929 F.3d 1163 (9th Cir. 2019) ............................................ 6, 7

18
*DaimlerChrysler Corp. v. Cuno*,
19
   547 U.S. 332 (2006) ......................................................... 12, 13

20
*FCC v. Fox Television Stations, Inc.*,
21
   556 U.S. 502 (2009) ............................................................. 12

22
*Gill v. Whitford*,
23
   138 S. Ct. 1916 (2018) .......................................................... 13

24
*Lewis v. Casey*,
25
   518 U.S. 343 (1996) ......................................................... 13, 14

26
*Lincoln v. Vigil*,
27
   508 U.S. 182 (1993) ............................................................... 4

28

*Los Angeles Haven Hospice, Inc. v. Sebelius*,
   638 F.3d 644 (9th Cir. 2011) .......................................................13, 14, 15

*Marbury v. Madison*,
   5 U.S. (1 Cranch) 137 (1803)...............................................................13

*McKenzie v. City of Chicago*,
   118 F.3d 552 (7th Cir. 1997) ...............................................................15

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010)...............................................................................14

*Murphy v. NCAA*,
   138 S. Ct. 1461 (2018)..........................................................................11

*New York v. United States*,
   505 U.S. 144 (1992)...........................................................................7, 9

*Policy & Research, LLC v. HHS*,
   313 F. Supp. 3d 62 (D.D.C. 2018) .......................................................11

*South Dakota v. Dole*,
   483 U.S. 203 (1987).................................................................................7

*Summers v. Earth Island Institute*,
   555 U.S. 488 (2009)...............................................................................14

*Town of Chester v. Laroe Estates, Inc.*,
   137 S. Ct. 1645 (2017)....................................................................12, 13

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018)..........................................................................15

*Warth v. Seldin*,
   422 U.S. 490 (1975).........................................................................13, 15

*Zepeda v. U.S. Immigration & Naturalization Serv.*,
   753 F.2d 719 (9th Cir. 1983) ...........................................................13, 15

**STATUTES**

8 U.S.C. § 1324 .................................................................................................. 10

8 U.S.C. § 1325 .................................................................................................... 8

28 U.S.C. § 530C ......................................................................................... 3, 5, 6

34 U.S.C. § 10102 .......................................................................................... 3, 4

34 U.S.C. §§ 10381-10389 .............................................................................. 7

34 U.S.C. § 11102 ............................................................................................. 6

34 U.S.C. § 11111 .................................................................................... 2, 3, 5

34 U.S.C. § 11131 ............................................................................................. 3

34 U.S.C. § 11132 ...................................................................................... 3, 5, 6

34 U.S.C. § 11133 ............................................................................................. 3

34 U.S.C. § 11142 ......................................................................................... 5, 6

34 U.S.C. § 11143 ......................................................................................... 5, 6

34 U.S.C. § 11144 ......................................................................................... 5, 6

34 U.S.C. § 11171 .................................................................................... 2, 5, 12

34 U.S.C. § 11172 ............................................................................................. 2

34 U.S.C. § 11173 ......................................................................................... 3, 5

34 U.S.C. § 11294 ............................................................................................. 3

34 U.S.C. § 11295 ......................................................................................... 3, 5

34 U.S.C. § 11296 ............................................................................................. 3

34 U.S.C. § 11313 ......................................................................................... 3, 5

1
2

Pub. L. No. 115-141, 132 Stat. 348 (2018) ........................................................*passim*

3

**OTHER AUTHORITIES**

4
5

Cal. Bus. & Prof. Code § 16801 ................................................................................10

6

Cal. Health & Safety Code § 1367.02 ......................................................................10

7

Cal. Penal Code § 32 ................................................................................................10

8
9

*5 Out Of 6 State Prisoners Were Arrested Within 9 Years Of Their Release*,
https://www.bjs.gov/content/pub/press/18upr9yfup0514pr.cfm ...........................9

10
11

*ICE's 'Operation Raging Bull' nets 267 MS-13 arrests*,
https://www.ice.gov/features/raging-bull ...............................................................8

12
13
14

*MS-13 gang member, Interpol fugitive arrested under Operation Matador removed
to El Salvador*, https://www.ice.gov/news/releases/ms-13-gang-member-interpol-
fugitive-arrested-under-operation-matador-removed-el .........................................8

15
16
17

*MS-13 Gang Members Charged in Connection with Murders of Juveniles*,
https://www.justice.gov/usao-edva/pr/ms-13-gang-members-charged-connection-
murders-juveniles....................................................................................................9

18
19

*MS-13 Member Convicted for Gang Murders of Two Teenagers*,
https://www.justice.gov/usao-ma/pr/ms-13-member-convicted-gang-murders-
two-teenagers ....................................................................................................8, 9

20
21
22
23
24
25
26
27
28

## INTRODUCTION

Plaintiff attempts to graft a host of grant conditions, borrowed from myriad provisions across the Juvenile Justice and Delinquency Prevention Act of 1974, onto an appropriations line-item that refers only to three specific provisions of that Act. This appropriations line-item (and the three specific provisions that authorize it) vests significant discretion in the Department of Justice ("Department"), plainly empowering the Department to create new discretionary law enforcement grant programs – such as the Fiscal Year 2018 Gang Suppression Planning Grants ("Gang Suppression") Program to include program requirements (tailored to those programs) with which grant recipients must comply. Thus, the Department may, *inter alia*, require the recipients of certain federal law enforcement funds to refrain from disclosing federal law enforcement information for purposes of advancing continued violations of federal law.

Plaintiff fundamentally misunderstands the nature and scope of the Department's authority in this matter. Plaintiff seeks to cabin the Department's ability to adopt reasonable requirements as if Congress had created the program itself and established all of its requirements. Further, Plaintiff entirely ignores the need to protect sensitive law enforcement information so that federal, state, and local agencies can work together safely and effectively. Finally, Plaintiff denies the obvious, common-sense link between law enforcement cooperation with respect to criminal aliens and efforts to combat transnational gangs. These and all other issues in this action should be decided in defendants' favor.

### ADDITIONAL STATUTORY BACKGROUND[1]

The Department of Justice created the Gang Suppression program to carry out Congress's appropriations line-item, under the general FY 2018 Juvenile Justice and

---

[1] This additional background supplements defendants' opening memorandum because Plaintiff wrongly contends that a grant program authorized under the three specific provisions of the Juvenile Justice Act that are referred to in the pertinent

1

Delinquency Prevention appropriations heading for "gang and youth violence education, prevention and intervention, and related activities" and for "community-based violence prevention initiatives":

> For grants, contracts, cooperative agreements, and other assistance authorized by the Juvenile Justice and Delinquency Prevention Act of 1974 ("the 1974 Act") . . . $282,500,000, to remain available until expended as follows . . .
>
> > (3) $27,500,000 for delinquency prevention, as authorized by section 505 of the [Juvenile Justice and Delinquency Prevention Act of 1974], of which, pursuant to sections 261 and 262 thereof . . .
> >
> > > (B)  *$4,000,000 shall be for gang and youth violence education, prevention and intervention, and related activities* [and] . . .
> > >
> > > (E)  *$8,000,000 shall be for community-based violence prevention initiatives, including for public health approaches to reducing shootings and violence* . . . .

Pub. L. No. 115-141, 132 Stat. 348, 420, 422-23 (2018) (emphases added) (hereinafter, the "2018 Appropriations Act").

The Juvenile Justice and Delinquency Prevention Act of 1974 ("Juvenile Justice Act" or the "Act") created the Office of Juvenile Justice and Delinquency Prevention ("OJJDP" or "Office") in the Department "to award, administer, modify, extend, terminate, monitor, evaluate, reject, or deny" grants to enhance juvenile justice and prevent delinquency.  34 U.S.C. § 11111(b).  The Act expressly authorizes a wide variety of grant programs, all with differing statutory parameters and statutory requirements; for example:

- "[G]rants to States and units of local government . . . for the development of more effective education, training, research, prevention, diversion, treatment, and rehabilitation programs in the area of juvenile delinquency and

---

appropriations line-item may not include the immigration-related conditions challenged in this litigation.

programs . . . ." *id.* § 11131(a).  The Act includes detailed requirements for the annual allocation of funds under this section and requires an extensive application from a state applicant meeting these requirements.  *See id.* §§ 11132(a), 11133.

- "[G]rants" to conduct "research, demonstration projects, or service programs designed," among many other things, "to educate parents, children, schools, school leaders, teachers, State and local educational agencies, homeless shelters and service providers, and community agencies and organizations in ways to prevent the abduction and sexual exploitation of children." *Id.* § 11294(a)(1).  The Act imposes several "[c]riteria for grants" under this section and requires OJJDP to establish additional "priorities and criteria" by regulation and conduct regular audits.  *See id.* §§ 11295, 11296.

- Grants for units of local government for "delinquency prevention programs for juveniles who have had contact with the juvenile justice system or who are likely to have contact with the juvenile justice system." *Id.* § 11313(a).

Within the limits described by whatever the pertinent statutory parameters and requirements may be, the Department has discretion to fashion each grant program, as funds may be appropriated for them from year to year.  *See*, *e.g.*, 34 U.S.C. § 11111(b); 34 U.S.C. § 10102(a)(6); 28 U.S.C. § 530C(a)(4).  Grants authorized under the three specific Juvenile Justice Act provisions that are referred to in the appropriations line-item that is pertinent to this litigation are no different.

Taking those three authorizing provisions *seriatim*:  Section 505 of the Juvenile Justice Act is (or was) simply an "authorization of appropriations" for Fiscal Years 2004 through 2008.  Section 261 of the Act authorizes grants to States, local governments, or private organizations "to carry out projects for the development, testing, and demonstration of promising initiatives and programs for the prevention, control, or reduction of juvenile delinquency," *id.* § 11171(a), and Section 262 of the Act authorizes grants for "technical assistance" to carry out projects under Section

261, *id.* § 11172.  The *only* statutory requirement for grants authorized under Section 261 is that OJJDP "shall ensure that, to the extent reasonable and practicable, such grants are made to achieve an equitable geographical distribution of such projects throughout the United States."  *Id.* § 11171(a).  To be sure, any grant program established under the authority of "section 505" of the Juvenile Justice Act, and "pursuant to sections 261 and 262 thereof" must remain within the limits described by those three statutory provisions, but within those very wide, general parameters, the Department's discretion to fashion the grant program is limited only by the terms of the appropriations act that funds the program.

## ARGUMENT

I.   **The Challenged Requirements in the FY 2018 Gang Suppression Program Are Permissible.**

A.   **The Gang Suppression Requirements Are Authorized by Statute and Do Not Violate the Separation of Powers.**

1.   **The 2018 Appropriations Act Provides Ample and Sufficient Authority for the Challenged Conditions.**

In relation to Plaintiff's *ultra vires* and separation-of-powers challenges, the appropriations line-item under which the FY 2018 Gang Suppression program is funded provides minimal limitations (other than those relating to purposes and indicating what the specific authorizing statutes are) on how the Department awards the grant funds, leaving the agency great discretion in designing the program. Congress appropriated funds, "pursuant to sections 261 and 262" of the Juvenile Justice Act, "for gang and youth violence education, prevention and intervention, and related activities" and "for community-based violence prevention initiatives, including for public health approaches to reducing shootings and violence."  Pub. L. No. 115-141, 132 Stat. 348, 420, 422-23 (2018).  This kind of appropriation allows the Department of Justice to "adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way."  *Lincoln v.*

1   *Vigil*, 508 U.S. 182 (1993).  Thus, ensuring that grantees under the Gang

2   Suppression program transfer criminal aliens to federal immigration authorities upon

3   request rather than releasing them back into the community is well within the

4   Department's authority – particularly given the program's focus on transnational

5   gangs and the common-sense link between apprehension of criminal aliens and

6   combatting transnational gangs.  The authority of the Assistant Attorney General for

7   the Office of Justice Programs to place "special conditions on all grants," 34 U.S.C.

8   § 10102(a)(6), also authorizes these Gang Suppression conditions.  *See also*

9   28 U.S.C. § 530C(a)(4).

10      Plaintiff contends that Congress's inclusion of the words "pursuant to sections

11   261 and 262" limit the Department's discretion and eliminate its authority to impose

12   the challenged requirements.  Pl's Opp. at 4-7.  Those words do not, however, limit the

13   Department's discretion in the ways Plaintiff asserts.  As noted above, the Juvenile

14   Justice Act empowers the Department "to award, administer, modify, extend,

15   terminate, monitor, evaluate, reject, or deny" federal grants for juvenile justice and

16   delinquency prevention.  34 U.S.C. § 11111(b).  The Act authorizes several specific

17   programs, and includes numerous statutory conditions regarding many of them,

18   including requirements regarding the allocation of funds among the States, the content

19   of grant applications, and giving "special consideration" to certain applicants.  *See* 34

20   U.S.C. §§ 11132(a), 11142(a), 11143, 11144(b), 11295, 11313(b), 11313(c).  The

21   appropriations line-item involved here did not, however, incorporate any of those

22   provisions, much less superimpose the Juvenile Justice Act in its entirety onto this

23   singular grant program:  It incorporated, plainly and specifically, *only* "section 505 of

24   the . . . Act," "pursuant to sections 261 and 262 thereof."  132 Stat. at 423.

25      Section 505 of the Act is (or was) nothing but an "authorization of

26   appropriations" for Fiscal Years 2004 through 2008, and sections 261 and 262 of the

27   Act are remarkably devoid of the hard statutory requirements and limitations on the

28   Department's discretion that are found in the statutory authorizations for the myriad

*other* Juvenile Justice Act grant programs.  *See*, *e.g.*, 34 U.S.C. §§ 11132(a), 11142(a), 11143, 11144(b), 11295, 11313(b), 11313(c).  Section 261 contemplates "promising initiatives" – a reflection of its indefinite scope and its divergence from the other specific grant programs authorized under the Juvenile Justice Act.  The only specific requirement imposed by the program's authorizing statutory provisions is that OJJDP "shall ensure that, to the extent reasonable and practicable, such grants are made to achieve an equitable geographical distribution of such projects throughout the United States."  *Id*. § 11171(a).  The Act establishes no other conditions or requirements for grants pursuant to Sections 261 and 262, leaving the Department to determine those requirements.[2]  *See*, *e.g.*, 28 U.S.C. § 530C(a) ("Except to the extent provided otherwise by law, the activities of the Department of Justice (including any bureau, office, board, division, commission, subdivision, unit, or other component thereof) may, in the reasonable discretion of the Attorney General, be carried out through any means, including . . . through . . . grants . . . with non-Federal parties.").  Thus, except as provided in Sections 505, 261, and 262 (which the Department has fully satisfied), the Department may determine how to implement Congress's directive to establish a program "for gang and youth violence education, prevention and intervention, and related activities" and for "community-based violence prevention initiatives."  132 Stat. at 422-23.

## 2.  The Challenged Conditions are also Authorized under the Juvenile Justice Act.

While the foregoing is sufficient to establish the Department's authority in this matter, the challenged conditions are also justified under the purposes of the Juvenile

---

[2] To the extent that Section 263 of the Act is even applicable, it provides that, "[t]o be eligible to receive a grant made under [the part of the Juvenile Justice Act that contains Sections 261 and 262, an entity] shall submit an application . . . at such time, in such form, and containing such information as [OJJDP] may reasonably require by rule" – an indication that *the Office* is to determine "eligibility," within the limits otherwise specified by statute.  *Id*. § 11173.

Justice Act, contrary to the Plaintiff's argument. *See* Pl's Opp. at 12-14. The statutorily enacted purposes of the Juvenile Justice Act include "support[ing] State and local programs that prevent juvenile involvement in delinquent behavior," and to "assist State and local governments in promoting public safety by encouraging accountability for acts of juvenile delinquency." 34 U.S.C. §§ 11102(1)-(2). The challenged conditions fit comfortably within either of these purposes under the Juvenile Justice Act. The Department's conditions are intended to "prevent juvenile involvement in delinquent behavior" by targeting transnational gangs that frequently prey on juveniles. When a member of a transnational gang is deported, that is one less gang member to intimidate, recruit, or blackmail a juvenile into gang life. And the conditions promote public safety by attacking one particular source of juvenile delinquency: deportable members of transnational gangs. As the Ninth Circuit has recognized, the Department's "understanding that illegal immigration presents a public safety issue" is eminently reasonable. *City of Los Angeles v. Barr*, 929 F.3d 1163, 1178 (9th Cir. 2019).[3]

### B. The Gang Suppression Requirements Are Consistent with the Spending Clause.

Under the Spending Clause, conditions on federal spending must bear "some

---

[3] Plaintiff invites this Court to ignore this recent decision by the Ninth Circuit and attempts to distinguish it away with arguments on "conditions" versus "consideration factors" (Pl.'s Opp. at 3) and on the fact that the COPS grant program is authorized under a different, more detailed statute. *See id.* at 9. The "conditions versus consideration factors" is a distinction without a difference. The Ninth Circuit approved the use of similar immigration requirements in a competitive, discretionary grant program – requirements that could determine whether a particular applicant succeeds or fails. *See City of Los Angeles*, 929 F.3d at 1171-72, 1179. And the fact that a different, but more detailed, authorizing statute was at issue cuts in favor of the Department. In *City of Los Angeles*, the authorizing statute (the Violent Crime Control and Law Enforcement Act) set forth a framework to direct the issuance of the COPS grant. *See id.* at 1169; 34 U.S.C. §§ 10381-10389. In contrast, here the 2018 Appropriations Act provides much less restriction on the Department's discretion and authority. *See* 132 Stat. at 422-23.

relationship" to the purpose of the spending, *New York v. United States*, 505 U.S. 144, 167 (1992), and the conditions must be stated so as to enable the recipients "to exercise their choice knowingly, cognizant of the consequences of their participation." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987).  The Gang Suppression program seeks to reduce gang activity and gang violence, especially by transnational gangs, and the challenged award requirements ensure that federal authorities can take custody of criminal aliens,[4] including those who may be members of transnational gangs.  Also, the requirements include definitions and Rules of Construction that make clear what is and is not required.

In arguing to the contrary, Plaintiff demands a relationship between the challenged award requirements and the overall goals of the Juvenile Justice Act. Pl's Opp. at 20-23.  As explained earlier, however, the appropriations line-item under which the Gang Suppression program is funded does not incorporate the *entire* Juvenile Justice Act, but *only* Sections 261 and 262 of the Act.  Section 261 authorizes the Department to make grants "to carry out projects for the development, testing, and demonstration of promising initiatives and programs for the prevention, control, or reduction of juvenile delinquency," and the FY 2018 appropriation provides funds, only somewhat more specifically, "for gang and youth violence education, prevention and intervention, and related activities" and "for community-based violence prevention initiatives."  132 Stat. at 422-23.  Facilitating federal custody of criminal aliens, including members of transnational gangs, clearly furthers the purposes of preventing and controlling juvenile delinquency and preventing gang violence, among other things because taking adult criminal aliens

---

[4] *See*, *e.g.*, 8 U.S.C. § 1325(a) (making a first offense of illegal entry a criminal misdemeanor punishable by six-months imprisonment), 1326 (making illegal re-entry a felony).  In FY 2019, the Department of Justice charged 80,866 defendants with misdemeanor improper entry into the United States and 25,426 defendants with felonious improper re-entry into the United States. https://www.justice.gov/opa/pr/department-justice-prosecuted-record-breaking-number-immigration-related-cases-fiscal-year (last visited: Oct. 25, 2019).

into federal custody diminishes their opportunities to target juveniles for gang recruitment.

The relevant facts further support the connection between immigration enforcement and reducing gang violence. Law enforcement statistics suggest that a high proportion of transnational gang members in the United States are here illegally, and that a high proportion of aliens removed from the country are criminal offenders. *See ICE's 'Operation Raging Bull' nets 267 MS-13 arrests*, https://www.ice.gov/features/raging-bull (stating that out of 214 persons arrested in United States in operation against MS-13, "198 were foreign nationals, of which only five had legal status to be in the U.S.") (last visited Oct. 23, 2019); *MS-13 gang member, Interpol fugitive arrested under Operation Matador removed to El Salvador*, https://www.ice.gov/news/releases/ms-13-gang-member-interpol-fugitive-arrested-under-operation-matador-removed-el (stating that 83% of aliens removed from United States by immigration authorities in FY 2017 had been convicted of a criminal offense) (last visited Oct. 23, 2019).[5] There can be no serious dispute that Los Angeles and the Federal Government share an interest in combating transnational organized crime and promoting public safety.[6] Contrary to Plaintiff's argument, the Spending Clause does not require that the goals of the grant program

---

[5] *See also MS-13 Member Convicted for Gang Murders of Two Teenagers*, https://www.justice.gov/usao-ma/pr/ms-13-member-convicted-gang-murders-two-teenagers (stating that 15 of 16 MS-13 gang members found responsible for murder were in the country illegally) (last visited Oct. 23, 2019); *MS-13 Gang Members Charged in Connection with Murders of Juveniles*, https://www.justice.gov/usao-edva/pr/ms-13-gang-members-charged-connection-murders-juveniles (describing indictment of 11 members and associates of MS-13 in connection with murder of two juveniles) (last visited Oct. 23, 2019).

[6] Statistics establish an extraordinary recidivism rate among state prisoners nationwide, further establishing the reasonableness of tackling one component of that problem – that is, those who are arrested and also may be subject to consideration for removal by an immigration court. *See 5 Out Of 6 State Prisoners Were Arrested Within 9 Years Of Their Release*, https://www.bjs.gov/content/pub/press/18upr9yfup0514pr.cfm (last visited Oct. 23, 2019).

1   expressly rely on the enforcement of immigration law or that the grant program

2   reference the INA.  The Clause only requires "some relationship" between the

3   challenged conditions and the spending program involved, and the Gang

4   Suppression requirements challenged here easily satisfy that standard.  *New York*,

5   505 U.S. at 167.

6        In arguing that the challenged requirements are ambiguous, Plaintiff appears

7   to require the Department to "specifically identify and proscribe in advance every

8   conceivable [City] action that would be improper," which the Spending Clause does

9   not require.  *See Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004).  The

10  challenged requirements are set forth at some length, with definitions and Rules of

11  Construction as needed.  Moreover, the requirements reasonably contemplate

12  familiarity with and understanding of federal law, and a lack of such understanding

13  on the part of a grant applicant does not make the requirements unconstitutionally

14  ambiguous.  In that regard, the Plaintiff here complains that the public-disclosure

15  requirement "casts a much wider net" than contemplated by 8 U.S.C. § 1324, Pl's

16  Opp. at 15-16; Section 1324 does not, however, contemplate public disclosures.

17  Rather, the public-disclosure requirement clearly prohibits "public disclosure [of]

18  federal law enforcement information in a direct or indirect attempt to conceal,

19  harbor, or shield from detection any fugitive from justice under [federal criminal

20  law], or any alien who has come to, entered, or remains in the United States in

21  violation of [federal immigration law]."  This language is reasonably clear.  Indeed,

22  the State of California's own laws use most of the operative terms of this

23  requirement.  *See, e.g*., Cal. Penal Code § 32 ("Every person who, after a felony has

24  been committed, harbors, conceals or aids a principal in such felony, with the intent

25  that said principal may avoid or escape from arrest, trial, conviction or punishment,

26  . . .  is an accessory to such felony."); Cal. Health & Safety Code § 1367.02(b) ("The

27  director shall not publicly disclose any information submitted pursuant to this

28  section that is determined by the director to be confidential pursuant to state law.");

10

Cal. Bus. & Prof. Code § 16801 ("Any person who attempts, directly or indirectly, to enforce any such rule, regulation, or by-law, is guilty of a misdemeanor and subject to the penalties prescribed in this chapter.").

### C. The Gang Suppression Requirements are Consistent with the Tenth Amendment.

Plaintiff's Tenth Amendment challenge to the Gang Suppression requirements is without merit because the grant is *voluntary*.  It is difficult to fathom how such a voluntary grant program impermissibly commandeers local officials after those local officials deliberately ponder and then accept the conditions.  The City is free to decline the funds if it does not wish to comply with the conditions, making a Tenth Amendment inquiry inapt.

Additionally, the requirements do not compel recipients to administer a federal program, contrary to Plaintiff's assertion.  *See* Pl's Opp. at 19-20.  Those requirements merely ensure that state and local law enforcement agencies receiving federal law enforcement funds *do not impede* the *Federal Government's* identification and apprehension of criminal aliens; the requirements do not to any degree transfer the administration of that "program" to grant recipients.

Plaintiff's contentions to the contrary notwithstanding, this case also cannot properly be analogized to *Murphy v. NCAA*, 138 S. Ct. 1461 (2018).  Pl's Opp. at 20.  The statute at issue in *Murphy* – the Professional Amateur Sports Protection Act of 1992 ("PASPA") – made it "unlawful" for States to authorize any "betting, gambling, or wagering scheme based . . . on competitive sporting events."  138 S. Ct. at 1470.  The Court found that PASPA was a clear effort to avoid accountability by requiring the States to regulate sports betting in the manner Congress wished.  *See id.* at 1477.  The Gang Suppression award requirements challenged here, in contrast, support a regulatory scheme – the identification and apprehension of criminal aliens – over which the Federal Government retains full responsibility and accountability for its actions.  And because this is a grant program subject to

11

Spending Clause limits, not Tenth Amendment limits, *Murphy* does not apply to these conditions.

## II.    The Challenged Requirements Are Consistent with the Administrative Procedure Act.

As for Plaintiff's claims under the Administrative Procedure Act ("APA"), "agency determinations related to how to best use appropriated funds are presumptively unreviewable," even if the appropriation refers to a specific program. *See Policy & Research, LLC v. HHS*, 313 F. Supp. 3d 62, 75 (D.D.C. 2018). Here, Congress appropriated funds for very general purposes not related to any established program, "pursuant to" a statute authorizing the Department of Justice to grant funds for unspecified "promising initiatives." 34 U.S.C. § 11171(a). Aside from the legislative directive to seek "an equitable geographical distribution" "to the extent reasonable and practicable," the creation of a program to implement those appropriations was within the agency's discretion.

The challenged grant requirements in the Gang Suppression program are "entirely rational." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 517 (2009). In arguing to the contrary, Los Angeles glaringly fails to address an eminently salient fact showing the need for the public-disclosure condition: an elected official in California recently disclosed on Twitter and Facebook an impending federal law enforcement operation to apprehend suspected illegal aliens. *See* Admin. Record AR01038-39. More than establishing the "entire sense" of the challenge condition, *Fox Television*, 556 U.S. at 521, that actual betrayal of law enforcement confidentiality and safety suggests that *not* adopting such a condition may have been unreasonable.

## III.    Any Injunction Should Be Limited to Los Angeles.

Lastly, Plaintiff persists in seeking a "program-wide" injunction. Pl's Opp. at 26-27. Yet, Plaintiff fails to explain why it needs a program-wide injunction to be made whole. Such a "program-wide" injunction would be, in reality, nation-wide in

scope.  Indeed, the court in a case regarding the FY 2017 Byrne JAG conditions initially entered nationwide relief, *City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 951 (N.D. Ill. 2017), but the court of appeals, *en banc*, later vacated that aspect of the order.  *City of Chicago v. Sessions*, No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018).  And, in a growing body of case law, the Ninth Circuit is routinely vacating overbroad injunctions that go beyond remedying the actual plaintiff before the court.  *See, e.g.*, *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018); *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1244-45 (9th Cir. 2018); *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 665 (9th Cir. 2011).

### A. Article III Requirements Preclude an Injunction that Extends Beyond Redressing Plaintiff's Injury.

To establish Article III standing, a plaintiff "must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006). "[S]tanding is not dispensed in gross," and the plaintiff must establish standing "separately for each form of relief sought."  *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017); *see also Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally.").  As the Ninth Circuit has recognized, "our legal system does not automatically grant individual plaintiffs standing to act on behalf of all citizens similarly situated."  *Zepeda v. U.S. Immigration & Naturalization Serv.*, 753 F.2d 719, 730 n.1 (9th Cir. 1983).

The Supreme Court recently reaffirmed these principles in *Gill v. Whitford*, 138 S. Ct. 1916 (2018), concluding that a set of voters had not demonstrated standing to challenge alleged statewide partisan gerrymandering of Wisconsin legislative districts.  The Court concluded that a "plaintiff's remedy must be 'limited to the inadequacy that produced [his] injury in fact,'" and that a voter's "harm [from

13

the dilution of [his] vote[] . . . is district specific" because it "results from the boundaries of the particular district in which he resides." *Id.* at 1930 (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)).  Accordingly, the Court held that "the remedy that is proper and sufficient lies in the revision of the boundaries of the individual's own district," not the broader remedy of "restructuring all of the State's legislative districts." *Id.* at 1930-31.  And the Court "caution[ed]" that "'standing is not dispensed in gross': A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Id.* at 1934 (quoting *Cuno*, 547 U.S. at 353).

Likewise, in *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), the Supreme Court held that the plaintiffs lacked standing to challenge Forest Service regulations after the parties had resolved the controversy regarding the application of the regulations to the project that had caused the plaintiffs' alleged injury.  Noting that the plaintiffs' "injury in fact with regard to that project ha[d] been remedied," *id.* at 494, the Court held that to allow the plaintiffs to challenge the regulations "apart from any concrete application that threatens imminent harm to [their] interests" would "fly in the face of Article III's injury-in-fact requirement." *Id*.

### B. Traditional Equitable Principles Preclude an Injunction That Extends Beyond Redressing Plaintiff's Injury.

Even apart from Article III's jurisdictional constraints, injunctions that go beyond a plaintiff's own injuries exceed the power of a court sitting in equity.  At least three equitable principles cut against the Plaintiff's requested relief.

*First*, the "Supreme Court has cautioned that 'injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs' before the Court." *Los Angeles Haven Hospice*, 638 F.3d at, 664 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).  In that case, the Ninth Circuit agreed with the district court that an HHS regulation was facially invalid, but nonetheless vacated an injunction insofar as it barred that agency from enforcing the regulation against entities other than the plaintiff.  The Ninth Circuit recognized that

14

1  relief benefitting parties not before the court is authorized only "if such broad relief
2  is necessary to give prevailing parties the relief to which they are entitled." 638 F.3d
3  at 664 (citing *Bresgal v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir. 1987)).

4  　　*Second*, nationwide injunctions "take a toll on the federal court system—
5  preventing legal questions from percolating through the federal courts, encouraging
6  forum shopping, and making every case a national emergency for the courts and for
7  the Executive Branch." *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J.,
8  concurring).

9  　　*Finally*, issuing injunctions that provide relief to non-parties subverts the
10  class-action mechanism provided under the Federal Rules of Civil Procedure.  The
11  Ninth Circuit has recognized the "elementary principle" that in the absence of class
12  certification, plaintiffs are "not entitled to relief for people whom they do not
13  represent." *Zepeda*, 753 F.2d at 730 n.1.  Were it otherwise, any individual plaintiff
14  "could merely file an individual suit as a pseudo-private attorney general and enjoin
15  the government in all cases." *Id.*  The availability of nationwide injunctions without
16  class certification creates a fundamentally inequitable asymmetry, whereby non-
17  parties can claim the benefit of a single favorable ruling, but are not bound by a loss.
18  If a plaintiff prevails, the court issues the relief that might have been appropriate had
19  it certified a class of all grant applicants; but if the federal government prevails, it
20  gains none of the benefits of prevailing in a class action.

21  ## CONCLUSION

22  　　For these reasons and for those stated in defendants' opening memorandum,
23  the Court should reject all of Plaintiff's claims regarding the FY 2018 Gang
24  Suppression program.

25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

NICOLA T. HANNA
United States Attorney

BRIGHAM J. BOWEN
Assistant Branch Director

/s/ Daniel D. Mauler
DANIEL D. MAULER
(Va.  Bar No.: 73190)
Trial Attorney
U.S. Department of Justice
Civil Division - Federal Programs Branch
1100 L Street, NW
Washington, D.C.  20005
Telephone: (202) 202-616-0773
Facsimile:  (202) 616-8470
E-mail:     dan.mauler@usdoj.gov

COUNSEL FOR DEFENDANTS